# UNITED STATES DISTRICT COURT

# DISTRICT OF MARYLAND

| | |
|---|---|
| Nathan Connolly and Shani Mott,<br><br>Plaintiffs,<br><br>v.<br><br>Shane Lanham, 20/20 Valuations, LLC, and loanDepot.com, LLC,<br><br>Defendants. | Civil Action No. |

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.      Plaintiffs Dr. Nathan Connolly and Dr. Shani Mott bring this action for damages, injunctive relief, and declaratory relief against Defendants Shane Lanham, 20/20 Valuations, LLC, and loanDepot.com, LLC ("loanDepot"), to seek redress for violations of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and Maryland Fair Housing Laws, Md. Code, State Gov't § 20-702 *et seq.*

2.      Defendants Lanham and 20/20 Valuations discriminated against Plaintiffs by dramatically undervaluing their home in an appraisal because of Plaintiffs' race and their home's location adjacent to a Black census block, notwithstanding that it is also located within Homeland, an affluent, mostly white neighborhood. Defendant loanDepot discriminated against Plaintiffs by knowingly relying on that appraisal to deny Plaintiffs a refinance loan and retaliating when Plaintiffs explained why the appraisal was discriminatory.

3.      Homeland is a historic neighborhood in Baltimore. It is predominantly white. Plaintiffs bought a four-bedroom, 2600 square foot single-family detached house in Homeland and moved there in 2017. They are professors at Johns Hopkins University. Both are Black.

4.      Plaintiffs applied to Defendant loanDepot in mid-2021 to refinance their existing mortgage debt and take advantage of historically low interest rates. loanDepot approved their application for a loan with a 2.25% interest rate, subject to confirming the $550,000 estimated value of the home with a formal appraisal. loanDepot's loan officer wrote to Plaintiffs that "we should be good" because the estimated value was "pretty conservative."

5.      loanDepot contracted with Defendant Shane Lanham's company, Defendant 20/20 Valuations, for the appraisal.

6.     Lanham conducted the appraisal, which was inconsistent with professional appraisal standards in many ways. He improperly limited his search for comparable recently-sold properties to a very small portion of Homeland, north of Northern Parkway (and, still, chose a comparable from outside the neighborhood boundary); failed to consider houses throughout Homeland, both north and south of Northern Parkway, that were more similar to Plaintiffs' house than ones he used for his valuation; made excessive downward adjustments to the sales prices of the houses he used; failed to make appropriate upward adjustments to reflect features those houses lacked but that Plaintiffs' house has; and failed to account for substantial improvements Plaintiffs made to their home in 2020. Lanham also questioned whether Plaintiffs were legitimate residents of Homeland by asking if they paid dues to the Homeland Association.

7.     Lanham appraised Plaintiffs' home for only $472,000, over $75,000 below the loan officer's "conservative" estimate of value. Defendant loanDepot denied Plaintiffs' loan application because of the low valuation.

8.     Plaintiffs were shocked at the appraisal and recognized that the low valuation was because of racial discrimination. They told this to their loanDepot loan officer and challenged the appraisal in a detailed letter.

9.     loanDepot maintained its application denial and did not provide any substantive response to Plaintiffs' communications about the discriminatory and flawed nature of the appraisal. Instead, the loan officer stopped responding to Plaintiffs' phone calls.

10.    Plaintiffs applied to another lender in early 2022 to refinance their mortgage debt. This time they "whitewashed" the house prior to the appraisal, removing the many indicia that a Black family lived there, such as family photos and their children's drawings of Black people, and replacing them with items borrowed from white friends. Plaintiffs enlisted a white colleague

to be present when the appraiser came and stayed away from the house themselves.

11. The home appraised for $750,000. Plaintiffs obtained their refinance loan on that basis, but at a higher interest rate than they would have received from loanDepot.

12. Defendant Lanham's dramatically lower valuation reflected his beliefs that a Black family did not genuinely belong in Homeland and could not be the owners of a higher-valued home, and also that their home was less valuable because it was at the edge of an area with a predominantly Black population. Lanham violated professional standards to devalue Plaintiffs' home because of these racist beliefs. Defendant loanDepot relied on Lanham's appraisal despite being informed that it was infected by discrimination and stopped answering or returning Plaintiffs calls once they challenged the appraisal on that basis.

13. Defendants' actions reflect intentional racial discrimination and retaliation against Plaintiffs for identifying those actions as discriminatory. Defendants' actions have caused financial and emotional injury to Plaintiffs for which they seek declaratory and injunctive relief and compensatory and punitive damages.

**PARTIES**

14. Plaintiffs Dr. Nathan Connolly and Dr. Shani Mott live in the historic Homeland neighborhood of Baltimore and own their home at 209 Churchwardens Road. They have been married since 2005 and have three children, aged fifteen, twelve, and nine. Dr. Connolly and Dr. Mott are both Black.

15. Dr. Connolly and Dr. Mott are professors at Johns Hopkins University. Dr. Connolly's scholarship focuses primarily on issues of racism, capitalism, politics, cities, and migration in the late nineteenth and twentieth centuries. Dr. Mott's scholarship focuses primarily on twentieth century African-American and American literature and history.

16.     Defendant Shane Lanham is licensed as a Certified Residential Real Estate Appraiser by the state of Maryland. He is the Managing Member, Resident Agent, and, upon information and belief, sole owner of Defendant 20/20 Valuations, LLC. Defendant Lanham personally conducted the discriminatory appraisal at issue in this case in his capacity as Managing Member and owner of 20/20 Valuations.

17.     Defendant 20/20 Valuations, LLC is a real estate appraisal company incorporated in the state of Maryland, with its principal office at 2936 Edgewood Avenue, Parkville, Maryland 21234.

18.     Defendant loanDepot.com, LLC is a digitally-based retail residential mortgage lender incorporated in the state of Delaware, with its principal office at 3355 Michelson Drive, Suite 300, Irvine, California, 92612. loanDepot is registered with the State of Maryland Department of Assessments and Taxation.

19.     loanDepot is owned by LD Holdings Group, LLC, which is in turn owned by loanDepot, Inc., a public company traded on the New York Stock Exchange under the symbol LDI. loanDepot, Inc. is a holding company with no operations of its own. It describes itself as "the third largest overall retail originator" of mortgage loans. It states that it originated $137 billion in mortgage loans in 2021, with a net income of $623.1 million.

20.     loanDepot, Inc. acknowledges in SEC filings that its business is subject to laws that "regulate the method by which appraisals are ordered and reviewed and [its] interaction with appraisers."

21.     In acting or failing to act as alleged herein, each corporate defendant acted through its employees and/or agents and is liable for the acts and omissions of its employees and/or agents.

22.     In acting or failing to act as alleged herein, each employee or officer of each corporate defendant was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by each corporate defendant as principal.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 3613. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants conduct business in or are residents of the District and a substantial part of the events or omissions giving rise to the claims occurred within this District.

## FACTUAL BACKGROUND

**A.  Plaintiffs' Home in the Historic Homeland Neighborhood of Baltimore**

25.     Dr. Connolly, Dr. Mott, and their three children have lived in their current home at 209 Churchwardens Road ("Churchwardens Home") since 2017.

26.     The Churchwardens Home is a fully detached single family house that is 2,600 square feet with 4 bedrooms, 3.5 bathrooms, and a finished basement. It is located in the historic Homeland district of Baltimore City ("Homeland").

27.     Homeland is a small neighborhood in the northern part of Baltimore City, bounded generally by Homeland Avenue on the south, Charles Street on the West, Melrose Avenue on the North, and Bellona Avenue and York Road on the east. It also includes a "west parcel" of houses north of the Cathedral of Mary Our Queen and south of Northern Parkway. Homeland's total area is only 0.6 square miles.

28.     The following map shows the location of Homeland in Baltimore City:



*Figure 1: Homeland Historic District in Baltimore City*

29.     Homeland was planned and designed by the Roland Park Company with the help of the Olmstead company, which also designed New York City's Central Park. The neighborhood is on the National Park Service's National Register of Historic Places.

30.     Homeland is a majority white[1] neighborhood, with a relatively small percentage of Black people. According to 2020 census data, its population is 77.5% white and 9.6% Black.

---

[1] "White" is used herein to indicate non-Hispanic white.

Baltimore City, by contrast, is approximately 58% Black and 28% white. The population of Homeland is approximately 3,120 people.

31.     Of the 82 census blocks in Homeland, only two have significant Black populations and both are partially within and partially outside Homeland. The first, which is majority-Black, is at the northeast corner of Homeland. The second, which is majority-non-white, is also in the northeast corner of Homeland, slightly south of the first. The Churchwardens Home borders the first and is approximately 250 feet from the border of the second.

32.     Additionally, there is one small census block, consisting of twelve people, on the western border of Homeland, just north of Enfield Road, in which approximately half of the population is Black.

33.     The following map shows Homeland and the percentage range of each census block's population that is Black:



*Figure 2: Homeland Black Population Density Map*

34.     Dr. Connolly and Dr. Mott purchased the Churchwardens Home in March of 2017 for $450,000. Plaintiffs financed the purchase with a 30-year mortgage from Prime Lending with a fixed interest rate of 4.65%.

35.     In April 2020, Plaintiffs took out a $30,000 home equity loan. Plaintiffs invested the money from that loan, along with money from their savings, into the Churchwardens Home. They made several improvements to their home between April 2020, when they received the loan, and June 2021, when Defendant Lanham appraised the home. Specifically, Plaintiffs

invested $35,000 to remodel their club room and $5,000 on a tankless water heater. In that time, Plaintiffs also spent significant amounts of money on other repairs and improvements, including $5,000 on window well repair and waterproofing; $8,000 on recessed lighting; and $5,000 in landscaping. This work increased the value of the Churchwardens Home above its pre-improvement value.

**B. Defendant loanDepot Denied Plaintiffs' Refinance Application Because of a Low Appraisal Conducted by Defendant Lanham**

36.     In May 2021, Dr. Connolly and Dr. Mott sought to refinance their loans to take advantage of historically low interest rates. After researching lending options, they submitted an application to Defendant loanDepot to refinance their 2017 mortgage with Prime Lending and their 2020 home equity loan into a new, lower-rate mortgage loan. The 2017 mortgage and 2020 home equity loan had a combined balance of approximately $426,000.

37.     In accordance with the federal Home Mortgage Disclosure Act, the loan application materials asked for Plaintiffs' demographic information (race, ethnicity, and sex). Dr. Connolly and Dr. Mott selected the "Black or African American" box.

38.     Plaintiffs' main contact with Defendant loanDepot was Christian Jorgensen, a Licensed Lending Officer employed by loanDepot. After loanDepot reviewed Plaintiffs' application materials, Jorgensen informed them that they satisfied loanDepot's standards for creditworthiness and were approved for a refinance loan at a 2.25% interest rate, pending appraisal.

39.     Lenders typically require home appraisals before issuing a loan for purchasing a home or refinancing a mortgage as assurance that a property has sufficient value to serve as collateral should the borrower default on the loan.

40.     Jorgensen had submitted Plaintiffs' application to loanDepot's underwriters with an estimated value of $550,000. loanDepot's final approval and the 2.25% interest rate were dependent on an appraisal of the home supporting that valuation. Jorgensen told Plaintiffs that he expected them to "be good" because he had been "pretty conservative on estimated value." That is, Jorgensen believed $550,000 was a conservative estimate of the value of the Churchwardens Home, and that an appraisal would likely reflect an even higher value.

41.     Even without accounting for the improvements that Plaintiffs made to their home, Jorgensen's belief was consistent with housing market trends. Since Plaintiffs had purchased the Churchwardens Home for $450,000 in 2017, average home sale prices in Baltimore had increased by approximately 25%.

42.     Defendant loanDepot hired Defendant Lanham via Defendant 20/20 Valuations to conduct the appraisal of Plaintiffs' home.

43.     On June 14, 2021, Defendant Lanham visited the Churchwardens Home for the appraisal. Dr. Connolly, Dr. Mott, and their children—all of whom are Black—were home during the visit. The home is also decorated with proud markers of the family's Black identity, including family photos, art that the children drew of the family and with other Black subjects, children's books featuring Black characters and addressing themes relating to the Black experience in America, African art, a print of *The Library* by Jacob Lawrence, a poster for the movie *Black Panther*, and more. It would have been obvious to anyone visiting that the home belonged to a Black family.

44.     When Defendant Lanham arrived, his demeanor was indifferent and aloof. Plaintiffs tried to engage with Defendant Lanham to improve the mood, but their efforts were not reciprocated. Lanham did not smile or make eye contact with Plaintiffs and said little other than

11

noting that the home had a tankless water heater. Defendant Lanham's demeanor at their home seemed significantly different to Dr. Mott than it was when she spoke to Defendant Lanham on the telephone to schedule the appraisal, which was prior to when he would have had occasion to see Dr. Connolly and Dr. Mott in person.

45.     Upon completing his visit to the house, Defendant Lanham told Dr. Connolly and Dr. Mott that the appraisal would be ready in the following days. Lanham also told them they should contact their lender if they had any issues with it.

46.     Soon after visiting their home, Defendant Lanham called Plaintiffs to ask if they pay fees to the Homeland Association, the neighborhood organization that enforces Homeland's covenants. All households within Homeland are required to pay such dues, so Defendant Lanham's question betrayed skepticism that their home was actually located within Homeland. Plaintiffs confirmed that they do pay such dues.

47.     About a day later, Plaintiffs and their children drove to Florida for a scheduled family vacation. Prior to taking the trip, Dr. Mott began experiencing significant unexplained health issues and saw her doctors in Baltimore, who ran tests. Her condition deteriorated while they were on the road. She lost more and more of her mobility and her legs swelled so much that Dr. Connolly had to cut open her stretch pants to get them off her legs.

48.     On or about June 19, 2021, while Plaintiffs and their children were still on the road to Florida, Dr. Mott received a telephone call from her doctors in Baltimore, informing her that the tests revealed abnormalities and urging her to seek further evaluation and immediate care. She was eventually diagnosed with stage 4 cancer in the adrenal gland.

49.     Almost immediately after receiving that telephone call, Dr. Connolly and Dr. Mott received a call from Christian Jorgensen at loanDepot. Jorgensen informed them that

Defendant Lanham appraised their home for only $472,000, and that loanDepot would therefore not extend the loan.

50.     Dr. Connolly and Dr. Mott were shocked by this low appraisal. Dr. Mott told Jorgensen that the appraisal was racially discriminatory. Plaintiffs explained that there is a long and well-documented history of devaluing Black homes and that the valuation was impossibly low given the characteristics of their neighborhood and their home.

51.     After a long silence, Jorgensen said Plaintiffs could write a letter to Defendant loanDepot explaining why they believed the appraisal was flawed and gave them a deadline of June 28, 2021, less than ten days, to submit the letter. Dr. Connolly and Dr. Mott eventually learned that loanDepot's policy would have afforded Plaintiffs the right to formally appeal the appraisal and sixty days to do so, but Jorgensen did not tell them this until 2022, by which point that time period had long since expired. Nor did he provide any guidelines for drafting the letter or explain how loanDepot would use or consider it or in what circumstances loanDepot would order a new appraisal.

**C.  Defendant Lanham's Appraisal Was Flawed and Racially Discriminatory**

52.     To appraise Plaintiffs' home, Defendant Lanham used the sales comparison approach. In this common appraisal method, an appraiser assesses the value of a home by identifying recent sales prices of similar homes in the area, called "comparables" or "comps." The rationale underlying this approach is that the sales prices of comparable properties from the same neighborhood from a similar time period are considered the best indicator of value. However, it simultaneously presents significant fair lending risks, as appraisers have broad discretion in selecting comps and establishing neighborhood boundaries, which opens the door for discrimination.

53.     As explained below, Lanham's undervaluation of Plaintiffs' home reflected his belief that, because they are Black, Dr. Connolly and Dr. Mott did not belong in Homeland, an attractive and predominantly white neighborhood. Lanham's undervaluation also reflected his belief that Plaintiffs' home is worth less than other homes in Homeland both because the homeowners are Black and because the home borders the majority Black area in the northeast corner of Homeland. Because of these discriminatory beliefs, Lanham did not follow proper and well-established appraisal standards including searching for and selecting similar homes throughout Homeland to use as comps. Instead, Lanham arbitrarily and without justification restricted the area from which he selected comps, selected ill-suited homes with low values as comps, and further improperly devalued the comps he selected.

a.  ***Defendant Lanham Improperly Limited the Geographic Area from Which He Drew Comparables***

54.     Lanham blatantly violated professional appraisal standards by improperly limiting the geographical area from which he considered properties to compare to the Churchwardens Home. He did not pull comps from throughout Homeland, but instead limited his search to houses north of Northern Parkway. Defendant Lanham thereby limited his search to about 16% of the total land area of Homeland. This excluded over 80 potential comps of the almost 100 available, leaving him to choose from only fifteen. Ultimately, Lanham chose and considered three comps that were north of Northern Parkway (L1, L2, and L3 in the map below), and one of those comps (Comparable #2 or L2 in the map below) was located outside of Homeland proper, in a majority-Black census block.

55.     Lanham identified one comparable south of Northern Parkway in his appraisal report, Comparable #4 (L4 in the map below), but did not use it in calculating the value of the Churchwardens Home. He drew Comparable #4 from the twelve-person majority-Black census

14

block along the western border. In short, when Lanham looked south of Northern Parkway for additional comps, he ignored majority-white areas that made up the overwhelming majority of Homeland and instead took the position that only this tiny majority-Black area was the proper place to look. And even then, he refused to let a house south of Northern Parkway influence his valuation.

56.     The limited geographic area that Lanham considered for comps, and the comps he included in his appraisal report, are indicated on the following map:



*Figure 3: Lanham's Comparables*

57.     Defendant Lanham later claimed that he limited his search to homes north of Northern Parkway because of the Churchwardens Home's location on the corner of Churchwardens Road and Northern Parkway. Despite acknowledging that the area north of Northern Parkway in which the Churchwardens Home is located is "considered Homeland" (indeed, it is a part of Homeland proper), he asserted that "the comps most locationally similar to" the Churchwardens Home are north of Northern Parkway, as opposed to homes located in the "heart of Homeland." This post hoc explanation is inaccurate and clearly pretextual. There is no difference between the areas within Homeland north and south of Northern Parkway and the Churchwardens Home is more "locationally similar"—closer and in the same historic neighborhood—to many homes south of Northern Parkway than to homes north of Northern Parkway chosen as comparables by Lanham. In any event, such fragmenting of a well-defined historic area is not an appropriate appraisal practice without adequate justification.

58.     Instead, Defendant Lanham's decision to geographically limit the area from which he selected comparable sales reflected his belief that, because of their race, Dr. Connolly and Dr. Mott did not belong in Homeland, an attractive and predominantly white neighborhood, and that a home with Black homeowners located adjacent to a predominantly Black area is worth less than if it were in the whiter areas that he deemed "the heart" of Homeland. This is the real and discriminatory reason Lanham refused to compare Plaintiffs' home to any from most of Homeland.

59.     Lanham's actions and pretextual explanation are consistent with a recognized discriminatory appraisal practice: devaluing homes in Black or Latino areas by circumscribing the geographic area from which comparables are chosen more narrowly when appraising homes in Black or Latino neighborhoods than when appraising homes in white neighborhoods. This

reflects a discriminatory belief that homes in neighborhoods of color should only be compared to other homes in neighborhoods of color and are not worthy of comparison to homes in white neighborhoods.

### b. *Defendant Lanham Unjustifiably Selected Invalid, Low Priced Comparables*

60. Defendant Lanham's illegitimate geographic distinction facilitated his selection of lower-valued comps. It artificially and significantly shrunk the pool of available homes from which he could draw comparables, as discussed above. But Lanham then made his discriminatory treatment of Plaintiffs even worse by inappropriately choosing comps in the area north of Northern Parkway that were lower priced, while ignoring similar, higher-priced homes, thus further depressing the ultimate valuation of the Churchwardens Home.

61. Lanham selected and used three comparables to value Plaintiffs' home. His choices were not suitable as comparables for the Churchwardens Home. For example, as Comparable #1, Lanham chose a home on the edge of Homeland that sold for $435,000. The listing for this house stated that parts of it "need some TLC and the price reflects this," and that the home has "great bones." Plainly, this home was a fixer-upper, not a finished home in excellent condition like the Churchwardens Home. For Comparable #2, Lanham chose a home that is not within Homeland at all.

62. At the same time, Defendant Lanham ignored legitimately comparable homes with much higher sale prices close to the Churchwardens Home. These include (but are not limited to) similarly sized homes that had recently sold for $655,000, $673,000, $679,000, and $785,000. These homes are all between 0.2 and 0.4 miles—within blocks—of the Churchwardens Home, and the latter two are also north of Northern Parkway.

63.     Defendant Lanham's treatment of Comparable #4 illustrates the extent to which his appraisal of Dr. Connolly and Dr. Mott's home was calculated to depress the value of their home rather than accurately assess its value. As noted above, Lanham identified Comparable #4 in his report—a home south of Northern Parkway that was listed for sale at $650,000 at the time—but did not use it in valuing the Churchwardens Home. Later, after Plaintiffs objected to the appraisal, Lanham purported to explain his decision to not consider Comp 4 in calculating the value of the Churchwardens Home by stating, without support, that Comp 4 was "overpriced." The home sold months later for $680,000, $30,000 above the asking price.

####     c.  *Lanham Further Depressed His Valuation of the Plaintiffs' Home Through the Improper Use of Adjustments*

64.     Having improperly limited the geographic scope of his search and then unjustifiably cherry-picked low-value homes as comps, Defendant Lanham further depressed his valuation of the Churchwardens Home via the improper use of price adjustments.

65.     Appraisers may adjust the value of comparables to account for differences in value associated with features not shared between the subject home and comparables. For example, an appraiser may adjust the sales price of a comp upward if the subject home has more bathrooms than the comp or downward if it has fewer bathrooms (the rationale being that the houses are otherwise similar, but the likely sales price of one will be higher if it has additional bathrooms).

66.     Lanham made unjustifiably large negative adjustments to the sales prices of comps. He also failed to make sufficient adjustments to account for positive aspects of the Churchwardens Home not shared by the comps.

67.     Lanham subtracted $50,000 from the sales prices of Comparable #2 and Comparable #3, the only comparables he considered with sales prices over $500,000. His

explanation was that Plaintiffs' home is located at the corner of Churchwardens Road and a busy street, Northern Parkway. Lanham's appraisal report stated that "[b]ased on historical paired sales analysis the discount in price to a house on a busy road is approximately 10%." He did not provide any independent support for that assertion, and it is inaccurate. While it is acceptable to adjust the value of a comparable downward if the subject of the appraisal is located on a busy road and the comparable is not, a negative adjustment of ten percent is excessive and is inconsistent with proper appraisal practices.

68.    Similarly, Lanham subtracted an additional $5,000 in value from Comparable #2 and $20,000 from Comparable #3 due to "quality of construction," despite the fact that he gave those comps and the Churchwardens Home the same score for quality of construction.

69.    Conversely, Lanham did not assign positive credit for the improvements Plaintiffs made to the Churchwardens Home and incorrectly stated that there had been no updates to the home in the previous fifteen years. He also gave Plaintiffs insufficient credit for finished rooms below grade (including the basement/club room into which Plaintiffs invested $35,000) and a porch and balcony that the Churchwardens Home had but the comparables did not, issuing only $1,250 to $5,000 for the former and $4,000 for the latter. This is less than the industry standard.

70.    The chart below summarizes the comparables on which Lanham relied in his report:

|  | Comparable #1 | Comparable #2 | Comparable #3 | Comparable #4 |
|---|---|---|---|---|
| **Address** | 102 E. Northern Pkwy | 5606 Purlington Way | 5604 Saint Albans Way | 5113 N. Charles Street |
| **Price** | $435,000 (sale) | $530,000 (sale) | $545,000 (sale) | $650,000 (listing) |
| **Illegitimate Negative Price Adjustments** | n/a | $50,000 deduction for "busy road"<br><br>$5,000 deduction for "quality of construction" | $50,000 deduction for "busy road"<br><br>$20,000 deduction for "quality of construction" | n/a |
| **Other** | Fixer-upper | Not within Homeland |  | Not used in valuation |

\*   \*   \*

71.     There is no race-neutral or legitimate business justification for Defendant Lanham's decisions in appraising Plaintiffs' home. Defendant Lanham significantly underappraised the Churchwardens Home because of discrimination against Plaintiffs. Specifically, he did so because they are a Black couple in a generally white neighborhood, and because their home is adjacent to a majority Black area. This discrimination is apparent based on Lanham's actions and demeanor in dealing with Dr. Connolly and Dr. Mott; his refusal to compare the Churchwardens Home to others south of Northern Parkway in the whiter "heart of Homeland," as he called it, in contravention of proper appraisal standards (as well as his related decision to choose a home that is not actually in Homeland as a comparable); his failure to consider as comparables homes in Homeland north and south of Northern Parkway that were in fact similar to the Churchwardens Home; his excessive downward adjustments to the homes he selected as comparables; and his failure to make appropriate upward adjustments based on the condition and features of the Churchwardens Home.

### D.  Defendant loanDepot Knowingly Relied on Lanham's Discriminatory Appraisal and Retaliated Against Plaintiffs

72.     After their June 19, 2021, telephone call in which Defendant loanDepot's loan officer Christian Jorgensen informed Plaintiffs of Lanham's low appraisal and Plaintiffs

protested that it was because of racial discrimination, Jorgensen's demeanor toward Dr. Connolly and Dr. Mott changed. Previously Jorgensen was friendly, responsive, and proactive in providing information related to Plaintiffs' loan application. But after that call, he became unhelpful and consistently acted to maintain loanDepot's rejection of the loan application based on Defendant Lanham's appraisal. He did so notwithstanding his own recognition that the appraisal dramatically undervalued the house, evident from Jorgensen's prior statement that $550,000 was a "conservative" estimate of its value. Jorgensen also began to avoid Plaintiffs' telephone calls and they were unable to speak to him directly for months. By that point loanDepot had long ago rejected their application and Plaintiffs had secured a loan with another lender.

73.     Until it was too late, Jorgensen never informed Plaintiffs that under loanDepot's policies, they had sixty days to formally appeal the appraisal. When Dr. Connolly and Dr. Mott told Jorgensen that the appraisal was infected by racial bias, Jorgensen merely told them that they could write a letter to loanDepot explaining why they believed the appraisal was flawed. He gave them an arbitrary and excessively tight deadline of less than ten days to submit the letter. He did not provide guidelines for drafting it nor did he explain how it would be used or considered.

74.     Dr. Connolly and Dr. Mott completed and submitted the letter by Jorgensen's arbitrary deadline, despite having to research and write it while dealing with Dr. Mott's medical issues in Florida and arranging an early return to Baltimore for further medical evaluation and treatment. While the additional burden of having to prepare the letter was difficult for Plaintiffs, they nonetheless decided to make the sacrifices necessary to prepare the letter because they determined that it was important to stand up in the face of racial discrimination.

75.    Plaintiffs' letter was detailed and comprehensive. They pointed out numerous deficiencies in Defendant Lanham's appraisal that resulted in a significantly and unjustifiably depressed valuation of their home. For example, they noted that Defendant Lanham's valuation did not adequately reflect the improvements Plaintiffs made to the home since 2020 and that his chosen comparable properties were inappropriate. Plaintiffs provided a list other Homeland comparables that were more appropriate or at least illustrated the impropriety of Lanham's chosen comparables. Plaintiffs' list included similarly sized homes in the same neighborhood that were sold within the past five months with sales prices from $630,000 to $755,000.

76.    Dr. Connolly and Dr. Mott received no response from Jorgensen after they submitted the letter to Defendant loanDepot. The only response they received from loanDepot was what appeared to be an automated e-mail informing them that two new documents had been uploaded to their customer portal.

77.    One document was another copy of Defendant Lanham's appraisal report, with a few additional paragraphs from Lanham purporting to rebut Plaintiffs' letter, but not engaging substantively with the concerns raised therein. For example, Lanham acknowledged that he "should have" noted some improvements to Plaintiffs' home but attempted to downplay his failure to recognize the improvements by claiming, inaccurately and without evidence, that he could not determine their contributory value, that they were unlikely to add meaningful value to the home, and that the comparables might have similar upgrades. These defenses are factually inaccurate and inconsistent with standard appraisal practice: appraisers regularly determine the value of improvements, determine whether comparables have similar improvements, and adjust valuations accordingly.

78.     Defendant Lanham similarly attempted to dismiss the alternative comps identified by Dr. Connolly and Dr. Mott, in part because all were south of Northern Parkway. He stated that his "priority was location" in picking comparables, but that excuse fails even on its own terms: he offered no explanation for ignoring suitably comparable Homeland houses located north of Northern Parkway that were valued higher than—and located closer to the Churchwardens Home than—the comparables he chose.

79.     Defendant Lanham's attempt to defend his $472,000 appraisal of the Churchwardens Home was clearly pretextual. His assertions were unsupported by evidence, based on unfounded assumptions, and inconsistent with regular appraisal practice.

80.     The second document in Plaintiffs' customer portal was a letter from Defendant loanDepot formally informing Plaintiffs that loanDepot was denying Plaintiffs' loan as a result of Defendant Lanham's appraisal. The letter failed to acknowledge that Plaintiffs had conveyed to loanDepot their belief that Lanham's appraisal was unjustifiably low and racially discriminatory. It stated that loanDepot's decision was final and contained no indication that Plaintiffs could appeal the decision or seek a second appraisal.

81.     In other words, Dr. Connolly and Dr. Mott complained to loanDepot that the appraisal was discriminatory and then loanDepot sent Plaintiffs a letter denying the loan because of the appraisal and did so without engaging in any way with Plaintiffs about their complaint. This was an extraordinary departure from sound practice in the lending industry regarding the handling of complaints of discrimination. loanDepot thus retaliated against Plaintiffs for exercising their fair housing rights.

82.     Despite many attempts, Dr. Connolly and Dr. Mott were unable to speak to loanDepot's Christian Jorgensen again until February 2022, after they had already secured a loan

from another lender. They called him to request copies of the documents that were in their

loanDepot customer portal, which they could no longer access. Upon answering the telephone

and realizing that he was speaking to Dr. Connolly and Dr. Mott (and before Plaintiffs even

explained why they were calling) Jorgensen immediately told Plaintiffs that their 60-day window

for filing an appraisal appeal had passed. This was the first time he ever mentioned such a right

and that they had 60 days to file, which was entirely inconsistent with the rushed timeline that

Jorgensen gave Plaintiffs to prepare their letter to loanDepot in June 2021. Once Plaintiffs

explained why they were calling, Jorgensen told them that he would look into whether he could

get them the documents they sought, but he never provided the documents and never again

responded to their numerous e-mails and telephone calls. Jorgensen's behavior reflects

loanDepot's retaliation against Plaintiffs for exercising their fair housing rights.

### E.  Dr. Connolly and Dr. Mott Conduct a Whitewashing Experiment Demonstrating that Defendant Lanham Dramatically Underappraised Their Home

83.     Plaintiffs did not immediately re-apply for a new loan after being turned down by

Defendant loanDepot, as they were dealing with Dr. Mott's health issues. But in December 2021,

they received a Maryland Department of Assessments and Taxation Notification assessing the

value of the Churchwardens Home at $622,000. After receiving this updated assessment, they

decided to apply for another loan to refinance their two home loans.

84.     Plaintiffs applied for a loan with Swift Home Loans, partnering with Rocket

Mortgage, in early January 2022 and they were again approved pending appraisal. By this time,

however, interest rates were higher than when they were approved by Defendant loanDepot.

Rocket Mortgage approved Plaintiffs for a refinance loan at a 3.23% interest rate, which they

brought down to 2.75% by paying $2,136 (lenders commonly allow customers to lower the rate

on a loan by buying "points").

85.     On January 10, 2022, Plaintiffs were contacted by Daniel Ray Dodd of Associate Appraisers to appraise the Churchwardens Home in connection with the Rocket Mortgage application.

86.     Based on their experience with Defendant Lanham and their understanding of the realities of mortgage discrimination, Plaintiffs made the difficult decision to conduct a "whitewashing" experiment on their home prior to Dodd's appraisal.

87.      "Whitewashing" is where a Black homeowner removes markers of Black identity, such as family photographs, from their home and enlists a white person to stand in as the homeowner when an appraiser is present, thereby making it seem to the appraiser that the house is owned by white people. Black homeowners regularly see valuations of their homes increase appreciably under whitewashing experiments. The increased prevalence of whitewashing is responsible for raising awareness of appraisal discrimination.[2]

88.     Plaintiffs removed family photographs and other markers of Black identity from their home and replaced them with family photographs borrowed from white friends and colleagues. They replaced their artwork with items signifying whiteness, such as a vintage print featuring a white pin-up model and various stock photographs with white subjects.

89.     Plaintiffs felt embarrassment, humiliation, and anger that they had to carry out this experiment, and Dr. Mott, who was undergoing cancer treatment, suffered physical pain and severe exhaustion from the exertion of whitewashing the home in advance of the appraisal.

90.     Daniel Dodd conducted the appraisal on January 18, 2022. Consistent with their whitewashing experiment, however, Plaintiffs were not home. Instead, a white colleague was there and greeted Dodd. The only other people present were two white men whom Plaintiffs

---

[2] *See, e.g.*, Jonathan Edwards, *A Black Couple Says an Appraiser Lowballed Them. So, They 'Whitewashed' Their Home and Say the Value Shot Up*, Washington Post (Dec. 6, 2021), https://tinyurl.com/mudawt3z.

hired to do some touch-up painting in their kitchen. By all appearances, the Churchwardens Home was owned by white people.

91.     Three days after Dodd visited the whitewashed home, Plaintiffs were notified by a representative of the lender that he had appraised their home for $750,000. That valuation is $278,000 more—and almost 60% higher—than Defendant Lanham's appraisal less than seven months prior.

92.     Plaintiffs made no significant improvements in their home in the interim nor had home prices meaningfully changed since Defendant Lanham's appraisal.

93.     Daniel Dodd's appraisal confirms that Defendant Lanham's appraisal was grossly inconsistent with appraisal guidelines and principles and that his excuses for devaluing the Churchwardens Home were invalid and pretextual.

94.     For example, Dodd identified comparable homes from throughout all of Homeland. Four of his five comps were south of Northern Parkway and one was north of it, demonstrating the illegitimacy of using Northern Parkway as a boundary (let alone of also choosing a comparable outside the neighborhood boundary). The following map identifies the locations of the comps used by Dodd and by Defendant Lanham:



*Figure 4: Comparison of Lanham's Comps and Dodd's Comps*

95.     Dodd also deducted only $15,000 from the comparables not located on a busy road. These homes sold for between $749,000 and $785,000. Defendant Lanham, by contrast, deducted $50,000 in value for that purpose from homes that sold for more than $200,000 less. Dodd's two percent adjustment for a home on a busy road is consistent with industry standards; Lanham's ten percent adjustment is not.

96.     Dodd also credited from $15,000 to $25,000 in Plaintiffs' favor for additional finished rooms below grade, whereas Defendant Lanham only credited $1,250 to $5,000 for those features. Dodd credited Plaintiffs $8,000 for having a balcony and a porch while Defendant Lanham only provided a $4,000 credit for that reason.

**F.  Injury to Plaintiffs**

97.     Plaintiffs' experience is emblematic of systemic appraisal discrimination in the United States. Studies show that there is a measurable and pervasive "appraisal gap," whereby homes located in neighborhoods of color and homes owned by people of color are more likely to be appraised below an agreed upon sales price than are similar homes located in white neighborhoods or owned by white borrowers.[3]

98.     The harm caused by appraisal discrimination to minority families and society at large is staggering. This discrimination prevents people and families of color from being able to purchase homes and access the equity in the homes that they already own, thus preventing them from building generational wealth via home ownership, as so many Americans have done, and contributing to the nation's racial wealth gap.

99.     Plaintiffs have suffered similar harm due to appraisal discrimination caused by Defendants Lanham, 20/20 Valuations, and loanDepot.

100.     Defendants 20/20 Valuations and Lanham intentionally engaged in discriminatory practices in appraising the Churchwardens Home, including by arbitrarily limiting the area from which Lanham drew comparables, then selecting among the least valuable comparables from what remained, and, finally, further depressing the appraisal by making unjustifiable adjustments to value that further devalued the Churchwardens Home.

---

[3] Melissa Narragon, et al., *Racial and Ethnic Valuation Gaps in Home Purchase Appraisals*, Freddie Mac (Sept. 20, 2021), https://www.freddiemac.com/research/insight/20210920-home-appraisals.

101.    Defendant Lanham did so because of his beliefs that Dr. Connolly and Dr. Mott, as a Black couple, could not *really* own a valuable home in Homeland and that their home could not be valuable because it was located at the border of a predominantly Black area at the edge of Homeland.

102.    Defendant Lanham's discrimination prevented Dr. Connolly and Dr. Mott from realizing the benefit of their home's true value and obtaining a loan at the lower rate negotiated with Defendant loanDepot. As a result of Defendant Lanham's discriminatory appraisal and the resultant denial of their loan, Dr. Connolly and Dr. Mott had to expend significant time and effort to re-apply for a new loan and whitewash their home for the appraisal. The loan they ultimately secured from another lender cost more than the one they would have received from loanDepot absent Defendant Lanham's discriminatory appraisal.

103.    Defendant Lanham's actions also caused Dr. Connolly and Dr. Mott significant emotional distress, including humiliation and embarrassment, arising from being subjected to discrimination and having to whitewash their own home.

104.    Defendant loanDepot injured Plaintiffs by relying on Defendant Lanham's discriminatory appraisal to deny Plaintiffs' loan despite the fact that it knew or should have known that the appraisal was racially discriminatory—it was an obvious and egregious undervaluation of the Churchwardens Home and Plaintiffs notified Jorgensen that they understood the undervaluation to be caused by racial discrimination. This injury was compounded by loanDepot's retaliation against Plaintiffs for exercising their fair housing rights, including failing to adequately notify Plaintiffs of their right to formally appeal Lanham's appraisal and hastily denying their loan application. As a result, Plaintiffs were unable to realize the benefit of their home's true value, missed out on securing a loan at the lower rate negotiated

with loanDepot, and expended significant time and effort to re-apply for a new loan and whitewash their home.

105.    Defendant loanDepot further injured Plaintiffs by causing them significant emotional distress, including humiliation and embarrassment, arising from being subjected to discrimination and retaliation and having to whitewash their own home.

106.    Defendants' actions were willful and/or taken in reckless disregard of the civil rights of Plaintiffs.

**CAUSES OF ACTION**

**Count I – Violation of the Fair Housing Act,**

**42  U.S.C. § 3601 *et seq.***

107.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 106 above.

108.    Defendants' conduct, as alleged herein, violates multiple provisions of the Fair Housing Act. Specifically, Defendants have engaged in the following discriminatory housing practices:

    i.  Discrimination in the terms, conditions, or privileges of a sale of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, or national origin, in violation of 42 U.S.C. § 3604(b);

    ii.  Making, printing, or publishing, or causing to be made, printed, or published a notice, statement or advertisement, with respect to the sale or rental of a dwelling that indicates a preference, limitation, or discrimination based on race, color, or national origin, or an intention to make such preference, limitation, or discrimination, in violation of 42

U.S.C. § 3604(c);

iii.   Discrimination in making available a residential real estate-related

transaction, or in the terms or conditions of such a transaction, because of

race, color, or national origin, in violation of 42 U.S.C. § 3605;

iv.   Coercion, intimidation, threats, or interference with persons in the exercise

or enjoyment of, or on account of their having exercised or enjoyed, their

rights under Section 3604 of Title 42, in violation of 42 U.S.C. § 3617.

109.   Accordingly, Plaintiffs are "aggrieved persons" as defined in 42 U.S.C. § 3602(i),

and are entitled to relief under 42 U.S.C. § 3613(c).

### Count II – Violation of the Equal Credit Opportunity Act,
### 15 U.S.C. § 1691 *et seq.*

110.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in

paragraphs 1 through 106 above.

111.   Defendant loanDepot is a "creditor" within the meaning of 15 U.S.C. § 1691a(e).

112.   Defendant loanDepot's conduct, as alleged herein, constitutes discrimination with

respect to aspects of a credit transaction on the basis of race, color, or national origin, in violation

of 15 U.S.C. § 1691(a)(1).

113.   Accordingly, Plaintiffs are aggrieved applicants who are entitled to relief under 15

U.S.C. § 1691e.

### Count III – Violation of the Civil Rights Act of 1866,
### 42 U.S.C. § 1981.

114.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in

paragraphs 1 through 106 above.

115. In acting as alleged herein, Defendants have injured Plaintiffs by impairing their right to make and enforce contracts and to the full and equal benefit of the laws for security of property as is enjoyed by white citizens, in violation of 42 U.S.C. § 1981.

116. Accordingly, Plaintiffs are entitled to relief under 42 U.S.C. §§ 1981 and 1988(a).

## Count IV – Violation of the Civil Rights Act of 1866,
## 42 U.S.C. § 1982.

117. Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 106 above.

118. In acting as alleged herein, Defendants have injured Plaintiffs by depriving them of their right to purchase, lease, sell, hold, and convey real property, in violation of 42 U.S.C. § 1982.

119. Accordingly, Plaintiffs are entitled to relief under 42 U.S.C. §§ 1982 and 1988(a).

## Count V – Maryland Fair Housing Laws,
## Md. Code, State Government § 20-702 *et seq*.

120. Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 106 above.

121. Defendants' conduct, as alleged herein, violates multiple provisions of Maryland's fair housing laws. Specifically, Defendants have engaged in the following discriminatory housing practices:

    i. Discrimination in the terms, conditions, or privileges of a sale of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, or national origin, in violation of Md. Code, State Gov't § 20-705(2);

    ii. Making, printing, or publishing, or causing to be made, printed, or

published a notice, statement or advertisement, with respect to the sale

or rental of a dwelling that indicates a preference, limitation, or

discrimination based on race, color, or national origin, or an intention to

make such preference, limitation, or discrimination, in violation of Md.

Code, State Gov't § 20-705(3);

iii.     Discrimination in making available a residential real estate-related

transaction, or in the terms or conditions of such a transaction, because

of race, color, or national origin, in violation of Md. Code, State Gov't §

20-707;

iv.      Coercion, intimidation, threats, or interference with persons in the

exercise or enjoyment of, or on account of their having exercised or

enjoyed, their rights under Subtitle 7, in violation of Md. Code, State

Gov't § 20-708.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court grant judgment in their favor, and against

Defendants, as follows:

(1)     Declare that Defendants have violated the provisions of applicable federal and

state laws;

(2)     Permanently enjoin Defendants from engaging in the conduct described herein,

either directly or through others;

(3)     Order Defendants to take appropriate affirmative actions to ensure that the

conduct described herein is not engaged in by them again;

33

(4)     Award compensatory damages to Plaintiffs in an amount to be determined by a jury that would fully compensate them for the injuries caused by Defendants' conduct alleged herein;

(5)     Award punitive damages to Plaintiffs in an amount to be determined by a jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein that would effectively deter similar conduct in the future;

(6)     Award reasonable attorneys' fees and costs;

(7)     Award such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

Respectfully submitted,

/s/ John P. Relman
John P. Relman #11482
Gabriel Diaz*
Soohyun Choi*
RELMAN COLFAX, PLLC
1225 19th St. NW
Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
jrelman@relmanlaw.com
gdiaz@relmanlaw.com
schoi@relmanlaw.com

*Attorneys for Plaintiffs*

*pro hac vice application to be filed*