**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

Nathan Connolly and Shani Mott,

Plaintiffs,

v.

Shane Lanham, 20/20 Valuations, LLC, and loanDepot.com, LLC,

Defendants.

Civil Action No. 1:22-cv-02048-SAG

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS DEFENDANTS SHANE LANHAM AND 20/20 VALUATIONS, LLC'S COUNTERCLAIM**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

STANDARD OF REVIEW ........ 9

ARGUMENT ........ 10

I. Lanham Fails to Adequately Plead Defamation ........ 10

A. Lanham's Counterclaims Must Be Dismissed Because the Statements in Question Are Constitutionally Protected Statements of Opinion ........ 10

B. Lanham Fails to Adequately Plead Fault ........ 16

II. Lanham's Counterclaims Are Barred by Privilege ........ 18

A. Lanham's Counterclaims Are Barred by The Fair Comment Privilege ........ 20

1. The Statements are Statements of Opinion on Matters of Legitimate Public Interest ........ 20

2. The Fair Comment Privilege Was Not Abused ........ 21

B. Lanham's Counterclaims are Barred by the Fair Reporting Privilege ........ 23

1. The Statements Made by Drs. Connolly and Mott are Fair and Accurate Reports About the Underlying Lawsuit ........ 23

2. Because the Statements Made by Drs. Connolly and Mott are Fair and Substantially Correct, The Privilege is Not Overcome ........ 25

III. The Counterclaim is a SLAPP Suit That Must Be Dismissed Pursuant to Md. Courts and Judicial Proceedings Code § 5-807 ........ 26

A. The Counterclaim is Brought in Bad Faith ........ 28

B. The Purpose of the Counterclaim is to Inhibit the Pursuit of First Amendment Rights ........ 30

IV. This Court Should Dismiss Lanham's Counterclaims with Prejudice ........ 31

CONCLUSION ........ 32

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Agora, Inc. v. Axxess, Inc.*,
90 F.Supp.2d 697 (D. Md. 2000) ....................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................9, 10

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) ....................11, 13, 14, 15

*Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*,
53 F.4th 286 (4th Cir. 2022) ....................20

*Brown v. Bd. of Educ. Of Prince George's Cty.*,
2022 WL 888424 (D. Md. 2022) ....................10, 16, 17, 18

*Byam v. Ocean Enter. 589, LLC*,
2023 WL 1442434 (D. Md. 2023) ....................31

*Cozzarelli v. Inspire Pharms. Inc.*,
549 F.3d 618 (4th Cir. 2008) ....................31

*Doe v. Salisbury Univ.*,
123 F. Supp. 3d 748 (D. Md. 2015) ....................19

*Fayetteville Invs. v. Com. Builders, Inc.*,
936 F.2d 1462 (4th Cir. 1991) ....................9

*Gohari v. Darvish*,
767 A.2d 321 (Md. Ct. App. 2001) ....................19

*Harvey v. Cable News Network, Inc.*,
48 F.4th 257 (4th Cir. 2022) .................... *passim*

*Hawks v. Ruby*,
2019 WL 4860760 (Md. Ct. Spec. App. 2019) ....................16, 18

*Jones v. Mutual of Omaha Insurance Co.*,
2022 WL 16763733 (D. Md. 2022) ....................30

*In re Livent, Inc. Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001) ....................10

*Marchesi v. Franchino*,
387 A.2d 1129 (Md. 1978) ....................19

*MCB Woodberry Dev., LLC v. Council of Owners of Millrace Condo., Inc.*,
265 A.3d 1140 (Md. Ct. Spec. App. 2021) ........................................ *passim*

*McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*,
780 F.3d 582 (4th Cir. 2015) ........................................9

*McLean v. United States*,
566 F.3d 391 (4th Cir. 2009) ........................................31

*McReady v. O'Malley*,
804 F. Supp. 2d 427 (D. Md. 2011), *aff'd*, 468 F. App'x 391 (4th Cir. 2012) ..................10, 11

*Mejia v. Telemundo Mid-Atl. LLC*,
440 F. Supp. 3d 495 (D. Md. 2020)........................................22

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
948 F. Supp. 2d 538 (D. Md. 2013)........................................31

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) ........................................9, 22

*Olukoya v. Sowore*,
2019 WL 3501567 ........................................24, 25

*Olukoya v. Sowore*,
2020 WL 7769777 (D. Md. 2020) ........................................23

*Parikh v. Frosh*,
2023 WL 131043 (D. Md. 2023) ........................................10, 31

*Peroutka v. Streng*,
695 A.2d 1287 (Md. Ct. Spec. App. 1997) ........................................14, 15

*Phillips v. Washington Magazine, Inc.*,
472 A.2d 98 (Md. Ct. Spec. App. 1984) ........................................12

*Piscatelli v. Smith*,
12 A.3d 164 (Md. Ct. Spec. App. 2011) ........................................20, 23, 25

*Piscatelli v. Van Smith*,
35 A.3d. 1140 (Md. 2012) ........................................19, 23, 25

*Pisner v. McCarthy*,
2022 WL 4465898 (D. Md. 2022) ........................................30

*Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.*,
829 F.2d 1280 ........................................20

*Rosenberg v. Helinski*,
616 A.2d 866 (Md. 1992) ....................23, 25, 26

*Shahidullah v. Shankar*,
2022 WL 286935 (D. Md. 2022) ....................31

*Shulman v. Rosenberg*,
2017 WL 5172642 (Md. Ct. Spec. App. 2017)....................12, 19, 21, 22

*Smith v. Griffiths*,
2020 WL 5413672 ....................16, 20

*State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*,
381 F. Supp. 3d 536 (D. Md. 2019)....................4, 9

*Watkins v. Carr*,
2018 WL 6570686 (D. Md. 2018) ....................11

**Statutes**

MD. Code Ann., Cts. & Jud. Proc. § 5-807(b) ....................1, 27

Md. Courts and Judicial Proceedings Code § 5-807....................26, 27

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)....................1

Restatement (Second) of Torts.................... *passim*

U.S. Const. amend. I .................... *passim*

**INTRODUCTION**

Drs. Nathan Connolly and Shani Mott ("Plaintiffs") sued Shane Lanham and the appraisal company he owns, 20/20 Valuations, (collectively "Lanham") for violations of the Fair Housing Act and other federal and state laws based on Lanham's discriminatory undervaluation of their home. The claims were based on many factors, including that Lanham deviated from established appraisal practices in ways that indicate racial discrimination; that he has been accused of similar discriminatory conduct in the past; and that multiple objective, independent factors demonstrate that he significantly undervalued their home.

Appraisal discrimination is a long-underappreciated issue that is an increasing focus of public attention and concern. Perhaps because a second appraisal conducted by a different appraiser after Plaintiffs "whitewashed" their home by removing indicators of their Black identity resulted in a $278,000 increase in valuation, there was significant media interest in their lawsuit. Recognizing the importance of helping to educate the public, Plaintiffs discussed the case with journalists.

Lanham's Counterclaim asks the Court to punish Drs. Connolly and Mott for bringing this lawsuit and exercising their First Amendment right to discuss it. The Court should dismiss it with prejudice under Fed. R. Civ. P. 12(b)(6) and pursuant to Maryland's Anti-SLAPP Statute, MD. Code Ann., Cts. & Jud. Proc. § 5-807(b), because: (1) the Counterclaim fails to allege facts to make its claims of defamation and false light plausible; (2) the statements made by Dr. Connolly and Dr. Mott are protected by the Fair Comment and Fair Report privileges; and (3) the Counterclaim is a strategic lawsuit against public participation ("SLAPP suit") barred by Maryland law. While Lanham is free to disagree with Plaintiffs' conclusion about his appraisal, his disagreement does not render the statements made by Drs. Connolly and Mott defamatory,

nor does it entitle him to inhibit Plaintiffs' exercise of their First Amendment rights. Because amendment would be futile, the Counterclaim should be dismissed with prejudice.

## FACTUAL BACKGROUND

Drs. Nathan Connolly and Shani Mott are a Black, married couple, both of whom are professors at Johns Hopkins University and live in Baltimore, Maryland.[1] FAC ¶¶ 3, 15–16. In or around May of 2021, Plaintiffs sought to refinance the mortgage for their home, which they bought in 2017 for $450,000; their lender, loanDepot, preliminarily approved the refinance pending appraisal. *Id.* ¶¶ 4, 37–39. loanDepot said that $550,000 was a "conservative" estimate for the home's value. Drs. Connolly and Mott had made significant investments to improve the home and prices in Baltimore had appreciated significantly in the intervening four years. *Id.* ¶¶ 4, 41–42.

loanDepot contracted Lanham to appraise Plaintiffs' home. *Id.* ¶¶ 17, 43. Lanham valued the home at $472,000—well below loanDepot's "conservative" estimate—which ultimately led loanDepot to deny Plaintiffs' loan notwithstanding Plaintiffs' submission of a detailed rebuttal and notification of loanDepot them that they believed the appraisal was discriminatory. *Id.* ¶¶ 50–51, 95. Later that year, the Maryland Department of Assessments and Taxation Notification assessed the home's value at $622,000, and Plaintiffs decided to apply again for a refinance loan. *Id.* ¶ 115. They were again approved for a loan pending appraisal with a different lender but, based on their experience with Lanham, made the difficult decision to "whitewash" their home prior to the appraisal, removing all markers of their Black identity and having a white colleague

[1] For a more detailed discussion of Plaintiffs' claims, see Plaintiffs' First Amended Complaint, Dkt. 25, and the factual backgrounds included in their oppositions to both motions to dismiss filed by the defendants in this case, Dkt. 42, 43 .

show the home. *Id.* ¶ 118–22. After the whitewashing, the home appraised for $750,000. *Id.* ¶ 123.

On August 15, 2022, Drs. Connolly and Mott filed a lawsuit alleging, *inter alia*, that Lanham's appraisal was discriminatory. *Id.* ¶¶ 1–2. Plaintiffs' complaint contains a detailed discussion of the many facts supporting their belief that Lanham undervalued their home for discriminatory reasons, including, but not limited to, the objective indicators of the home's true value; that Lanham improperly circumscribed the area from which he chose "comparables" for determining the home's value; that he chose inappropriate comparables from among the lowest-value comparables available, including one from a majority-Black census block outside of Plaintiffs' neighborhood; that, despite claiming to prioritize location in selecting comparables, Lanham ignored higher-priced and more appropriate comparable homes located more closely to Plaintiffs' home than the ones he selected; and that, in contrast to the appraiser who valued the home at $750,000, and inconsistent with established appraisal standards, he applied unjustifiably large deductions of value to the home and failed to assign adequate credit for positive aspects of Plaintiffs' home. *See* Dkt. 43 at 4–7. Lanham and loanDepot moved to dismiss Plaintiffs' complaint on December 12, 2022. *See* Dkt. 31, 32.

On January 24, 2023, Lanham filed a document containing an answer to Plaintiffs' First Amended Complaint as well as a two-count Counterclaim accusing Plaintiffs of defamation and false light invasion of privacy. Dkt. 36 ("Countercl."). Lanham provides almost no information about the bases for the counterclaims in the mere 6 paragraphs he devotes to Plaintiffs' alleged defamation. *See* Countercl. ¶¶ 68–74 (section entitled "PLAINTIFFS FALSELY ACCUSE DEFENDANTS OF RACISM").

Lanham complains that "Dr. Connolly and Dr. Mott, on information and belief, were angry about the appraisal that they had received in June 2021 from Mr. Lanham and 20/20 Valuations" and that, "[a]s a result, they launched a self-serving media campaign in retaliation against Mr. Lanham and 20/20 Valuations and in support of their lawsuit against Mr. Lanham and 20/20 Valuations." *Id.* ¶ 68. Lanham references, but does not actually identify, two news stories as the basis for his claims. He does not discuss the content of any interview or article or quote any allegedly defamatory language, with the exception of one word, "racist."

Lanham states that "in or about August 2022, Dr. Connolly and Dr. Mott sat for an interview with a reporter from the New York Times" and that "[d]uring this interview, Dr. Connolly and Dr. Mott falsely accused Mr. Lanham and 20/20 Valuations of undervaluing their home based on race." *Id.* ¶¶ 70–71. Lanham also pleads that "[o]n or about August 23, 2022, Dr. Connolly and Dr. Mott gave an interview to ABC News that was broadcast on ABC News Live in which they falsely accused Mr. Lanham and 20/20 Valuations of having discriminated against them on the basis of their race during the appraisal and that their home was undervalued simply because they are black," adding, "[d]uring the interview, Dr. Connolly and Dr. Mott falsely accused Mr. Lanham and 20/20 of engaging in 'racism' in the appraisal process." *Id.* ¶¶ 72–73. Lanham provides no more information about the allegedly defamatory statements.

The Counterclaim appears to be based on statements attributed to Plaintiffs in two articles reporting on Plaintiffs' complaint, along with an associated video. The first article, attached as Ex. A,[2] was written by Debra Kamin and ran in the New York Times on August 18, 2022, 3 days

[2] Lanham has failed to set out the specific statements of which they complain but his Counterclaim relies on and incorporates by reference the New York Times and ABC News pieces referenced, and it is proper for the Court to consider them. *See State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 554 (D. Md. 2019) ("Because the [materials] were referenced in the Amended Counterclaim as a basis for the defamation . . . claims, they are integral to the suit." (citing *Goldfarb*, 791 F.3d at 508)).

after Plaintiffs initiated this case, *see* Dkt. 1. The piece is entitled "Home Appraised with a Black Owner: $472,000. With a White Owner: $750,000." Its subheading is "Nathan Connolly and his wife, Shani Mott, say an appraisal company undervalued their home based on their race. The couple has filed a lawsuit in Maryland." Ex. A at 1.[3]

Kamin's article describes the circumstances of Drs. Connolly and Mott's lawsuit in Kamin's own words, regularly referencing or quoting facts alleged in Plaintiffs' complaint. *See* Ex. A, *see also infra* at 6, 12. About two-thirds of the way into the article, Kamin pivots from discussing Plaintiffs' lawsuit, specifically, to the issue of appraisal discrimination, generally, referencing another appraisal discrimination lawsuit and efforts by the Department of Justice and the Biden administration to address the issue. Ex. A, at 2.

The article includes quotes attributed to Dr. Connolly (though none to Dr. Mott), and indicates that Lanham "declined to comment." *Id.* The only statements that are arguably attributable to either Plaintiff and also arguably qualify as statements alleging that Lanham "undervalue[ed] their home because of race" are those identified, in context, in italics below:

- But 20/20 Valuations, a Maryland appraisal company, put the home's value at $472,000, and, in turn, loanDepot, a mortgage lender, denied the couple a refinance loan. *Dr. Connolly said he knew why: He, his wife and three children, aged 15, 12, and 9 are Black*. A professor of history at Johns Hopkins University, Dr. Connolly is an expert on redlining and the legacy of white supremacy in American cities, and much of his research focuses on the role of race in the housing market. Months after the first appraisal, the couple applied for another refinance loan, removed family photos and had a white male colleague—another Johns Hopkins professor—stand in for them. The second appraiser valued the house at $750,000. This week, Dr. Connolly and Dr. Mott sued loanDepot, which is based in Foothill Ranch, Calif., as well as 20/20 Valuations and Shane Lanham, owner of 20/20 Valuations. Mr. Lanham is the appraiser who conducted the first appraisal.

---

[3] The New York Times article has an audio feature, in which the article is read by its author. There is an introduction to the feature in which the author provides additional context and commentary. The introduction includes brief audio of Drs. Connolly and Mott discussing their whitewashing experiment. This audio is not discussed separately because none of the statements made by Drs. Mott or Connolly in the introductory segment could plausibly be understood as defamatory.

- 'We were clearly aware of appraisal discrimination,' said Dr. Connolly, 44. '*But to be told in so many words that our presence and the life we've built in our home brings the property value down?* It's an absolute gut punch."

*Id.* (emphasis added).

The second article, attached as Ex. B, was written by Linsey Davis, Kendall Ross, and Sabina Ghebremedhin for ABC News and is dated August 24, 2022, nine days after Plaintiffs filed the original complaint in this case. It is published on the ABC News website and contains a video with excerpts of an interview of Dr. Connolly and Dr. Mott conducted by Linsey Davis.[4]

As in the New York Times piece, the ABC News article immediately alerts the reader that the story is about Plaintiffs' lawsuit. It begins:

> A Black couple whose home valuation increased nearly $300,000 after their Homeland, Maryland, property was re-appraised with a white colleague serving as homeowner is suing two firms alleging racial discrimination. Nathan Connolly and Shani Mott, who are both professors at Johns Hopkins University in Baltimore, allege that Shane Lanham of 20/20 Valuations racially discriminated against them by undervaluing their 2,600-square-foot home at $472,000.

Ex. B, at 1. It also discusses the facts as alleged in the complaint, repeatedly quoting and referencing the lawsuit before quoting Paige Glotzer, a professor at University of Wisconsin-Madison, about appraisal discrimination and the history of Plaintiffs' Homeland neighborhood. *Id.* The article notes that Lanham declined a request for comment. Ex. B, at 3.

From the ABC News piece, all that can arguably be attributed to Plaintiffs and arguably characterized as a statement that Lanham "discriminated against them on the basis of their race during the appraisal and that their home was undervalued simply because they are black" is:

- The couple is also suing loanDepot, alleging the company discriminated against them by using the 20/20 Valuations appraisal to deny them a refinance loan. "*My jaw dropped. I was like, this is racism. Because we had done the research, right?*" said Mott, during an

[4] What appears as the first photograph in Ex. B is actually, when viewed on the website, an embedded video. The piece is located at https://abcn.ws/3cdCkaM. Quotes from the video are indicated by Ex. B Video and appropriate timestamps.

interview with ABC News Live. "We didn't go into this process, this refinance process, blindly."

- Mott, an Africana Studies lecturer, said that she and Connolly, a professor of history focusing on racism, capitalism and notions of property, had reviewed several comparable homes and educated themselves on what to expect. *Based [on] their research, the couple found the $472,000 valuation 'impossible.'* Earlier this year, they looked to another lender for an appraisal, this time removing their children's artwork, artifacts and other signs that indicated a Black family resided in the home. Then, Connolly and Mott had a white colleague answer the door when the new appraiser arrived. The new home appraisal was $750,000.

*Id.* (emphasis added).

Lanham alleges that Plaintiffs accused him of engaging in "racism" in the appraisal process. Countercl. ¶¶ 72–73. Of all the content in the printed articles, only the first excerpt from the ABC News article even arguably fits this description. The video embedded in the article contains a longer exchange from which that quotation is apparently drawn:

> **Ms. Davis (Interviewer)**: Because, right from the beginning, it seems that you jumped to the conclusion, "Our house came in with this low appraisal simply because we're Black."
>
> **Dr. Connolly**: Well, I don't know if it was that we jumped to that conclusion. I mean we certainly gave the representative from 20/20 Valuations, Mister Shane Lanham, a chance to do his job. I mean, we were in the home during the first appraisal. We made, you know, light conversation with him, we certainly gave him free run of the place. You know, we, again, had some sense that discrimination was a problem, but we didn't expect that it would happen in this particular case. *And so, when the number came back at four hundred and seventy-two thousand-*
>
> **Dr. Mott**: *My jaw dropped. I just was like, "This is racism."* Because we had done the research. Right? Like, aside from researching to try to figure out what the numbers would be for what we could sell our house for. I would ask a neighbor, if they were in the process of refinancing, you know, what did their homes come in at. And so, we didn't go into this process, this refinance process, blindly. Like we were, you know, we were educated consumers.
>
> **Dr. Connolly**: We did the whitewashing experiment. And even though we had already given loanDepot comps that had reflected a value in the mid-sixes or even higher, and we had been rejected, we had left the whitewashing experiment to, kind of, be that final bit of evidence that we needed to be made whole.

Ex B Video (2:08–3:31). The embedded interview contains two additional exchanges that are arguably consistent with Lanham's claims that Plaintiffs accused them of discrimination. First:

> **Ms. Davis**: . . . So, let's just walk through the process here. The two of you were looking to refinance your home to take advantage of the low interest rates. And then what happened?
>
> **Dr. Connolly:** *Well, we experienced discrimination*. We made a pretty straightforward application to get our house at a reduced interest rate, from 4.65 percent to two and a quarter, and we thought we were in pretty good shape to be able to meet the mark. We had made investments in the house that exceeded thirty thousand dollars. We had seen the market on a steady uptick, and we had a baseline amount that was labeled as pretty conservative, both by us and by the loan officer at loanDepot with whom we worked. And so, we were very surprised to learn, upon a drive down to Florida we were making as a family, that the home did not come in at value.

*Id.* (0:33–1:13). And second:

> **Dr. Connolly**: …And the appraisal came back, I want to say within the same week at seven hundred and fifty thousand dollars, which was—
>
> **Ms. Davis**: And your jaw dropped again, I would have to imagine?
>
> **Dr. Connolly**: (laughter) You know, it was just one of those moments where, um, you're kind of like "Okay, this is real." You know about the history, but to feel *that we're very much a part of that historical process of Black folk being devalued, of not being able to get, um, a fair shake*. And it also feels as though, frankly we're at a moment where we need a new movement that is able to operate and still be able to, kind of, *distill this particular form of racism* and really challenge it.
>
> **Ms. Davis**: So, despite this being your expertise, you still found this very hurtful?
>
> **Dr. Mott**: Yeah, I think that that's—I mean—it's so interesting, because there's a dilemma, right? There's a—continue—you live in a contradiction. Like there are things that happen in this country, where you're like "Ah, things have progressed significantly," and *you never think that, somehow, you would be the—the victim of discrimination*. Like you're like "I play by the rules, I do all that I'm supposed to do."

*Id.* (3:54–5:12).

The news coverage is replete with factual statements attributed to Drs. Connolly and Mott—directly and via reference to their complaint—about the appraisal of their home, but Lanham challenges only the conclusion that Plaintiffs drew from those facts: namely, that Lanham discriminatorily undervalued Plaintiff's home. Lanham devotes the bulk of his complaint—over 43 of the Counterclaim's 74 pre-count paragraphs—attempting to defend the

choices he made in appraising Plaintiffs' home,[5] *see* Countercl. ¶ 24–67, but does not dispute any of the underlying factual claims attributed to Plaintiffs in either story. Lanham criticizes the whitewashing experiment that led to the subsequent $750,000 appraisal of the Churchwardens home, *see id*. ¶¶ 11–12, 62, 85, and faults Plaintiffs for not mentioning the sale of a nearby home while discussing the case with journalists, *id.* ¶¶ 57–59.

## STANDARD OF REVIEW

Lanham must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the [counterclaim defendant] is liable for the misconduct alleged." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015). "[W]hen a counterclaim states facts that are 'merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal* , 556 U.S. 662, 678 (2009) (internal quotations omitted). "[L]egal conclusions, elements of a cause of action, and bare assertions devoid of factual enhancement fail to constitute well-pled facts." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Likewise, courts "decline to consider unwarranted inferences, unreasonable conclusions, or arguments." *Id.* (internal quotation marks omitted).

The Court may consider documents attached to the motion to dismiss provided they are integral to the complaint and there is no dispute about the documents' authenticity. *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 554 (D. Md. 2019). Any statement in a pleading that is contradicted by documents upon which the pleadings rely should not be accepted as true. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir.

[5] Lanham similarly spent much of his motion to dismiss defending his appraisal. *See, e.g.*, Dkt. 31-1 at MTD 8-15.

1991) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails."); *see In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (court should not "accept as truth statements in the pleadings that are contradicted . . . by documents upon which the pleadings rely").

## ARGUMENT

### I. Lanham Fails to Adequately Plead Defamation

To survive dismissal, Lanham must plead sufficient factual material to plausibly make out that Plaintiffs (1) made a defamatory statement to a third person; (2) the statement was false; (3) Plaintiffs were legally at fault for making that statement; and (4) Lanham thereby suffered harm. *See Parikh v. Frosh*, 2023 WL 131043, at *10 (D. Md. 2023); *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Ignoring bare and conclusory assertions, unwarranted inferences, unreasonable conclusions, and arguments, Lanham has failed to meet his burden.

#### A. Lanham's Counterclaims Must Be Dismissed Because the Statements in Question Are Constitutionally Protected Statements of Opinion

It is "well established" that a statement of opinion based on disclosed or readily available facts is constitutionally protected and not subject to action for defamation or false light.[6] That is, a statement of "pure" opinion—by definition—cannot constitute defamation or false light. *See, e.g.*, *McReady v. O'Malley*, 804 F. Supp. 2d 427, 441 (D. Md. 2011), *aff'd*, 468 F. App'x 391 (4th Cir. 2012) (defamation claim cannot be based on statement of opinion but only a false statement of fact; under the First Amendment there is no such thing as a false idea) (quoting

[6] A false light claim "may not stand unless the claim also meets the standards of defamation." *Brown v. Bd. of Educ. Of Prince George's Cty.*, 2022 WL 888424, at *10 (D. Md. 2022) (quoting *Piscatelli v. Smith*, 12 A.3d 164, 173 (Md. Ct. Spec. App. 2011); *see also Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 275 (4th Cir. 2022), Plaintiffs' arguments are therefore presented in the context of Lanham's defamation Counterclaims but all apply equally to Defendants' claims for false light invasion of privacy.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974)); *Watkins v. Carr*, 2018 WL 6570686, at *3 (D. Md. 2018) ("[Q]uestions or opinions, no matter how 'embarrassing or unpleasant to its subject' do not constitute a *statement* the truth or falsity of which the parties may demonstrate through independent evidence." (quoting *Chapin v. Knight-Ridder, Inc.,* 993 F.2d 1087, 1094 (4th Cir. 1993)); *see also Agora, Inc. v. Axxess, Inc.*, 90 F.Supp.2d 697, 704 (D. Md. 2000) (citing *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998)); Restatement (Second) of Torts § 566 cmt. c (Am. L. Inst. 1977). A statement qualifies as "pure" opinion if it is based on facts that are disclosed, known to, or readily available to the listener, and does not imply the existence of other defamatory facts. *See McReady*, 804 F. Supp. 2d at 441; *Agora*, 90 F. Supp. 2d at 704; Restatement (Second) of Torts §566 cmt. b–c.[7]

Whether a statement is pure opinion is a question of law for this Court to determine. *See, e.g.*, *Agora* at 90 F.Supp.2d at 702; Restatement (Second) of Torts § 566 cmt. c. More specifically, this Court must determine whether the alleged defamatory statements, read in context, would be understood as the opinion of the speaker because the bases underlying the conclusion is stated or known by the listener. *See Biospherics*, 151 F.3d at 185.

In this case, every statement made by Drs. Connolly and Mott that could potentially be understood as suggesting that Lanham discriminatorily undervalued their home or engaged in racism is clearly presented as their opinion on the matter, supported by facts both disclosed and readily available. Lanham is free to disagree with the opinion, but that disagreement may not form the basis of a defamation lawsuit.

[7] The Restatement of Torts provides the illustration that, although the statement "I think John must be an alcoholic," standing alone, potentially implies the existence of undisclosed and defamatory facts while the statement "He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 sitting in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic" is not defamatory because it "indicates the facts on which the expression of opinion was based and does not imply others." Restatement §566 cmt. c, illus. 3–4.

As detailed above, even under an extremely generous reading of the articles, the only statements that could potentially fit as statements that Lanham conducted a discriminatory appraisal are, from the New York Times article, Ex A, at 1–2:

- Dr. Connolly said he knew why [his home was valued at $472,000]: He, his wife and three children, aged 15, 12, and 9 are Black;
- 'We were clearly aware of appraisal discrimination,' said Dr. Connolly, 'but to be told in so many words that our presence and the life we've build in our home brings the property value down? It's an absolute gut punch";

from the ABC News article, Ex. B, at 2, 5:

- My jaw dropped. I was like, this is racism. Because we had done the research right?";
- Based [on] their research, the couple found the $472,000 valuation 'impossible;';

and from the recording embedded in the ABC News article, Ex. B Video (0:33–1:13; 3:54–5:00):

- And so, when the number came back at four hundred and seventy-two thousand—My jaw dropped. I just was like, "This is racism";
- Well, we experienced discrimination;
- You know about the history, but to feel that we're very much a part of that historical process of Black folk being devalued, of not being able to get, um, a fair shake. And it also feels as though, frankly we're at a moment where we need a new movement that is able to operate and still be able to, kind of, distill this particular form of racism and really challenge it . . . . Like there are things that happen in this country, where you're like "Ah, things have progressed significantly," and you never think that, somehow, you would be the—the victim of discrimination.

*See supra* at 7–8.

Despite Lanham's claims, when these statements are read in context—which they must be, *see Phillips v. Washington Magazine, Inc.*, 472 A.2d 98, 101 (Md. Ct. Spec. App. 1984); *Shulman v. Rosenberg*, 2017 WL 5172642, at *8 (Md. Ct. Spec. App. 2017)—they clearly convey Plaintiffs' opinion that Lanham conducted a discriminatory appraisal of their home. Given the extensive factual support provided for that opinion, no reasonable reader could

possibly construe it as "anything but the opinion of [Plaintiffs] drawn from the circumstances related." *Biospherics*, F.3d at 185.

The New York Times article, for example, includes at least the following facts as support for the conclusion that Lanham discriminatorily underappraised their home:

- that Plaintiffs "believed that their house—improved with a new $5,000 tankless water heater and $35,000 in other renovations—was worth much more than the $450,000 they paid for it in 2017" because "[h]ome prices have been on the rise nationwide since the pandemic;"
- that the home was valued at $750,000 after Plaintiffs "removed family photos [from the home] and had a white colleague . . . stand in for them" during a second appraisal;
- that Lanham selected undervalued and inappropriate comparables for his appraisal, including by "cherry-pick[ing] low value homes as comps and, by doing so. . . ignor[ing] legitimately comparable homes with much higher sales prices";
- that Lanham took unjustifiably large deductions from the homes;
- that Lanham's "appraisal incorrectly stated that their home had not received any updates for 15 years";
- and the juxtaposition of the second, higher appraisal, with Lanham's—the former appropriately relying on higher-priced comparables and taking smaller deductions.

Ex. A, at 1–2. The ABC News piece similarly contained explanation of the bases for Plaintiffs' conclusion that Lanham's appraisal was discriminatory, including, but not limited to:

- that the valuation of the home "increased nearly $300,000 after the Homeland, Maryland, property was re-appraised with a white colleague serving as the homeowner";
- that Lanham's valuation was "just over the $450,000 they paid for the home in 2017" despite investment of "more than $50,000 in renovations and improvements";
- that "[b]ased on their research the couple found the $472,000 'impossible'";
- that the home appraised for $750,000 after they whitewashed the home;
- an independent scholar's opinion of the existence of "a deeply rooted connection in Connolly and Mott's lawsuit to racially exclusive housing covenants," as well as of the "codification of discrimination a national real estate industry" such that "both consumers and home buyers[] acknowledge[e] that race [is] a part of property value."

Ex. B, at 1–3, 5. Factual support in the video interview includes:

- that Plaintiffs "thought we were in pretty good shape to meet the [necessary valuation]. We had made investments in the house that had exceeded thirty thousand dollars. We had

seen the market on a steady uptick, and we had a baseline amount that was labeled as pretty conservative, both by us and the loan officer at loanDepot with whom we worked";

- that they gave loanDepot "comps that reflected a value in the mid-sixes or even higher";
- that they "left the whitewashing experiment as the final bit of evidence" regarding the home's true value," and the home appraised for $750,000;
- that the undervaluation was part of the "historical process of Black folk being devalued."

Ex. B Video (0:45–01:03; 03:18–03:30; 03:58).

A review of either story, or of the video, thus establishes, based on facts asserted within the four corners of each, that Plaintiffs' statements about Lanham's appraisal are manifestly statements of pure opinion.

But even if the news coverage did not include ample factual support for Drs. Connolly and Mott's statements, a statement need not be supported by facts explicitly referenced by the speaker to qualify as pure opinion. It can also be supported by facts readily available to, known to, or assumed by the listener. *See, e.g.*, *Peroutka v. Streng*, 695 A.2d 1287, 1297 (Md. Ct. Spec. App. 1997) ("If the facts from which a defendant forms his or her opinion are given *or are readily available* and those facts cannot be proved false, the defendant is not subject to liability for the opinion.")(emphasis added); *see also* Restatement (Second) of Torts § 566 cmt. b. Given that Plaintiffs' complaint was publicly available, repeatedly referenced in the ABC and New York Times coverage, and contains an extremely detailed discussion of the many bases for their conclusion that Lanham discriminatorily undervalued their home, that conclusion qualifies as pure opinion—and cannot be defamatory—even without the detailed explanation for Plaintiffs' rationale set forth in the coverage.

Underlying the protection of pure opinion is the assumption that reference to the bases for a conclusion signals that the speaker is sharing an opinion, not a potentially defamatory statement of facts. *See, e.g.*, *Biospherics*, 151 F.3d at 185; Restatement (Second) of Torts cmt. c.

The support for Plaintiffs' opinion about Lanham's appraisal—both within each article and in the complaint—is more than sufficient to notify a reader that Plaintiffs shared an opinion drawn from those facts. *See Biospherics*, 151 F.3d at 185 (three sentences reflecting potential high cost of product and that competitors are developing alternatives deemed sufficient explanation for conclusion that a company's stock was overvalued); Restatement (Second) of Torts cmt. c.

There are only two narrow circumstances in which a defamation claim regarding a statement of opinion may proceed: where the proponent of that claim can demonstrate that (1) the underlying facts are themselves defamatory, or (2) the opinion implies the existence of other facts, not available to the listener, upon which the conclusion is based. *See, e.g.*, *Peroutka*, 695 A.2d at 1297; Restatement (Second) of Torts cmt. c. Lanham cannot demonstrate either, and does not meaningfully attempt to do so.

Although Lanham disputes the conclusion Drs. Connolly and Mott reached, Lanham does not claim, nor could he, that any of the underlying facts asserted are defamatory. Lanham also does not identify any statement made by Plaintiffs that suggests the existence any undisclosed facts, defamatory or otherwise. The only allegations to this effect in the Counterclaim are textbook examples of conclusory pleading without sufficient factual support. *See* Countercl. ¶ 81 ("Dr. Connolly and Dr. Mott's false and defamatory statements about Mr. Lanham and 20/20 Valuations implied the existence of undisclosed defamatory facts."). Indeed, it is implausible that Drs. Connolly and Mott would attempt to conceal any fact that would support their claims in the underlying lawsuit. The robust recitation of factual bases for Plaintiffs' ultimate conclusion contained in the articles, the video interview, and Plaintiffs' complaint refute the possibility that a reader or listener might believe that additional facts exist. *Cf.* Restatement (Second) of Torts cmt. c ("But an expression of opinion that is not based on disclosed or assumed facts and

therefore implies that there are undisclosed facts upon which the opinion is based, is treated differently.").

Dr. Connolly and Dr. Mott concluded that Lanham conducted a discriminatory appraisal of their home. The First Amendment protects their right to share that opinion provided that its bases were disclosed or known, which it was, and the underlying bases were non-defamatory, which they also were. That Lanham spends so much time arguing against Plaintiffs' conclusion is evidence that Plaintiffs shared a pure opinion regarding the appraisal. Lanham, like any listener, may draw contrary conclusions, but this Court must dismiss his Counterclaims.

**B. Lanham Fails to Adequately Plead Fault**

The majority of Lanham's Counterclaim is an attempt to establish that Lanham followed proper procedures when completing the appraisal of the Drs. Connolly and. Mott's home. But even assuming Lanham plausibly alleges that Plaintiffs' opinions were false because race did not impact the appraisal, Lanham cannot state a claim for defamation without also plausibly alleging that Drs. Connolly and Mott were legally at fault in making the complained-of statements. This is because "there can be no recovery without fault in any defamation action." *Hawks v. Ruby*, 2019 WL 4860760, at *9 (Md. Ct. Spec. App. 2019) (internal marks omitted); *see also Smith v. Griffiths*, 2020 WL 5413672, at *7 (evidence that might support falsity of statements was not relevant to "the gravamen" of defamation suit).

Because Lanham is not a public figure, fault requires, at minimum, showing that Drs. Connolly and Mott were negligent with respect to the complained-of statements. *See Hawks* at *8; *Brown v. Bd. Of Educ. Of Prince George's County*, 2022 WL 888424, at *8 (D. Md. 2022). To determine negligence, the court looks to "the facts known to [the speaker] at the time the statements were made." *Hawks* at *8. The question is whether, construing the Counterclaim and

the incorporated materials—the news reports from ABC and the New York Times—in the light most favorable to Lanham, Lanham has pleaded sufficient factual material to make plausible that Plaintiffs "failed to act as a reasonable person under like circumstances in making" their statements. *Id.* (internal marks omitted) (quoting Restatement (Second) of Torts, § 580B, cmt. g (Am. L. Inst. 1977)); *see Brown*, 2022 WL 888424 at *8.

Lanham's Counterclaim, and the press coverage it incorporates, includes significant facts that provide reasonable grounds for Plaintiffs to believe that Lanham's appraisal was racially motivated. *See Brown*, 2022 WL 888424, at *8 (inquiry into negligence asks whether the speaker "had reasonable grounds for believing that the communication was true"). To reiterate briefly, these materials show that Drs. Connolly and Mott's conclusion was based on the facts that: they purchased their home for $450,000 four years prior to Lanham's appraisal and, since its purchase, had invested at least $40,000 in improvements to the home; they received a conservative estimate of value from their loanDepot loan officer that exceeded Lanham's appraisal of $472,000; they independently identified properties they believed to be comparable that sold for significantly higher than Lanham's appraisal; and that the home appraised for $750,000 only seven months after Lanham's appraisal, after being whitewashed. *See supra* 10–15.

Against this backdrop, regardless of Lanham's allegations regarding the validity of his appraisal, it cannot plausibly be concluded that Plaintiffs failed to act as reasonable people under the circumstances. They had "reasonable grounds for believing" their statements to be true, and they diligently assessed the truth of their statements by conducting research on neighborhood sales and obtaining the later appraisal, for nearly $300,000 higher than Lanham's. *See Brown*, 2022 WL 888424, at *8. Indeed, even if Plaintiffs could have determined from other materials

that their statements were false (which they are not), it would not establish fault. Because there was a sound factual foundation for their statements, they were not obligated to seek out other facts that might conceivably have led to a different conclusion. *See Hawks*, 2019 WL 4860760, at *9 (the facts as known to defamation defendant at the time precluded a finding of negligence, even though defendant could have researched and discovered falsity of her statement; she had no duty to engage in such research).

Lanham's conclusory allegations regarding Plaintiffs' state of mind do nothing to support his claim. His allegations—that the statements were "recklessly made" (Countercl. ¶ 4), that Plaintiffs "knew at the time that they made their false and defamatory accusations of racism that they were false" (*id.* ¶ 5), and that Plaintiffs made their statements "with actual malice" or in the alternative "with negligence and lack of reasonable care" (*id.* ¶¶ 83, 84), and that Plaintiffs "knew that the statements . . . were false" (*id.* ¶ 95)—are precisely the sort of conclusory allegations that do nothing to makes his claims plausible. *See Brown*, 2022 WL 888424, at *8 (allegations that speaker "had knowledge that the information he allegedly publicized was untrue or he acted in reckless disregard for the truth," among others, failed to establish negligence).

In short, Lanham's claims are belied by his pleading and the materials on which he relies. Given the facts known to them at the time—including the fact that another appraiser had valued their home at $750,000 shortly after Lanham's appraisal—Drs. Connolly and Mott had a reasonable basis for believing their statements to be true, they were not negligent, and Lanham has failed to plausibly allege that they were at fault.

## II. Lanham's Counterclaims Are Barred by Privilege

Even if Plaintiffs' statements were defamatory, which they are not, they are not actionable because they are privileged. This is because "a defendant may escape liability for an

otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest." *Marchesi v. Franchino*, 387 A.2d 1129, 1131 (Md. 1978). Where an allegedly defamatory statement is made "in furtherance of some interest of social importance, which is entitled protection," it is privileged and cannot form the basis of a defamation suit. *Gohari v. Darvish*, 767 A.2d 321, 328 (Md. Ct. App. 2001); *see* Restatement (Second) of Torts scope note preceding § 593 (Am. L. Inst. 1977) ("the common law recognized that a person ought to be shielded against civil liability for defamation . . . where his declaration would be of interest to the public in general.").

"The common law conditional privilege is broad and may apply to an infinite variety of factual circumstances." *Gohari*, 767 A.2d. at 328–29. At issue in this case are two conditional privileges recognized in Maryland: the fair comment privilege, and the fair reporting privilege. The former can be overcome only when the defamation proponent demonstrates malice; the latter, when he or she demonstrates that the report is not fair and accurate. Lanham can defeat neither.

Whether a conditional privilege exists is a question of law. *Piscatelli v. Van Smith*, 35 A.3d. 1140, 1147 (Md. 2012). Although privilege is an affirmative defense, a court may appropriately dispose of a defamation claim on a motion to dismiss when a meritorious privilege claim is apparent from the pleadings. *See Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 275-76 (4th Cir. 2022) (upholding grant of MTD on defamation claims when facts pleaded were insufficient to overcome assertion of privilege); *Shulman*, 2017 WL 5172642, at *14-15 ("a court can decide the question of [conditional privilege] as a matter of law if the plaintiff fails to allege or prove facts that would support a finding of abuse"); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d

748, 758 (D. Md. 2015) (noting on motion to dismiss that privilege barred defamation claims); *accord Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 298 (4th Cir. 2022) (appropriate to consider affirmative defense on MTD when "defendants relied solely on the allegations of the complaint in moving to dismiss"). That is the case here.

### A. Lanham's Counterclaims Are Barred by The Fair Comment Privilege

The fair comment privilege is closely related to and overlaps substantially with the First Amendment's protections for pure opinions, discussed *supra* at 10–15. *See*, *e.g.*, *Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1285 n.13; *see also* Restatement (Second) of Torts § 566 cmt a. The fair comment privilege protects opinions or comments regarding matters of legitimate public interest where the opinions are based on non-defamatory facts, true facts, privileged facts, facts assumed mutually by the opinion-maker and recipient, or the underlying facts are readily accessible to the recipient of a communication. *Piscatelli*, 35 A.3d. at 1151–52; *Smith v. Griffiths*, 2020 WL 5413672, at *10.

#### 1. The Statements are Statements of Opinion on Matters of Legitimate Public Interest

The fair comment privilege undoubtedly covers Plaintiffs' statements that Lanham conducted a discriminatory appraisal of their home. As discussed at length above, the statements Lanham complains of are, even under Lanham's characterization, statements of opinion supported by facts asserted or mutually assumed to be true. *See supra* at 10–15.

The topic, appraisal discrimination, is also of significant public concern. Indeed, on June 1, 2021, President Biden announced that he had launched an interagency initiative to combat appraisal bias called the Interagency Task Force on Property Appraisal and Valuation Equity (PAVE), involving thirteen federal agencies and offices and co-chaired by the Secretary for the U.S. Department of Housing and Urban Development and the White House's Domestic Policy

Advisor.[8] Multiple hearings have occurred in front of federal governmental entities relating to appraisal bias, including a hearing on March 29, 2022, before the House Financial Services Committee,[9] and on January 4, 2023, before the Appraisal Subcommittee of the Federal Financial Institutions Examination Council (ASC).[10] The issue of appraisal bias and effects to combat that bias are the topics of significant research and are regularly covered in the press.[11] Under these circumstances, there can be no question that the matter is one of significant public concern and public interest. *See Shulman*, 2017 WL 5172642, at *15 (email pertained to crime in the community, which was an issue of public concern).

In short, it is apparent from the face of Lanham's Counterclaim that the statements made by Drs. Connolly and Mott are opinions or comments, based on facts that are presented within the news coverage in which the complained-of statements appear, and relate to issues of public concern. As such, the fair comment privilege applies.

**2. The Fair Comment Privilege Was Not Abused**

Because Plaintiffs' statements regarding Lanham's appraisal fall within the fair comment privilege, this Court must dismiss Lanham's Counterclaims unless Lanham has alleged specific facts that could demonstrate that the statements were made with malice. *See Shulman*, 2017 WL 5172642, at *16. For purposes of a defamation claim, malice is defined as knowledge of falsity

[8] U.S. Dep't of Housing and Urban Dev., *About PAVE* (March 9, 2023, 10:00 AM), https://pave.hud.gov/about

[9] Devalued, Denied, and Disrespected: How Home Appraisal Bias and Discrimination Are Hurting Homeowners and Communities of Color, Hearing Before the Housing Financial Services Cmte., 117 Cong. 1-275 (2022).

[10] FFIEC Appraisal Subcommittee (ASC) Public Hearing on Appraisal Bias, YOUTUBE (Jan. 23, 2023), https://www.youtube.com/live/QW8ADw9vOSc?&t=390 (begins at 6:30)

[11] *See, e.g.,* Jonathan Rothwell and Andre M. Perry, How racial bias in appraisals affects the devaluation of homes in majority-Black neighborhoods, Brookings (Dec. 5, 2022), *see also* Debra Kamin, *Widespread Racial Bias Found in Home Appraisals*. N.Y. TIMES, Nov. 2., 2022, https://www.nytimes.com/2022/11/02/realestate/racial-bias-home-appraisals.html.; *see also* Molly Grace, *Appraisal bias undervalues homes and robs homeowners of equity — here's how to spot it*, BusinessInsider (Oct.6, 2022), https://www.businessinsider.com/personal-finance/appraisal-bias; Kenon Chen, Progress now or perfect later: Improving the appraisal process, HousingWire (Feb. 24, 2023), https://www.housingwire.com/articles/new-or-perfect-later-improving-the-appraisal-process/.; • Jeff Ostrowski, The Black neighborhood home appraisal gap is real and persistent, Yahoo! Finance (Feb. 23, 2023), https://finance.yahoo.com/news/black-neighborhood-home-appraisal-gap-164515735.html.

or reckless disregard for falsity. *Id.* at 14; *see Mejia v. Telemundo Mid-Atl. LLC*, 440 F. Supp. 3d 495, 501 (D. Md. 2020) (citing *Batson*, 325 Md. at 728). Malice is *not* established merely by showing that the allegedly defamatory statement "was erroneous, derogatory or untrue," that the speaker "acted out of ill will, hatred or a desire to injure," that the speaker "acted negligently," or that the speaker "acted without undertaking the investigation that would have been made by a reasonably prudent person." *Shulman*, 2017 WL 517624, at *14-15 (quoting *Bagwell*, 665 A.2d 297, 318 (Md. Ct. Spec. App. 1995).

Lanham does not and cannot plausibly allege malice. As described above, he fails even to demonstrate negligence. *See supra* 15–18. As discussed, Lanham's allegations that Plaintiffs knew that their statements were false are conclusory, bare recitations, without any factual material pleaded to render them plausible. *See Nemet*, 591 F.3d at 155. Nor are the allegations that Plaintiffs knew about the sales prices of *other* properties sufficient to establish malice, or even undercut the validity of the facts, discussed *supra* at 21–22, that form the basis for Plaintiffs' opinion. *See Harvey*, 48 F.4th at 273–74 (no malice where pleading did not allege sufficient facts to show makers of allegedly defamatory statements "subjectively knew" their statements were false); *id.* ("courts have consistently held that reliance on tainted or troubled sources does not alone establish actual malice"); *Shulman*, 2017 WL 5172642, at *16 (allegations that speaker failed to conduct investigation into underlying facts prior to making statements, and that speaker had a motive to defame, did not support finding of malice).

Again, Lanham is free to disagree with Plaintiffs' opinion, but it is apparent from the face of Lanham's Counterclaim, the news coverage itself, and Plaintiffs' complaint that Plaintiffs had a good-faith basis for believing their statements to be true and that those facts were both stated

and available to any listener. The fair comment applies and there can be no finding of malice to overcome it.

### B. Lanham's Counterclaims are Barred by the Fair Reporting Privilege

The fair reporting privilege bars defamation claims against those who report on legal and official proceedings so long as the account is "fair and accurate." *See*, *e.g.*, *Harvey*, 48 F.4th at 274; *see also Piscatelli*, 35 A.3d at 1149; Restatement (Second) of Torts § 611 cmt. a.

Although "the fair report privilege usually arises in lawsuits involving the press or electronic media, it is not limited to defendants in the news business but protects reports of judicial proceedings made by others as well." *Rosenberg v. Helinski*, 616 A.2d 866, 874 (Md. 1992) (applying fair reporting privilege to medical professional summarizing expert testimony). It also covers statements reflecting information contained within documents filed in Court, such as civil complaints, in addition to reports of events that occur within a courtroom. *See, e.g.*, *Olukoya v. Sowore*, 2020 WL 7769777, at *2 (D. Md. 2020) ("*Olukoya II*"); *see also Piscatelli*, 35 A.3d at 1145–46 ("information in a court case file is covered by the fair reporting privilege, if the reporter's account of that information is fair and substantially accurate"). That privilege applies in this case.

#### 1. The Statements Made by Drs. Connolly and Mott are Fair and Accurate Reports About the Underlying Lawsuit

Lanham fashions his Counterclaim as relating to media coverage. But the media coverage of which Lanham complains is coverage of Plaintiffs' discrimination lawsuit against him. In sitting for interviews about their lawsuit, Plaintiffs stated the basis of the lawsuit as contained in the complaint: that Lanham conducted a discriminatory appraisal of their home. While Lanham may disagree with a statement that he discriminatorily appraised Plaintiffs home, he does not and

cannot reasonably argue that such a statement does not fairly and accurately convey the basis for Plaintiffs' lawsuit as described in their complaint.

In determining whether a statement falls within the purview of a privilege, it may not be considered in isolation and must, instead be interpreted in the context of the articles in which it appears. *See, e.g.*, *Olukoya v. Sowore*, 2019 WL 3501567, at *4 ("*Olukoya I*"); *see also supra* at 11, Restatement (Second) of Torts § 563 cmt. d ("In determining the meaning of a communication, words, whether written or spoken, are to be construed together with their context."). Read in context, it is evident that Plaintiffs' statements regarding Lanham and his appraisal were restatements of the basis of their lawsuit and fairly and accurately recounted information contained in their complaint, and there is no doubt that a reader would have understood them as relating to Plaintiffs' lawsuit.

First, as discussed *supra* at 14, each article begins by immediately placing the story in the context of Plaintiffs' lawsuit for appraisal discrimination: the lawsuit is explicitly referenced in the sub-headline of the New York Times article and in the first sentence of the ABC News piece. Furthermore, each article repeatedly both references the lawsuit and explicitly attributes allegations to the complaint. The New York Times article makes no fewer than twelve such references in approximately the first two thirds of the article, before pivoting to a discussion of appraisal discrimination generally. [12] Ex. A. The ABC News article has at least eight such references, including two statements indicating, explicitly, that when Dr. Connolly and Dr. Mott spoke to ABC News, they did so specifically about their appraisal discrimination lawsuit, Ex. B. The context of the articles leaves no doubt that the statements made by Plaintiffs about Lanham's appraisal were made to report on their recently-filed lawsuit. *See, e.g.*, *Harvey*, 48 F.4th at 274–

[12] Any statement that can even remotely be characterized as a statement by either Plaintiff about Lanham would be found in the first two thirds of the article.

75 (privilege applied where article "summarized (and provided a link to) official documents from the impeachment proceedings (citing *Gubarev v. BuzzFeed, Inc.*, 340 F.Supp.3d 1304, 1318-19 (S.D. Fla. 2018)). Indeed, Lanham acknowledges that the interviews were directly related to Dr. Connolly and Dr. Mott's lawsuit. *See* Countercl. ¶ 68 (asserting that Plaintiffs' interviews were conducted "in support of their lawsuit against Mr. Lanham and 20/20 Valuations."). Any statement made about Lanham's appraisal must therefore be understood as a reference to the basis of Plaintiffs' lawsuit, placing it within the protection of the fair reporting privilege.

**2. Because the Statements Made by Drs. Connolly and Mott are Fair and Substantially Correct, The Privilege is Not Overcome**

The fair reporting privilege is "broader in scope" than other qualified privileges: while some privileges can be overcome by demonstrating actual malice on the part of the speaker, Maryland law adopts the "modern view" of the fair reporting privilege under which that privilege is a complete bar to defamation claims provided that the report is "fair and substantially correct." *Piscatelli*, 35 A.3d at 1149 n.3; *see also Olukoya I*, 2019 WL 3501567 at *3. A "fair" report of a court document is one that "is consistent with the facts" contained therein, "does not add additional details or allegations[,]" and creates an impression that is "no more defamatory than that created by the original." *Piscatelli*, 35 A.3d at 1150–51 (quoting *Rosenberg*, 616 A.2d at 875). A statement need not directly reference or be attributed to the underlying judicial document or proceeding in order to be considered a report protected by the privilege; a restatement of the information is sufficient. *See Rosenberg*, 616 A.2d at 869.

Here, Plaintiffs' statements that Lanham conducted a discriminatory appraisal of Plaintiffs' home are fairly and substantially correct because they restate the bases for the lawsuit as alleged in Plaintiffs' complaint. It is "consistent with the contents" of the complaint and "does not add additional details or allegations," *Piscatelli* at 1150–51, nor does it result in a "materially

misleading account" of the information contained in the complaint, *Rosenberg* 616 A.2d at 875. Indeed, the only statement containing a direct quote from Defendant—that Dr. Mott's "jaw dropped" and she concluded "this is racism" upon seeing how inappropriately low Lanham's valuation was—has a direct analogue in Plaintiffs' complaint. *See* FAC ¶ 51 ("Dr. Connolly and Dr. Mott were shocked by this low appraisal. Dr. Mott told Jorgensen that the appraisal was racially discriminatory. Plaintiffs explained that there is a long and well-documented history of devaluing Black homes, and that the valuation was impossibly low given the characteristics of their neighborhood and their home.").

Because Dr. Connolly and Dr. Mott's statements in the media were fair and substantially correct reports of the information underlying their complaint in this case, the fair report privilege applies to their statements and the Counterclaim should be dismissed.

## III. The Counterclaim is a SLAPP Suit That Must Be Dismissed Pursuant to Md. Courts and Judicial Proceedings Code § 5-807

In addition to his failure to state a claim, Lanham's Counterclaim should be dismissed pursuant to Maryland Courts and Judicial Proceedings Code Ann. § 5-807, Maryland's law prohibiting strategic lawsuits against public participation ("Anti-SLAPP Statute"). The Anti-SLAPP Statute was enacted "to protect individuals and groups, many with few assets, from defending costly legal challenges to their lawful exercise of such constitutionally protected rights as free speech, assembly, and the right to petition the government." *MCB Woodberry Dev., LLC v. Council of Owners of Millrace Condo., Inc.*, 265 A.3d 1140, 1150 (Md.App. 2021) (internal quotation marks omitted).

Under that law, a strategic lawsuit against public participation (SLAPP suit) is a one that, in relevant part, is:

> (1) Brought in bad faith against a party who has communicated with . . . the public at large to report on, comment on, rule on, challenge, oppose, or in any other way exercise rights under the First Amendment of the U.S. Constitution . . . regarding . . . any issue of public concern;
> (2) Materially related to the defendant's communication; and
> (3) Intended to inhibit or inhibits the exercise of rights under the First Amendment of the U.S. Constitution . . . .

MD. Code Ann., Cts. & Jud. Proc. § 5-807(b).[13] "A defendant in a SLAPP suit is not civilly liable for communicating with . . . the public at large, if the defendant, without constitutional malice, reports on, comments on, rules on, challenges, opposes, or in any other way exercises rights under the First Amendment of the U.S. Constitution" regarding "any issue of public concern." *Id.* § 5-807(c). A defendant in a SLAPP suit may move to dismiss the alleged SLAPP suit. *Id.* § 5-807(d).

Lanham's Counterclaim meets all three of the elements of Maryland's Anti-SLAPP law and this Court should dismiss it on that basis. There can be no question that Drs. Connolly and Mott's statements in the New York Times and ABC News relate to a matter of public concern, *i.e.*, appraisal discrimination, and Lanham's Counterclaim is materially related to the plaintiffs' statements. "Whether a communication is "on a matter of public concern is a question of law for the court, to be determined 'by the content, form, and context of a given statement." *MCB Woodberry*, 265 A.3d at 1155 (internal marks omitted). Matters of public concern include those "fairly considered as relating to any matter of political, social, or other concern in the community," and also matters that are "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *MCB Woodberry*, 265 A.3d at 1154–55 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). As discussed above, *supra* 19–25, the

---

[13] The Anti-SLAPP Statute also applies to exercise of rights afforded by Articles 10, 13, and 40 of the Maryland Declaration of Rights. *See* MD. Code Ann., Cts. & Jud. Proc. § 5-807. Article 40 of the Maryland Declaration of Rights is the state counterpart to the First Amendment. *MCB Woodberry*, 265 A.3d at 1153 n. 13.

issue of appraisal discrimination is one of significant, and increasing, concern for government actors and the public at large.

The only remaining questions are whether the Counterclaim has been brought in bad faith, and whether it is intended to or does inhibit the exercise of First Amendment rights.

**A. The Counterclaim is Brought in Bad Faith**

"Bad faith," as it is used in the Anti-SLAPP Statute, includes "the pursuit of litigation 'vexatiously, for the purposes of harassment or unreasonable delay, or for other improper reasons.'" *MCB Woodberry*, 265 A.3d at 1156. The issue of bad faith "is susceptible of being determined as a matter of law by the court on a motion to dismiss an alleged SLAPP suit," *id.* at 1155, in particular when "the allegations of the pleadings, exhibits incorporated therein, and other matters capable of being noticed judicially, supply evidence from which bad faith may be discernible as a matter of law," *id.* at 1157. That is the case here.

*MCB Woodberry*, 265 A.3d 1140 (Md. App. 2021), is instructive. *MCB Woodberry* involved a suit brought by a real estate developer against residents and homeowners' associations who opposed changes to a planned development. *Id.* at 1145. The plaintiff developer alleged that opposition to the proposed changes violated a community declaration and interfered tortiously with the developer's business and economic relations. *Id.* The Maryland Court of Special Appeals upheld the trial court's dismissal under the Anti-SLAPP Statute. *Id.* at 1145. Among the factors supporting the finding of bad faith were (1) a request for punitive damages that was unsupported by any plausible allegations of evil motive; and (2) the fact "that the allegations of the complaint were 'conclusory' and 'devoid of any specific facts' to support" two central allegations in the pleading. *Id.* at 1158. On the latter point, the court noted that "[t]he

conclusory nature of those allegations was notable . . . because the remaining allegations against the [defendants] were customarily protected First Amendment activities." *Id.* at 1158-59.

Similar to *MCB Woodberry*, Lanham has failed to plead facts sufficient to support his Counterclaims. His pleading is rife with conclusory allegations about Drs. Connolly and Mott's state of mind, but lacks factual allegations from which the court could plausibly infer defamation or false light. As in *MCB Woodberry*, this weighs in favor of a finding of bad faith. And, similar to *MCB Woodberry*, this is especially notable because the core conduct alleged by Lanham—speaking to the press—is a "customarily protected First Amendment" activity. 265 A.3d at 1158–59. In addition, also similar to *MCB Woodberry*, Lanham's Counterclaim is devoid of factual allegations to support his request for a quarter-million-dollar punitive damage award. (ECF No. 35, p. 54, ¶ 2). "In Maryland, in order to recover punitive damages . . . facts sufficient to show actual malice must be pleaded and proven by clear and convincing evidence." *Id.* Plainly, the Counterclaim—which fails to plead facts sufficient even to show negligence, *see supra* 15–18—does not contain sufficient factual content to plausibly allege malice. Nor does the Counterclaim plead facts to support that punitive damages in the amount of $250,000 are appropriate. In total, with respect to damages, Lanham alleges that the statements were "highly damaging," Countercl.¶ 4; "have had a devastating impact," *id*. ¶ 15; "injured Mr. Lanham and 20/20 Valuations in their profession, employment, and business," *id*. ¶ 79; "caused [Lanham's] standing in the community to suffer and their reputation to be harmed," *id*. ¶ 80; and caused Lanham to "suffer[ ] a loss of income and . . . not receive[ ] as much business and work as a Certified Real Estate Appraiser licensed by the State of Maryland, *id*. ¶ 89. In fact, Mr. Lanham has been told that he has not received appraisal work because of" the complained-of statements (para 89). All but one of these allegations are conclusory and formulaic recitations of an element

of Lanham's underlying cause of action, and the final allegation provides no support for punitive, as opposed to compensatory, damages. Simply put, Lanham has failed to adduce facts "to remotely suggest that" Plaintiffs "committed acts of such gravity or have the means to support an award" of punitive damages in the amount requested, supporting a finding of bad faith.

### B. The Purpose of the Counterclaim is to Inhibit the Pursuit of First Amendment Rights

A meritless counterclaim that would effectively sanction a party for speaking to the press about a matter of public concern undoubtedly has the effect of inhibiting the exercise of First Amendment rights. This is clear from the very nature of the Counterclaim: Lanham brings the Counterclaim on the basis of Plaintiffs speaking with the media, and it strains credulity to believe that a lawsuit expressly premised on sanctioning contact with the media would not inhibit or be designed to inhibit further media contact. The lack of allegations sufficient to support the Counterclaim and the outsized and unsupported punitive damages request suggest that this is precisely Lanham's intention. *Cf. MCB Woodberry*, 265 A.3d at 1152 (upholding court's rejection of argument that the lawsuit was not intended to inhibit the exercise of First Amendment Rights because the material relied upon by plaintiff did not support its position). Moreover, the Court need only look to the discussion within the appraisal community about Lanham's Counterclaim in this case to see that this would be a welcomed effect: "By fighting back like [Lanham], appraisers can show borrowers that they run the risk of a countersuit if potentially false and difficult to prove allegations are promulgated in the media." *See* Ex. C.[14]

[14] The Court may take judicial notice of the fact of the publication of this blog. The Court "may consider relevant facts subject to judicial notice without converting a motion to dismiss into a motion for summary judgment." *Pisner v. McCarthy*, 2022 WL 4465898, at *4 (D. Md. 2022). Judicial notice is appropriate for facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Jones v. Mutual of Omaha Insurance Co.*, 2022 WL 16763733 (D. Md. 2022). Here, the facts over which the Court should take judicial notice are the publication of the blog and its contents. It cannot reasonably be questioned that the blog has been published, or that its contents are as they appear.

This is the core of what the Anti-SLAPP Statute is intended to prevent: the intimidation of those who would exercise their First Amendment rights, in order to inhibit the exercise thereof. As such, the Counterclaim should be dismissed.

**IV. This Court Should Dismiss Lanham's Counterclaims with Prejudice**

"[W]hen a complaint is incurable through amendment, dismissal is properly rendered with prejudice and without leave to amend." *McLean v. United States*, 566 F.3d 391, 400 (4th Cir. 2009); *see also Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008) (affirming dismissal with prejudice without leave to amend where "amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability"). Courts in this district frequently dismiss defamation and false light claims with prejudice where amendment would be futile. *See, e.g.*, *Byam v. Ocean Enter. 589, LLC*, 2023 WL 1442434, at *5 (D. Md. 2023); *Parikh*, 2023 WL 131043, at *11; *Shahidullah v. Shankar*, 2022 WL 286935, at *9 (D. Md. 2022).

In this case, "no set of facts would make [the] allegedly false statements actionable." *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 556 (D. Md. 2013). For the reasons stated above, the statements that form the basis for Lanham's Counterclaim are not defamatory, and the materials on which the claim relies fundamentally contradict the claims themselves. In these circumstances, Lanham's Counterclaim "fails not because of some technical deficiency but because it[] lack[s] legal merit," and should be dismissed with prejudice. *McLean*, 566 F.3d at 401.

Dismissal with prejudice also is appropriate because of the Counterclaim's nature as a SLAPP suit. As the Maryland Court of Special Appeals discussed in *MCB Woodberry*, the structure of the Anti-SLAPP Statute and the inclusion of dismissal as a remedy "create[s] a

mechanism for a defendant to obtain an expeditious dismissal of a SLAPP suit before he or she is forced to expend time and money defending the suit." *Id.* at 1157. "This is consistent with the overall purpose of the Anti-SLAPP Statute, which is aimed at protecting defendants from being deterred from exercising their First Amendment rights by the initiation of meritless and vexatious litigation." *Id.* In this case, the Court should not allow Lanham the opportunity to replead what is evidently a SLAPP suit that Maryland law seeks to prohibit. To do so would significantly undercut the purpose of the Anti-SLAPP Statute and unnecessarily limit the remedy it provides. *See id.* (if the determination of bad faith necessarily required an evidentiary proceeding, it would "render[ ] nugatory" the provision of law that provided for dismissal).

**CONCLUSION**

For the reasons set forth above, the Court should dismiss Lanham's Counterclaims with prejudice.

DATED: March 9, 2023

Respectfully Submitted,

/s/ John Relman
John Relman (#11482)
Gabriel Diaz*
Soohyun Choi*
David DePriest*
RELMAN COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
jrelman@relmanlaw.com
gdiaz@relmanlaw.com
schoi@relmanlaw.com
ddepriest@relmanlaw.com

*Counsel for Plaintiffs*

*admitted *pro hac vice*