**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| Nathan Connolly and Shani Mott, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:22-cv-02048-SAG |
| Shane Lanham, 20/20 Valuations, LLC, and loanDepot.com, LLC, | |
| Defendants. | |

**BRIEF OF *AMICUS CURIAE* MORTGAGE BANKERS ASSOCIATION**
**IN SUPPORT OF DEFENDANT LOANDEPOT.COM, LLC**

# TABLE OF CONTENTS

I.     **Introduction** ................................................................................................ 1

II.    **Argument** .................................................................................................... 1

      A.     The Government Agencies mischaracterize the standard for liability over third parties under the FHA and the ECOA ........................................................ 2

           1.     A lender is not liable under ECOA for the acts of an independent, third-party non-creditor .......................................................................... 2

           2.     A lender is liable under the FHA for the acts of a third party only in limited, prescribed cases .......................................................................... 4

      B.     The Government Agencies improperly assume that, under the FHA, lenders are expected to know or should know of discrimination by an independent, third-party appraiser ..................................................................... 11

      C.     The Government Agencies seek to hold lenders liable for third parties under a disparate treatment theory by applying an incongruous negligence standard ............................................................................................. 14

III.   **Conclusion** ................................................................................................. 15

**TABLE OF AUTHORITIES**

Page(s)

Cᴀꜱᴇꜱ

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................... 15

*Barkley v. Olympia Mortg. Co.*,
No. 04 CV 875, 2007 WL 2437810 (E.D.N.Y. Aug. 22, 2007) ................................... 10

*Bell Atl. Corp. v. Twombly*,
550 U. S. 544 (2007) .......................................................................................... 15

*Brown v. Interbay Funding, LLC*,
No. CIV-04-617, 2004 WL 2579596 (D. Del. Nov. 8, 2004) ...................................... 3

*DiCocco v. Garland*,
18 F.4th 406 (4th Cir. 2021), *reh'g en banc granted*, No. 20-1342, 2022 WL 832505
(4th Cir. Mar. 21, 2022), *rev'd on other grounds*, 52 F.4th 588 (4th Cir. 2022)..................... 14

*Griffith v. City of Des Moines*,
387 F.3d 733 (8th Cir. 2004) ............................................................................... 14

*Gross v. FBL Fin. Servs.*,
557 U.S. 167 (2009).......................................................................................... 11

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005).......................................................................................... 14

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 ...................................................................................................... 14

*Meyer v. Holley*,
537 U.S. 280 (2003)............................................................................................ 4

*Ricci v. DeStefano*,
557 U.S. 557 (2009)........................................................................................... 14

*Steele v. GE Money Bank*,
No. 08 C 1880, 2009 WL 393860 (N.D. Ill. Feb. 17, 2009)...................................... 10

*Swanson v. Citibank N.A.*,
614 F.3d 400 (7th Cir. 2010) ............................................................................... 10

**S**TATUTES

15 U.S.C. § 1639e(c) ................................................................................................ 11

15 U.S.C. 1691 *et seq.* ...................................................................................... 2, 3, 11

**R**EGULATIONS

12 C.F.R. § 528.2a .................................................................................................... 3

12 C.F.R. § 1002.2(l) ..............................................................................................2, 3

12 C.F.R. § 1026.42 .................................................................................................. 7

12 C.F.R. § 1026.42(f) .............................................................................................. 4

24 C.F.R. § 100.7(a)(iii) ................................................................................4, 5, 11, 14

Board of Governors of the Federal Reserve System, Proposed Rule, 12 C.F.R. pt. 226, 73
    Fed. Reg. 44522 (July 30, 2008). .......................................................................6, 7

U.S. Dep't of Labor, *Proposed Rule, Employee or Independent Contractor Classification
    under the Fair Labor Standards Act*, 87 Fed. Reg. 62218 (Oct. 13, 2022) ............... 5

**O**THER **A**UTHORITIES

Cal. Labor & Workforce Dev. Agency, ABC,
    https://www.labor.ca.gov/employmentstatus/abctest/ .................................................. 5

Fannie Mae, Appraiser Independence Requirements (updated Mar. 2022),
    https://singlefamily.fanniemae.com/media/21986/display ............................................ 9

Fannie Mae Single Family Selling Guide, Section B4-1.1-02, https://selling-
    guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/; Freddie Mac Single-
    Family Seller/Servicer Guide, Section 5604.1 ......................................................... 6

Fannie Mae Selling Guide, D1-1-01, Lender Quality Control Programs, Plans, and
    Processes, https://selling-guide.fanniemae.com/Selling-Guide/Ensuring-Quality-Control-
    QC-/Subpart-D1-Lender-QC-Process/Chapter-D1-1-Lender-Quality-Control-
    Process/1049099251/D1-1-01-Lender-Quality-Control-Programs-Plans-and-Processes-08-07-
    2019.htm?touchpoint=Guide ................................................................................ 7

Fannie Mae Selling Guide: Fannie Mae Single Family (Apr. 5, 2023), https://selling-
    guide.fanniemae.com/Underwriting-Property-Projects/Appraisal-Requirements/Appraisal-
    Report-Assessment/Valuation-Analysis-Quality-Assurance/1131591691/How-are-changes-
    in-the-appraised-value-considered.htm. .................................................................. 7

Fannie Mae Selling Guide, B4-1.3-12, Quality Assurance, https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B4-Underwriting-Property/Chapter-B4-1-Appraisal-Requirements/Section-B4-1-3-Appraisal-Report-Assessment/1032992391/B4-1-3-12-Quality-Assurance-06-03-2020.htm. ..................................... 9

Fed. Hous. Admin. Single Family Housing Policy Handbook 4000.1, Section II.A.1.a.iii(B)(9)(a), https://www.allregs.com/tpl/%2fHome%2fIndexWithDocumentId2%2f3df7d806-f6e3-4df0-b3e8-05636cc9c565%3b62ab7b5e-4613-45e7-b5a8-dddb8f34a66c ............................................... 9

Freddie Mac, Appraiser Independence Requirements FAQ, https://sf.freddiemac.com/faqs/appraiser-independence-requirements-faq. ................................. 9

Freddie Mac Single-Family Seller/Servicer Guide, Section 5604.1, https://guide.freddiemac.com/app/guide/section/5604.1 ............................................................ 6

George Krivorotov and Michael Lacour-Little, *AVM versus Appraisal-Based Underwriting in Refinance Mortgages: The Trade-off Between Noise and Bias* (Dec. 22, 2020) ................ 12

I.R.S., Employee (Common-Law Employee), https://www.irs.gov/businesses/small-businesses-self-employed/employee-common-law-employee ................................................. 5

K. Anacker, J. Carr, and M. Mulcahy, *Foreclosure Crisis and its Impact on Communities of Color: Research and Solutions*, National Community Reinvestment Coalition (Sept. 2011), https://ncrc.org/wp-content/uploads/2011/10/ncrc_foreclosurewhitepaper_2011.pdf .................................... 7, 8

U.S. Dep't of Hous. & Urban Dev. and U.S. Dep't of Treasury, *Curbing Predatory Home Mortgage Lending* (June 2000), https://www.huduser.gov/portal//Publications/pdf/treasrpt.pdf ......................................... 7

U.S. Dep't of Justice, Title VI Legal Manual, Section VI: Proving Discrimination - Intentional Discrimination, https://www.justice.gov/crt/fcs/T6Manual6 ............................. 15

*Wealth Gaps Rise to Record Highs Between Whites, Blacks, Hispanics*, Pew Research Center (July 2011), https://www.pewresearch.org/social-trends/2011/07/26/wealth-gaps-rise-to-record-highs-between-whites-blacks-hispanics/ ................................................................................................. 8

## I.    Introduction

The Mortgage Bankers Association ("MBA") respectfully submits this Brief of *Amicus Curiae* in support of the pending Motion to Dismiss filed by Defendant loanDepot.com, LLC ("loanDepot"), ECF No. 32, and specifically in response to the arguments raised by the U.S. Department of Justice and the Consumer Financial Protection Bureau (collectively, the "Government Agencies") in their Statement of Interest, ECF No. 45-1, addressing the questions of law raised by Defendant loanDepot in its Motion to Dismiss.

## II.   Argument

The Government Agencies assert that, "[u]nder the [Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA")] and [Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* ("ECOA")], lenders can be held liable for relying upon discriminatory appraisals." ECF No. 45-1. This assertion greatly overestimates the reach of these anti-discrimination statutes by: (1) mischaracterizing the liability standard that would apply under the FHA and the ECOA to lenders, such as loanDepot, for the acts of independent, third-party appraisers; and (2) assuming that lenders, such as loanDepot, would necessarily know or should know whether an independent, third-party appraiser engaged in discrimination for purposes of FHA liability. In making their assertion, the Government Agencies effectively ignore the purpose of the independent appraisal in the lending process, and the resulting restrictions placed on lenders to ensure appraiser independence. Further, the MBA disagrees with the Government Agencies' attempt to impose requirements and novel interpretations of existing law on the MBA's members by opining on private actions in federal court rather than by issuing rulemaking through appropriate notice and comment. The MBA's Argument is limited to the Plaintiffs' allegations, as well as the Government Agencies'

arguments, related to loanDepot's liability for the alleged discriminatory actions of the third-party appraiser, and does not address the Plaintiffs' allegations regarding retaliation by loanDepot.

A.    The Government Agencies mischaracterize the standard for liability over third parties under the FHA and the ECOA

The Government Agencies improperly assume that lenders are automatically liable for the actions of independent, third-party appraisers, and the First Amended Complaint fails to allege any facts to support such a conclusion. Indeed, the Government Agencies' blanket assertion that "[u]nder the FHA and ECOA, lenders can be held liable for relying upon discriminatory appraisals" is misleading and inaccurate.

1.    A lender is *not* liable under ECOA for the acts of an independent, third-party non-creditor

Under ECOA, it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction…on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)." For purposes of this prohibition, Regulation B defines a "creditor" as "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit." 12 C.F.R. § 1002.2(l). Further, the term "creditor" includes "a creditor's assignee, transferee, or subrogee who so participates," as well as "a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made." *Id.* However, "[a] person is not a creditor regarding any violation of the Act or this part committed by another creditor unless the person

knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction." *Id.*

Plaintiffs have not alleged, and the Government Agencies have not asserted or argued, that the there was any creditor involved in the relevant transaction except for loanDepot, and it is apparent that an appraiser's role in performing a property valuation does not make them a creditor under 12 C.F.R. § 1002.2(l). Nor do Plaintiffs or the Government Agencies claim the appraiser to be an assignee, subrogee, or transferee of a creditor. Therefore, because Plaintiffs are not seeking to impose liability on loanDepot for the acts of another creditor, the Regulation B language regarding "knew or had reasonable notice" of the discrimination is inapplicable here.

In fact, the Government Agencies have no support for their assertion that a lender is liable for an appraiser's allegedly discriminatory appraisal under ECOA. They have not cited, and cannot cite, any language from ECOA or Regulation B to support their incorrect proposition. Rather, as the Government Agencies' sole "support," the Statement of Interest references an unpublished federal court decision from 2004 that itself relies solely on an Office of Thrift Supervision ("OTS") regulation, applicable only to "savings associations," which was repealed in 2018. *See Brown v. Interbay Funding, LLC*, No. Civ-04-617-SLR, 2004 WL 2579596, at *4 (D. Del. Nov. 8, 2004) (citing 12 C.F.R. § 528.2a). As it stands, the Government Agencies' best shot at imposing third-party liability on loanDepot under ECOA is a repealed regulatory provision, issued by a defunct agency, that was inapplicable to loanDepot. Ultimately, there is no legal or regulatory support whatsoever for imposing ECOA liability on loanDepot for the actions of an independent, third-party appraiser.

## 2. A lender is liable under the FHA for the acts of a third party only in limited, prescribed cases

As a preliminary matter, the FHA imposes liability for the discriminatory acts of a third party by applying traditional principles of vicarious liability. Indeed, the Supreme Court has held that the FHA does <u>not</u> impose a nondelegable duty on a lender to ensure that third parties with whom it conducts business do not discriminate. *See Meyer v. Holley*, 537 U.S. 280, 289-91 (2003). Rather, the Supreme Court found that courts should apply traditional principles of vicarious liability to determine whether a party is liable under the FHA for the discriminatory conduct of third parties with whom it does business. In particular, the Supreme Court clarified that "traditional vicarious liability rules" are those that "ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Id.* at 285. The U.S. Department of Justice's own *amicus* brief in *Meyer v. Holley* made this very point:

> Neither the FHA, nor HUD's implementing regulations, reflect an intent to depart from general agency and corporate law principles in resolving questions of vicarious liability for violations of the Act. The text of the Act does not articulate distinct standards for determining the scope of vicarious liability, nor does it suggest that background agency principles should be disregarded. The most natural inference is that courts in FHA cases should follow generally applicable rules of agency and corporate law.

*See* Brief for the United States of *Amicus Curiae*, Docket No. 01-1120, at 7-8, https://www.justice.gov/sites/default/files/osg/briefs/2002/01/01/2001-1120.mer.ami.pdf.

Not surprisingly, in this case, the Government Agencies note that their "Statement of Interest does not address the issue of vicarious liability," presumably because the Government Agencies agree that the appraiser is not an agent or employee of loanDepot. Indeed, it is well-established that fee appraisers, by federal design, are not agents of lenders. *See, e.g.*, 12 C.F.R. §

1026.42(f). Further, generally accepted federal or state standards demonstrate that fee appraisers are appropriately classified as independent contractors and not agents of the lender.[1] And absent an agency or employee relationship, lender liability under the FHA for the alleged discrimination of a third party is extremely limited.

Specifically, the FHA imposes potential liability for a third party for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by a third party, where the person knew or should have known of the discriminatory conduct **and had the power to correct it**." *See* 24 C.F.R. § 100.7(a)(iii) (emphasis added). However, the Government Agencies, in their Statement of Interest, failed to mention the rest of § 100.7(a)(iii), which clarifies that "[t]he power to take prompt action to correct and end a discriminatory housing practice by a third party **depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party**." *Id.* (emphasis added). Thus, a claim

---

[1] *See, e.g.*, U.S. Dep't of Labor, *Proposed Rule, Employee or Independent Contractor Classification under the Fair Labor Standards Act*, 87 Fed. Reg. 62218, 62218 (Oct. 13, 2022) ("For more than 7 decades, the Department and courts have applied an economic reality test to determine whether a worker is an employee or an independent contractor under the FLSA. The ultimate inquiry is whether, as a matter of economic reality, the worker is either economically dependent on the employer for work (and is thus an employee) or is in business for themself (and is thus an independent contractor."); I.R.S, Employee (Common-Law Employee), https://www.irs.gov/businesses/small-businesses-self-employed/employee-common-law-employee ("What matters is that you have the right to control the details of how the services are performed"); Cal. Labor & Workforce Dev. Agency, ABC Test ("Under the ABC test, a worker is considered an employee and not an independent contractor unless the hiring entity satisfies **all three** of the following conditions: [1] The worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; [2] The worker performs work that is outside the usual course of the hiring entity's business; **and** [3] the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed."), https://www.labor.ca.gov/employmentstatus/abctest/.

against a lender, such as loanDepot, for the acts of an independent, third-party appraiser cannot succeed without sufficient allegations to establish the lender's control over that third-party appraiser. Yet lenders do not have the power to control the acts of third-party appraisers, and Plaintiffs have made no such allegation about loanDepot. Indeed, the word "control" does not appear once in the First Amended Complaint.

It is well-established that lenders – by federal design – have extremely limited control over the actions of appraisers and are subject to other legal responsibilities that prevent lenders from influencing or participating in the appraisal process. These restrictions ensure that the property constitutes adequate collateral for the loan. *See* Fannie Mae Single Family Selling Guide, Section B4-1.1-02 ("The lender is responsible for ensuring that the subject property provides adequate collateral for the mortgage."), https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/; Freddie Mac Single-Family Seller/Servicer Guide, Section 5604.1 ("For each Mortgage transaction that requires an appraisal, the Mortgage file must contain an appraisal report that meets Freddie Mac's requirements to evidence that the Mortgaged Premises is acceptable collateral."), https://guide.freddiemac.com/app/guide/section/5604.1. When lenders are permitted to influence and ultimately inflate appraisal values, this "may lead consumers to believe that they have more home equity than in fact they do, and to borrow or make other financial decisions based on this incorrect information."[2] For example, "a consumer also may take out more cash with a refinance or home equity loan than he or she would have had an appraisal not been

_____

[2] Board of Governors of the Federal Reserve System, Proposed Rule, 12 C.F.R. pt. 226, 73 Fed. Reg. 44522, 44566 (July 30, 2008).

inflated."[3] Such a consumer, if saddled with "substantial unsecured consumer debt," may be "especially vulnerable" because "they may find a cash-out refinance offer attractive."[4]

Leading up to the 2008 financial crisis, "borrowers in black neighborhoods [were] five times as likely to refinance in the subprime market than borrowers in white neighborhoods," even when controlling for income.[5] These statistics indicate that racial and ethnic minorities were acutely affected by inflated appraisals and the resulting housing market crash. To that end, "[w]hile the foreclosure crisis has had vast consequences throughout the United States, it has had a disproportionate impact on persons of color," even when considering that homeownership rates for Black / African American and Hispanic/Latino borrowers had been at their lowest levels in over a decade and would drop even further.[6] Notably, neighborhoods with populations of color

---

[3] *Id.*

[4] *Id.* at 44558. The existing appraisal framework is designed not only to protect borrowers from taking on more debt than their property is worth but also to limit the investor's risk of loss in the event of borrower default. Fannie Mae, for example, emphasizes that, to be eligible for delivery, the loan must be "secured by a property that provides acceptable collateral." *See* Fannie Mae Selling Guide, D1-1-01, Lender Quality Control Programs, Plans, and Processes, https://selling-guide.fanniemae.com/Selling-Guide/Ensuring-Quality-Control-QC-/Subpart-D1-Lender-QC-Process/Chapter-D1-1-Lender-Quality-Control-Process/1049099251/D1-1-01-Lender-Quality-Control-Programs-Plans-and-Processes-08-07-2019.htm?touchpoint=Guide. To that end, Fannie Mae cautions lenders to "pay particular attention and institute extra due diligence for those loans in which the appraised value is believed to be excessive or when the value of the property has experienced significant appreciation in a short time period since the prior sale." *See* Fannie Mae Selling Guide: Fannie Mae Single Family (Apr. 5, 2023), https://selling-guide.fanniemae.com/Underwriting-Property-Projects/Appraisal-Requirements/Appraisal-Report-Assessment/Valuation-Analysis-Quality-Assurance/1131591691/How-are-changes-in-the-appraised-value-considered.htm.

[5] U.S. Dep't of Hous. & Urban Dev. and U.S. Dep't of Treasury, *Curbing Predatory Home Mortgage Lending*, at 47–48 (June 2000), https://www.huduser.gov/portal//Publications/pdf/treasrpt.pdf.

[6] K. Anacker, J. Carr, & M. Mulcahy, *Foreclosure Crisis and its Impact on Communities of Color: Research and Solutions*, National Community Reinvestment Coalition, at 5 (Sept. 2011), https://ncrc.org/wp-content/uploads/2011/10/ncrc_foreclosurewhitepaper_2011.pdf.

of less than 10% in 2000 saw an increase in foreclosures of 215%, while neighborhoods with 90% or greater minority populations experienced an increase of 544%.[7] Overall, the bursting of the housing market bubble took a far greater toll on the wealth of minorities than whites.[8]

In response to the increase in foreclosure rates, which threatened significant loss to government guarantors and investors, Freddie Mac, Fannie Mae, and the Federal Housing Finance Agency ("FHFA") entered into a 2008 settlement with the New York State Office of the Attorney General, resulting in a Home Valuation Code of Conduct ("HVCC") to protect against inflated appraisals caused in part by lender influence, which became effective in October 2010. Also in 2008, the Federal Reserve Board exercised its rulemaking authority under the Home Ownership and Equity Protection Act by amending Regulation Z, which implements the Truth in Lending Act, to provide for several new protections for consumer mortgages, including appraiser independence requirements designed to ensure the integrity of real estate appraisals, which became effective on October 1, 2009. Subsequently, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, which sunset the HVCC and codified the Regulation Z appraiser independence provisions via a new Section 129E of the Truth in Lending Act (implemented by the valuation independence requirements in current 12 C.F.R. § 1026.42), which became effective for all applications received on or after April 1, 2011.

From here, the government-sponsored entities ("GSEs") followed suit, issuing their Appraiser Independence Requirements, which imposed heightened obligations on lenders to

---

[7] *Id.* at 33.

[8] *See Wealth Gaps Rise to Record Highs Between Whites, Blacks, Hispanics*, Pew Research Center (July 2011), https://www.pewresearch.org/social-trends/2011/07/26/wealth-gaps-rise-to-record-highs-between-whites-blacks-hispanics/.

maintain separate and independent functions for their loan production and appraisal-related services. *See, e.g.,* Fannie Mae Selling Guide, B4-1.3-12, Quality Assurance (noting that "[a]ny request for a change in the opinion of market value must be based on material and substantive issues and must not be made solely on the basis that the opinion of market value as indicated in the appraisal report does not support the proposed loan amount"), https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B4-Underwriting-Property/Chapter-B4-1-Appraisal-Requirements/Section-B4-1-3-Appraisal-Report-Assessment/1032992391/B4-1-3-12-Quality-Assurance-06-03-2020.htm.

Further, the GSEs prohibit a lender from ordering a second appraisal in an attempt to influence the outcome of the first appraisal, a practice known as "value-shopping." *See* Fannie Mae, Appraiser Independence Requirements, at 3 (updated Mar. 2022), https://singlefamily.fanniemae.com/media/21986/display; *see also* Freddie Mac, Appraiser Independence Requirements FAQ (noting that a second appraisal must be done pursuant to "written, pre-established bona fide pre- or post-funding appraisal review or quality control processes or underwriting guidelines" and according to a "policy of selecting the most reliable appraisal"), https://sf.freddiemac.com/faqs/appraiser-independence-requirements-faq. Similarly, the Federal Housing Administration permits a second appraisal only "if the Direct Endorsement (DE) underwriter (underwriter) determines the first appraisal is materially deficient and the Appraiser is unable or uncooperative in resolving the deficiency," and requires the material deficiency to be documented in the mortgage file. Fed. Hous. Admin. Single Family Housing Policy Handbook 4000.1, Section II.A.1.a.iii(B)(9)(a), https://www.allregs.com/tpl/%2fHome%2fIndexWithDocumentId2%2f3df7d806-f6e3-4df0-

b3e8-05636cc9c565%3b62ab7b5e-4613-45e7-b5a8-dddb8f34a66c. A borrower's complaint that an appraisal value was lower than desired, and that, as a result, the appraisal was thus somehow discriminatory, does not rise to the level of a material deficiency. Indeed, the Federal Housing Administration itself recognizes this, as it recently announced proposed changes that, if finalized, would define a material deficiency to include "indications of unlawful bias in the appraisal or of a violation of applicable non-discrimination laws."

Given the above, it is not surprising that the only cases cited by the Government Agencies in support of lender liability for an allegedly discriminatory appraisal (*see Swanson v. Citibank N.A.*, 614 F.3d 400, 403–06 (7th Cir. 2010) and *Barkley v. Olympia Mortg. Co.*, No. 04 CV 875, 2007 WL 2437810, at *1–2, *15 (E.D.N.Y. Aug. 22, 2007)) involved transactions that occurred before the federal appraiser independence requirements were implemented. In fact, the basis of the plaintiff's claim in *Swanson*, for example, was that the lender and appraiser had engaged in "coordinated action," possibly as "part of a conspiracy," which is not at issue here and has not been alleged, precisely because of the appraisal independence framework currently in place. 614 F.3d at 403–06. Simply stated, existing appraiser independence requirements prohibit a lender from exerting sufficient control over the appraiser to trigger FHA liability. *See, e.g., Steele v. GE Money Bank*, No. 08 C 1880, 2009 WL 393860, at *6 (N.D. Ill. Feb. 17, 2009) (holding that even allegations that lenders provided information, training, and encouragement to brokers to make loans in accordance with their policy were insufficient to "support an inference that the defendant lenders had the ability to control the manner and method in which the brokers carried out their work").

Given the lender's lack of control, there are only limited actions loanDepot could have taken, and did indeed take, in connection with the appraisal of the Plaintiffs' property. As the Government Agencies note in their Statement of Interest, a lender may "ask[] an appraiser to . . . [c]onsider additional, appropriate property information, including the consideration of additional comparable properties to make or support an appraisal[,]" or "[c]orrect errors in the appraisal report." 15 U.S.C. § 1639e(c). It is evident from the Plaintiffs' allegations that loanDepot did just that. *See* First. Am. Compl. ¶¶ 52, 94-98. Indeed, loanDepot forwarded the Plaintiffs "detailed and comprehensive" information regarding potential additional comparables and alleged "numerous deficiencies" to the appraiser, who reviewed this information and noted as such in the revised appraisal report. *Id.* ¶¶ 95, 97. However, the lender has no control over whether the appraiser ultimately changes his opinion of value.

      B.      <u>The Government Agencies improperly assume that, under the FHA, lenders are expected to know or should know of discrimination by an independent, third-party appraiser</u>

The Government Agencies improperly assume that any lender such as loanDepot, would necessarily know or should know whether an independent, third-party appraiser engaged in discrimination. Moreover, the First Amended Complaint fails to allege any facts that suggest loanDepot "knew or should have known of the discriminatory conduct." 24 C.F.R. § 100.7(a)(iii) (emphasis added). Rather, Plaintiffs allege only that loanDepot "denied Plaintiffs' loan application because of the low valuation" (First Am. Compl. ¶ 7), not because of discrimination. Indeed, while Plaintiffs allege that they themselves were "shocked" at the appraisal and believed that the low valuation was because of discrimination (*Id.* ¶ 8), the fact that they relayed this belief to loanDepot does not mean, from a legal standpoint, that now loanDepot "knows" that the lower-

than-desired appraisal value was discriminatory. Practically speaking, it is common for an appraisal value to come in lower than a refinancing homeowner's aspirational estimated value.[9] This is due primarily to the enhanced appraisal independence process.

Further, a lender is not expected to make its own conclusion regarding the "right" value for a subject property. Even setting aside appraiser independence requirements, the Government Agencies' approach would require a lender to second-guess the expertise, training, and judgment of every licensed, geographically competent appraiser who performs an appraisal for a property. Yet even government investors acknowledge that there is not an exact appraisal value for a property. Fannie Mae and Freddie Mac refer to it as an "opinion" of value, and HUD acknowledges it is an "estimated" value. Similarly, the federal banking agencies note that an appraisal is "an opinion as to the market value" of a property on a particular date. Most importantly, the Uniform Standards of Professional Appraisal Practice ("USPAP") definition of an appraisal, with which all appraisers must comply, recognizes that the "opinion of value" may be numerically expressed "as a specific amount, as a range of numbers, or as a relationship" to a prior value or benchmark. Thus, the expertise and judgment of the appraiser is crucial.

In addition, the appraiser is subject to their own professional and ethical standards regarding performing appraisals without discrimination or bias, which lenders reasonably rely on when accepting an appraiser's work product. The USPAP explicitly prohibits an appraiser from relying on "unsupported conclusions relating to characteristics such as race, color, religion,

---

[9] *See, e.g.*, George Krivorotov & Michael Lacour-Little, *AVM versus Appraisal-Based Underwriting in Refinance Mortgages: The Trade-off Between Noise and Bias* (Dec. 22, 2020) (noting that almost half of cash-out refinance loan applicants receiving lower-than-desired appraisal values).

national origin, sex, sexual orientation, gender, marital status, familial status, age, receipt of public assistance income, disability, or an unsupported conclusion that homogeneity of such characteristics is necessary to maximize value." Further, for every appraisal report, the appraiser must certify that the report was prepared "in accordance with the requirements of USPAP;" contains the appraiser's "personal, impartial, and unbiased professional analysis;" reflects "no present or prospective personal interest or bias with respect to the participants in the transaction;" and was not based, "either partially or completely. . .on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law."

Given the above safeguards, absent references to a homeowner's race or ethnicity, or statements regarding the demographic composition of the neighborhood, a lender would not have any reason to know of an appraiser's discriminatory conduct in connection with the appraisal. Plaintiffs have not alleged any such indicia of discrimination. Rather, the First Amended Complaint is focused on Plaintiffs' disagreement with the appraiser's selection of comparables and degree of upward and downward adjustments – items that are squarely within a licensed, geographically competent appraiser's expertise and discretion. Again, while loanDepot may have known of Plaintiffs' opinion that the appraisal was discriminatory, there is nothing in the Complaint to suggest that loanDepot knew or should have known of any actual discrimination. Of course, the FHA requires that the defendant knew or should have known **of the discriminatory conduct**, not merely a plaintiff's thoughts about what happened. Yet, based solely on the Plaintiffs' assertion that the appraisal must have been discriminatory because it resulted in a

lower-than-desired value, the Government Agencies in their Statement of Interest insist that loanDepot should have done more, and gone above and beyond the permissible federal regulatory framework to influence the Plaintiffs' appraisal value.

      C.      <u>The Government Agencies seek to hold lenders liable for third parties under a disparate treatment theory by applying an incongruous negligence standard</u>

Setting aside Plaintiffs' allegations of discrimination by loanDepot itself, the Government Agencies seek to impose liability on loanDepot for the acts of the third-party appraiser under a theory of disparate treatment. However, the Government Agencies' reliance on the "knew or should have known" language of 24 C.F.R. § 100.7(a)(iii) is incompatible with the concept of intentional discrimination.

Under federal law and precedent, a claim of disparate treatment discrimination, whether under the FHA or ECOA, requires the plaintiff to plausibly allege that the defendant's actions resulted from a <u>discriminatory motive</u>, such that his or her protected characteristic was the "but for" cause of the respondent's actions. *See, e.g., Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176-77 (2009); *see also DiCocco v. Garland*, 18 F.4th 406, 419 (4th Cir. 2021) (noting that "differential treatment" directs the statute's focus to the defendant's actions and "requires intent") (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) and *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (referring to "disparate treatment" as "intentional discrimination")), *reh'g en banc granted*, No. 20-1342, 2022 WL 832505 (4th Cir. Mar. 21, 2022), *rev'd on other grounds*, 52 F.4th 588 (4th Cir. 2022).

To establish proof of discriminatory motive a plaintiff must produce either: (1) direct evidence of discriminatory intent (*i.e.*, overt discrimination); or (2) circumstantial evidence

creating an inference of discriminatory intent.[10] While at this stage in the proceeding we understand that the Plaintiffs need not yet produce such evidence, Plaintiffs are nevertheless required to state their claim via "well-pleaded, nonconclusory factual allegations." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565-66 (2007)). It is unclear how a disparate treatment claim against loanDepot could succeed, as a matter of law, unless the Plaintiffs can allege that loanDepot had actual knowledge of the appraiser's alleged discrimination and deliberately ignored it. However, the Plaintiffs have alleged only that loanDepot "knew or should have known" of the alleged discrimination by the appraiser without including any nonconclusory factual allegations regarding any discriminatory indicia on the face of the appraisal report or other facts to even suggest that the appraiser's actions were motivated by race and that loanDepot knew about it. Given the weakness of this allegation, there is no "plausible suggestion" of discrimination. *See id.* at 683. Thus, a discrimination claim against loanDepot for the alleged actions of a third-party appraiser, based on a theory of disparate treatment, cannot stand.

## III.     Conclusion

The MBA appreciates the opportunity to provide its arguments to the Court in support of loanDepot's Motion to Dismiss and in response to the arguments raised by the Government Agencies. On behalf of its members, the MBA respectfully requests that the Court recognize the lack of liability on the part of loanDepot for the alleged actions of the appraiser.

---

[10] *See* U.S. Dep't of Justice, Title VI Legal Manual, Section VI: Proving Discrimination – Intentional Discrimination, https://www.justice.gov/crt/fcs/T6Manual6.

This 21st day of April, 2023.

**ALSTON & BIRD LLP**

*/s/ Brian D. Frey*
Brian D. Frey
Maryland Bar No. 17592
The Atlantic Building
950 F Street, NW
Washington, DC 20004
Telephone: 202-239-3300
Facsimile: 202-239-3333
brian.frey@alston.com

Nanci L. Weissgold (*Pro Hac Vice* forthcoming)
Tel.: (202) 239-3189
Email: nanci.weissgold@alston.com

Melissa S. Malpass (*Pro Hac Vice* forthcoming)
Tel.: (202) 239-3071
Email: melissa.malpass@alston.com

*Counsel for the Non-Party Mortgage Bankers Association*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I filed a true and correct copy of the within and foregoing with the Clerk of Court using the Court's CM/ECF system, which will automatically send notification of such filings to all counsel of record.

This 21st day of April, 2023.

**ALSTON & BIRD LLP**

_/s/ Brian D. Frey_
Brian D. Frey
Maryland Bar No. 17592
The Atlantic Building
950 F Street, NW
Washington, DC 20004
Telephone: 202-239-3300
Facsimile: 202-239-3333
brian.frey@alston.com

_Counsel for the Non-Party Mortgage Bankers Association_