**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **NATHAN CONNOLLY & SHANI MOTT** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civil Case No.: SAG-22-02048** |
| **v.** | * | |
| | * | |
| **SHANE LANHAM**, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

In their First Amended Complaint, Plaintiffs Dr. Nathan Connolly and Dr. Shani Mott brought this action against Defendant Shane Lanham and his company, 20/20 Valuations, LLC (collectively "Lanham") as well as loanDepot.com, LLC ("loanDepot") for an allegedly discriminatory appraisal of their home in conjunction with an application to refinance their home mortgage. *See* ECF 25. Plaintiffs assert violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.* (Count I); the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 *et seq.* (Count II); the Civil Rights Act of 1866 ("CRA"), 42 U.S.C. §§ 1981, 1982 (Counts III–IV); and Maryland Fair Housing Laws ("MFH"), MD. CODE ANN., State Government ("SG") §§ 20-702 *et seq.* (Count V). ECF 25. Lanham filed counterclaims against Plaintiffs for defamation (Count I) and false light invasion of privacy (Count II). ECF 36.

Currently pending are Defendants' motions to dismiss for failure to state a claim, ECF 31 (Lanham); ECF 32 (loanDepot), and Plaintiffs' motion to dismiss Lanham's counterclaims, ECF 44. This Court has reviewed those motions and the related briefing, ECF 42, 43, 50, 51, 55, 56, including the Attorney General's "Statement of Interest" on behalf of the United States. *See* ECF 47. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons explained below,

Defendant Lanham's motion to dismiss, ECF 31, will be **GRANTED IN PART** and **DENIED IN PART**; Defendant loanDepot's motion to dismiss, ECF 32, will be **GRANTED IN PART** and **DENIED IN PART**; and Plaintiffs' motion to dismiss counterclaims, ECF 44, will be **DENIED**.

## I.   BACKGROUND

The following facts are derived from Plaintiffs' First Amended Complaint, ECF 25, and Defendant Lanham's Counterclaim, ECF 36, and are taken as true for purposes of evaluating the parties' motions.

Dr. Connolly and Dr. Mott are a married Black couple living at 209 Churchwardens Road (hereinafter referred to as the "Churchwardens Home") in the historic Homeland neighborhood of Baltimore, Maryland with their three children. ECF 25 ¶ 15. Homeland was planned and designed by the Roland Park Company with the help of the Olmstead Company. *Id.* ¶ 30. The neighborhood is on the National Park Service's National Register of Historic Places. *Id.* According to 2020 census data, Homeland's population is 77.5% white and 9.6% Black. *Id.* ¶ 31. Of the 82 census blocks in Homeland, only two have significant Black populations. *Id.* ¶ 32.

Plaintiffs purchased the Churchwardens Home in March of 2017 for $450,000. *Id.* ¶ 35. Plaintiffs financed the purchase with a 30-year mortgage with a fixed interest rate of 4.65%. *Id.* In April 2020, Plaintiffs took out a $30,000 home equity loan and invested it, along with money from their savings, into their home. *Id.* ¶ 36. Specifically, Plaintiffs invested $35,000 in remodeling their club room, $5,000 on a tankless water heater, $5,000 on window well repair and waterproofing, $8,000 on recessed lighting, and $5,000 in landscaping.

By the spring of 2021, the average sale price of homes in Baltimore had increased approximately 25% since Plaintiffs had purchased the Churchwardens Home in 2017. *Id.* ¶ 42. In May 2021, Dr. Connolly and Dr. Mott sought to refinance their loans "to take advantage of

historically low interest rates." *Id.* ¶ 37. They submitted an application to loanDepot. *Id.*  loanDepot approved Plaintiffs for a refinance loan at a 2.25% interest rate, pending an appraisal of their home supportive of an estimated value of $550,000. *Id.* ¶ 41. loanDepot hired Defendant Lanham via Defendant 20/20 Valuations to conduct the appraisal of Plaintiffs' home. *Id.* ¶ 43.

On June 14, 2021, Defendant Lanham visited the Churchwardens Home for the appraisal. *Id.* ¶ 44. Dr. Connolly, Dr. Mott, and their children—all of whom are Black—were home during the visit. *Id.* Plaintiffs had decorated their home with "proud markers of the family's Black identity, including family photos, art that the children drew of the family and with other Black subjects, children's books featuring Black characters and addressing themes relating to the Black experience in America, African art, a print of The Library by Jacob Lawrence, a poster for the movie Black Panther, and more." *Id.*

On or about June 19, 2021, loanDepot informed Plaintiffs that Defendant Lanham appraised their home for $472,000, and that loanDepot would therefore not extend the loan. *Id.* ¶ 50. Plaintiffs were "shocked" by this low appraisal and informed loanDepot that "there is a long and well-documented history of devaluing Black homes, and that the valuation was impossibly low given the characteristics of their neighborhood and their home." *Id.* ¶ 51. loanDepot's loan officer, Christian Jorgensen, informed Plaintiffs that they had ten days to submit a letter explaining why they believed the appraisal was flawed. *Id.* ¶ 52. Thereafter, Jorgensen stopped returning Plaintiffs' calls. *Id.* ¶¶ 89–91. Months later, Plaintiffs were able to connect with Jorgensen to request copies of their documents and upon answering, Jorgensen "immediately told Plaintiffs that their sixty-day window for filing an appraisal appeal had passed," which was the first time he informed them of their right to appeal. *Id.* ¶ 102.

In December 2021, Plaintiffs received a Maryland Department of Assessments and Taxation Notification assessing the value of the Churchwardens Home at $622,000. *Id.* ¶ 115. Given this higher estimate, in January 2022, Plaintiffs decided to try again and applied for a loan with Swift Home Loans. *Id.* ¶ 116. Plaintiffs were again approved for a refinance loan, pending appraisal by Daniel Ray Dodd of Associate Appraisers. *Id.*

Prior to the next appraisal inspection, Plaintiffs conducted a "whitewashing" of their home, where they "remove[d] markers of Black identity, such as family photographs, from their home and enlist[ed] a white [colleague] to stand in as the homeowner" during the appraisal. *Id.* ¶¶ 119, 122. Mr. Dodd conducted the appraisal on January 18, 2022. *Id.* Plaintiffs were not home, and their white colleague greeted Mr. Dodd. *Id.* ¶ 122. On January 21, 2022, Mr. Dodd appraised the value of Plaintiffs' home at $750,000—a value nearly 60% greater than that of Defendant Lanham seven months earlier.

Plaintiffs filed this lawsuit in August, 2022, and filed the First Amended Complaint two months later. ECF 1, 25. On January 24, 2023, Lanham filed an answer along with a two-count Counterclaim alleging defamation and false light invasion of privacy stemming from two interviews Plaintiffs conducted with the New York Times and ABC News, respectively, after filing their lawsuit. ECF 36. In the interviews, Plaintiffs accused Lanham of engaging in racial discrimination and undervaluing the Churchwardens Home based on their race. *Id*. ¶¶ 70–74. The Counterclaim alleges that these accusations were false, that Lanham's appraisal was not based on race, and that his appraisal appropriately relied on lower-priced comparable homes in the area. *Id*. ¶¶ 6–8, 40–46. The Counterclaim further asserts that Plaintiffs knew that their accusations of racism against Lanham were false, because they were aware of lower-priced home sales and market conditions that supported Lanham's appraisal. *See, e.g.*, *id*. ¶¶ 5, 32, 45. For example,

Lanham alleges that, at the time of the New York Times and ABC News interviews, Plaintiffs knew but failed to disclose that shortly after loanDepot denied their refinance application, the home next to theirs sold for $465,000—or $7,000 *less* than the appraised value determined by Lanham for the Churchwardens Home. *Id.* ¶¶ 9, 57–59. The Counterclaim also asserts that Plaintiffs' whitewashing experiment was unreliable because it "occurred *seven months after* [Lanham's] appraisal and relied on home sales that had not even occurred at the time of [Lanham's] appraisal." *Id.* ¶¶ 10–12 (emphasis in original).

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for all civil actions[.]")

(quotation omitted); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). However, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is

entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Finally, federal courts reviewing a 12(b)(6) motion may take judicial notice of matters of public record, including court filings, and may consider documents incorporated into a complaint by reference without converting the motion into a motion for summary judgment. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## III.  DEFENDANTS' MOTION TO DISMISS

### A. Discriminatory Intent

Plaintiffs bring claims under the FHA, ECOA, CRA, and MFA. Each of these claims requires evidence of discrimination because of, or on the basis of, a protected classification. *See* 42 U.S.C. § 3605 (prohibiting individuals or entities engaged in residential real estate-related transactions from discriminating "because of race"); Md. Code Ann., SG § 20-707 (same); 15 U.S.C. § 1691 (prohibiting a creditor from discriminating against an applicant on the basis of race regarding a credit transaction); 42 U.S.C. § 1981 (granting all persons "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens"); *Nnadozie v. Genesis Healthcare Corp.*, 730 Fed. App'x 151, 156 (4th Cir. 2018) ("Although Section 1981 does not explicitly use the word 'race,' the Supreme Court has construed the statute to ban all racial discrimination in the making of public and private contracts."). Defendants challenge Plaintiffs' claims on this point, asserting that Plaintiffs have failed to show evidence of discrimination. ECF 31-1 at 7, 24, 26; ECF 32-1 at 16–32, 37, 38, 42.

Eventually, to make out a prima facie case under these statutes, Plaintiffs must present evidence—either direct or circumstantial under the *McDonnell Douglas* burden shifting

framework—that Defendants discriminated on the basis of their race. *See, e.g.*, *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984) (concluding that to show a prima facie case of discrimination under the FHA, a plaintiff must demonstrate that the challenged action was either motivated by a discriminatory purpose or had a discriminatory impact); *Corey v. Secretary, U.S. Dept. of Housing & Urban Development ex rel. Walker*, 719 F.3d 322, 325 (4th Cir. 2013) (holding that discriminatory intent or motive for an FHA claim can be established "either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test."); *Williams v. Arora Hills Homeowners Ass'n Inc.*, No. CV DKC 19-3370, 2021 WL 2226199, at *5 n.8 (D. Md. June 2, 2021), *appeal dismissed*, No. 21-1738, 2022 WL 2484574 (4th Cir. Apr. 26, 2022) (same analysis for FHA and MFH claims); *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1136 (4th Cir. 1988) (holding that evidence of discrimination for a § 1981 claim may be proven by either direct evidence or the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 972 (1973)); *Glenn v. Wells Fargo Bank, N.A.*, 710 F. App'x 574, 576–77 (4th Cir. 2017) ("For each of his ECOA, MECOA, FHA discriminatory intent, and Title VI discrimination claims, [plaintiff] must either provide direct evidence of discrimination or make a prima facie case under the *McDonnell Douglas* test.").

However, at the motion to dismiss stage, Plaintiffs do not need to establish a prima facie case; they need only plausibly allege that Defendants discriminated on the basis of their race. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009); *see also CASA de Maryland, Inc. v. Arbor Realty Tr., Inc.*, No. CV DKC 21-1778, 2022 WL 4080320, at *10 (D. Md. Sept. 6, 2022) (to sufficiently plead discriminatory intent under the FHA at the motion to dismiss stage, plaintiffs must "allege facts at least supporting an inference that

discriminatory animus was a motivating factor."); *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (concluding that at the motion to dismiss stage, a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss" for a § 1981 claim); *Brown v. Harford Bank*, No. CV ELH-21-0096, 2022 WL 657564, at *11 (D. Md. Mar. 4, 2022) ("[A]lthough reference to the elements of a prima facie [§ 1981] claim can help to gauge the adequacy of the Amended Complaint's allegations, plaintiff is not required to establish a prima facie case to survive a motion to dismiss. And, regardless of the prima facie test that is referenced, the analysis at this stage turns on whether plaintiff has plausibly alleged facts that, if taken as true, allow the Court to draw a reasonable inference of intentional, but-for racial discrimination."); *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 705 (5th Cir. 2017) ("To state a claim for relief under the ECOA, the plaintiffs must plausibly show that they were discriminated against in violation of the statute. More specifically, the complaint must plausibly allege that (1) each plaintiff was an "applicant"; (2) the defendant was a "creditor"; and (3) the defendant discriminated against the plaintiff with respect to any aspect of a credit transaction on the basis of the plaintiff's membership in a protected class."). Thus, loanDepot's arguments that Plaintiffs have failed to offer direct evidence of discriminatory intent or plead a prima facie case under the *McDonnell Douglas* burden-shifting framework prematurely imposes a summary judgment standard on Plaintiffs' complaint. *See* ECF 32-1 at 17–27, 39.

In this context, for Plaintiffs' discrimination claim to be "plausible," this Court need not decide which version of events is most likely, but rather, simply, whether Plaintiffs' allegations could have happened. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Here, Plaintiffs plead facts that plausibly suggest Defendants discriminated against them on the basis of their race. With respect to Defendant Lanham, Plaintiffs allege, *inter alia*, that (1) Lanham knew

Plaintiffs were Black when he conducted the appraisal, ECF 25 ¶ 44, (2) Lanham initially selected four comparable homes to appraise Plaintiffs' home, *id.* ¶¶ 55–56, two of which were in a block with a significant Black population (L2, L4) even though only two of Homeland's 82 census blocks have significant Black populations, *id.* ¶¶ 31–32, 55–56, (3) one of the comparable homes in a significantly Black census block was not in Homeland proper (L2), *id.*; (4) the other potential comparable home in a significantly Black census block was located on the opposite side of Homeland (L4); (5) one of the three homes ultimately selected for comparison to Plaintiffs' home had a listing that noted the home had "great bones" but parts of the home "need some TLC and the price reflects this," *id.* ¶ 62, (6) Lanham decided against using a comparable house (L4) that was listed for sale at $650,000 that would have raised Plaintiffs' appraisal value because it was "overpriced," but the home sold for $30,000 over asking price a few months later, *id.* ¶ 64, and (7) Plaintiffs' home was appraised at $750,000 seven months later after it was "whitewashed" and assessed by a different company, *id.* ¶ 123.

These allegations, construed in the light most favorable to Plaintiffs, plausibly suggest intentional depression of Plaintiffs' home value on the basis of their race. In short, Homeland is nearly 80% white, *id.* ¶ 31, but Defendant Lanham used two out of four comparable homes from majority-Black census blocks, one of which was not actually located within Homeland. Further, the significant discrepancy between the two valuations suggests that other factors aside from fluctuations in the housing market, appraisal strategies, and timing could be at issue. Construed in the light most favorable to Plaintiffs, these facts plausibly allege a race-based motivation for Defendant Lanham's appraisal analysis. *Cf. Tate-Austin v. Miller*, No. 21-CV-09319-MMC, 2022 WL 1105072, at *4 (N.D. Cal. Apr. 13, 2022) (finding sufficient facts to plead disparate treatment discrimination under very similar facts); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 406

(7th Cir. 2010) (holding that a plaintiff sufficiently pled a § 3405 FHA claim where she alleges the appraisal knew her race and discriminated against her through the home's valuation).

With respect to loanDepot, Plaintiffs allege, *inter alia*, (1) loanDepot knew Plaintiffs were Black throughout the loan application process, *id.* ¶¶ 38, 51, (2) Plaintiffs informed Jorgensen, a loanDepot employee, that the appraisal had been discriminatory, *id.* ¶ 51, (3) Jorgensen failed to inform Plaintiffs about their right to a formal appeal until after the deadline had passed, *id.* ¶ 52, (4) Jorgensen gave Plaintiffs an opportunity to write a letter within ten days explaining why they think the process was flawed but then never responded to the letter, *id.* ¶¶ 52, 96, (5) Jorgensen and loanDepot thereafter stopped responding to Plaintiffs' inquiries, *id.* ¶¶ 85, 88–91, 96–102, and (6) loanDepot failed to order a second appraisal in response to Plaintiffs' claims of discrimination, *id.* at 85.

These allegations, construed in the light most favorable to Plaintiffs, suffice to make a plausible showing of race as the basis of Jorgensen and loanDepot's response (or lack thereof) to Plaintiffs' complaint of a discriminatory appraisal. The failure to properly inform Plaintiffs of their right to an appeal and Jorgensen's near-immediate unresponsiveness to Plaintiffs' outreach after Plaintiffs alleged discrimination plausibly suggests that Jorgensen's behavior was on the basis of Plaintiffs' race and decision to defend their right to a fair, nondiscriminatory appraisal. *Cf. Swanson*, 614 F.3d at 406 (denying motion to dismiss by bank where plaintiff's "complaint identifies the type of discrimination that she thinks occurs (racial), by whom (Citibank, through [] the manager, and the outside appraisers it used), and when (in connection with her effort in early 2009 to obtain a home-equity loan)").

Additionally, the FHA's implementing regulations make clear that a lender who relies on a discriminatory appraisal may be directly liable under the FHA. Specifically, the regulations make a person directly liable for:

> Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party.

24 C.F.R. § 100.7(a)(1)(iii). Here, Plaintiffs alleged that loanDepot was aware of the discriminatory appraisal, had the power to order a second appraisal or conduct a formal appeal and review, and failed to take action to remedy the discrimination. Taken as true, these allegations sufficiently plead a theory of direct liability under the FHA.

Accordingly, Plaintiffs have sufficiently pled facts to support a finding of disparate treatment on the basis of their race.[1]

## B. FHA Claims

Plaintiffs bring FHA claims against all Defendants under 42 U.S.C. §§ 3604, 3605, and 3617. ECF 25 ¶¶ 139–41. In addition to their arguments regarding a lack of discriminatory intent, Defendants raise other arguments as to why this Court should dismiss Plaintiffs' FHA claims, or portions thereof.

---

[1] In the Fourth Circuit, an "FHA claim can proceed under either a disparate-treatment or a disparate-impact theory of liability, and a plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018). "Therefore, for purposes of a motion to dismiss for lack of legally cognizable discrimination, the court must discern if either predicate theory of discrimination is sufficiently pled." *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 630 (D. Md. 2019). Because Plaintiffs have sufficiently pled disparate treatment, there is no need to address loanDepot's argument that Plaintiffs failed to allege policies that cause a discriminatory impact. *See* ECF 32-1 at 28–32.

i.   § 3604

For one, Defendants argue this Court should dismiss Plaintiffs' claims under § 3604 of the

FHA, asserting that this section only applies to actions associated with the sale or rental of a

dwelling, and not with home mortgage refinancing transactions. *See* ECF 31-1 at 22; ECF 32-1 at

15. In relevant part, § 3604 provides:

> [I]t shall be unlawful—
>
> * * *
>
> (b) To discriminate against any person in the terms, conditions, or
> privileges of sale or rental of a dwelling, or in the provision of
> services or facilities in connection therewith, because of race, color,
> religion, sex, familial status, or national origin.
>
> (c) To make, print, or publish, or cause to be made, printed, or
> published any notice, statement, or advertisement, with respect to
> the sale or rental of a dwelling that indicates any preference,
> limitation, or discrimination based on race, color, religion, sex,
> handicap, familial status, or national origin, or an intention to make
> any such preference, limitation, or discrimination.

In response, Plaintiffs note that the statute incorporates broad language. They assert that refinance

transactions fall under the "services" contemplated by the statute, and also argue that access to

home loan equity is a "privilege of sale."

Courts have split over whether § 3604's reach includes refinance transactions. *Compare*

*Beard v. Worldwide Mortg. Corp.*, 354 F. Supp. 2d 789, 809 (W.D. Tenn. 2005) ("Thus, the

language of § 3604(b) is broad enough to encompass home improvement loans and refinancing

loans because the burden of the debt affects individuals' ability to buy or sell a dwelling."), *Neals*

*v. Mortg. Guar. Ins. Corp.*, No. CIV.A. 10-1291, 2011 WL 1897442, at *5 (W.D. Pa. Apr. 6,

2011), *report and recommendation adopted sub nom. Neals v. Mortg. Guarantee Ins. Corp.*, No.

2:10CV1291, 2011 WL 1897452 (W.D. Pa. May 18, 2011) ("Mortgage financing or refinancing

has been deemed to constitute a 'service' associated with a dwelling."), *and Washington v. Wells*

*Fargo Bank, Nat'l Ass'n*, No. 1:22-CV-764, 2023 WL 415483, at *2 (M.D.N.C. Jan. 25, 2023) (permitting § 3604 claims to survive a motion to dismiss under a nearly identical fact pattern, while providing little actual analysis of the issue), *with Greer v. Home Realty Co. of Memphis, Inc.*, No. 07-2639, 2008 WL 11318325, at *16 (W.D. Tenn. Aug. 7, 2008) ("Although it is true that the debt associated with a home repair loan may affect one's 'ability to buy or sell a dwelling' in the future, it is not necessarily linked to the purchase or sale of property in the present."), *and Eva v. Midwest Nat'l Mortg. Bank, Inc.*, 143 F. Supp. 2d 862, 886 (N.D. Ohio 2001) (concluding that § 3604 covers transactions related to acquiring a home, as opposed to § 3605, which covers "the making or purchasing of loans or providing other financial assistance for maintaining a dwelling previously acquired").

The Fourth Circuit has not specifically addressed this issue, however, it has acknowledged that "services" under § 3604(b) extends to "'such things as garbage collection and other services of the kind usually provided by municipalities[.]'" *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 193 (4th Cir. 1999) (citing *Mackey v. Nationwide Ins. Companies*, 724 F.2d 419, 424 (4th Cir. 1984)); *see also* 24 C.F.R. § 100.65 (Department of Housing and Urban Development ("HUD") regulations interpreting § 3604 to prohibit, *inter alia*, "[f]ailing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin"). Similarly, other circuit courts have generally interpreted § 3604 broadly. *See, e.g.*, *Bloch v. Frischholz*, 587 F.3d 771, 779 (7th Cir. 2009) ("Subsection (b)'s language is broad"); *Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 344 (6th Cir. 1994) ("Congress intended § 3604 to reach a broach range of activities that have the effect of denying housing opportunities to a member of a protected class"); *see also Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 640 (D. Md. 2019) (interpreting *Jersey*

14

*Heights* and § 3604(b) to include the systemic neglect of bank-owned houses). *But see A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011) (holding that "[i]ntake services to sign up for a homeless shelter are simply not within the type of services covered by the FHA"); *Mackey*, 724 F.2d 424 (holding homeowner insurance is not covered by the FHA). Indeed, "[c]ourts have consistently given an expansive interpretation to the Fair Housing Act; to state a claim under the Act, it is enough to show that race was a consideration and played some role in a real estate transaction." *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986).

Despite § 3604's broad scope, this Court concludes that this specific subsection does not extend to the present situation, where Plaintiffs sought an appraisal of their home to refinance their mortgage. Under *Jersey Heights* and *Mackey*, Plaintiffs' challenged action does not constitute a "service[]" contemplated by the statute because it does not fall in the category of "such things as garbage collection and other services of the kind usually provided by municipalities." Further, a private appraisal of a home for the purposes of refinancing is not a privilege of sale.

More importantly, the very next section of the FHA resolves any lingering ambiguity. Unlike § 3604, § 3605 plainly provides the cause of action sought by Plaintiffs:

> (a) In general
>
> It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.
>
> (b) "Residential real estate-related transaction" defined
>
> As used in this section, the term "residential real estate-related transaction" means any of the following:
>
> (1) The making or purchasing of loans or providing other financial assistance—
>
> (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

>> (B) secured by residential real estate.
>
> (2) The selling, brokering, or appraising of residential real property.
>
> (c) Appraisal exemption
>
> Nothing in this subchapter prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

42 U.S.C. § 3605.

Unlike § 3604, § 3605 covers "residential real estate-related transactions" and explicitly prohibits race-based discrimination during an appraisal. As other courts have held, "where, as here, the allegedly discriminatory conduct occurs in connection with the refinancing or extension of financing for the purpose of maintaining a home the plaintiff already owns . . . , § 3605, rather than § 3604, is 'the more appropriate vehicle' for the FHA claim." *Tate-Austin v. Miller*, No. 21-CV-09319-MMC, 2022 WL 1105072, at *6 (N.D. Cal. Apr. 13, 2022) (collecting cases) (quoting *Gibson v. Household Int'l, Inc.*, 151 Fed. App'x 529, 531 (9th Cir. 2005)). Indeed, if § 3604 were "designed to reach every discriminatory act that might conceivably affect the availability of housing, § [3605]'s specific prohibition of discrimination in the provision of financing would have been superfluous." *Mackey v. Nationwide Ins. Companies*, 724 F.2d 419, 423 (4th Cir. 1984).

Accordingly, to the extent Plaintiffs rely on § 3604, that portion of their FHA claim is dismissed.

### ii.    § 3617

Next, loanDepot argues that this Court should dismiss Plaintiffs' claims under § 3617, asserting that (1) Plaintiffs have failed to plausibly allege a claim of retaliation, and (2) Plaintiffs have failed to allege a requisite "predicate violation" of the statute because they only alleged a violation based on their "rights under Section 3604" in their Amended Complaint. ECF 32-1 at 32; *see also* ECF 25 ¶ 140(iv).

Under the FHA, Section 3617 makes it unlawful:

> to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617.

In one of the first notable cases under the FHA, the U.S. Government sought to end the written practice of appraisers devaluing property "if the ethnic composition of the neighborhood to which it belonged was not homogeneous." *See Hanson v. Veterans Admin.*, 800 F.2d 1381, 1387 (5th Cir. 1986) (describing the written policy of the time). There, the court explained that the "'or interferes with' language of section [3617] has been . . . broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the Act," including the "activities of appraisers." *United States v. Am. Inst. of Real Est. Appraisers of Nat. Ass'n of Realtors*, 442 F. Supp. 1072, 1079 (N.D. Ill. 1977); *see also Tate-Austin*, 2022 WL 1105072, at *7 (quoting *United States v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994)); *United States v. Am. Inst. of Real Est. Appraisers of Nat. Ass'n of Realtors*, 442 F. Supp. 1072, 1079 (N.D. Ill. 1977) ("The promulgation of standards which cause appraisers and lenders to treat race and national origin as a negative factor in determining the value of dwellings and in evaluating the soundness of home loans . . . may 'interfere' with persons in the exercise and enjoyment of rights guaranteed by the [FHA]."). Thus, § 3617 can apply to the activities associated with the refinance transactions at issue in this case.

To state a claim under § 3617, Plaintiffs must show that (1) they exercised or enjoyed a right guaranteed by Sections 3603–06 of the FHA—here, the right to a non-discriminatory appraisal as guaranteed by § 3605; (2) Defendants' conduct constituted coercion, intimidation, a

threat, or interference; and (3) a causal connection exists between Plaintiffs' assertion of the right to a nondiscriminatory appraisal and Defendants' conduct. *See Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 112–13 (3d Cir. 2017) ("A Section 3617 interference claim requires proof of three elements: (1) that the plaintiff exercised or enjoyed "any right granted or protected by" Sections 3603–3606; (2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct."); *Hood v. Midwest Sav. Bank*, 95 F. App'x 768, 779 (6th Cir. 2004) (same); *Moore v. Camden Prop. Tr.*, 816 F. App'x 324, 335 (11th Cir. 2020) (same); *see also* Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 FR 63054-01, 63059 (same). As with above, the pleading standards at the motion to dismiss stage are less than those of summary judgment. "Rather than adduce a prima facie claim in the complaint itself—before discovery, often necessary to uncover a trail of evidence regarding the defendants' intent in undertaking allegedly discriminatory action, has taken place—a plaintiff need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Edwards*, 356 F.3d at 1061 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).

Of note, retaliation against a plaintiff for exercising his or her protected right is a recognized cause of action under § 3617. *See, e.g.*, *Hall v. Greystar Mgmt. Servs.*, L.P., 637 F. App'x 93, 98 (4th Cir. 2016); *see also* 24 C.F.R. § 100.400(c)(5) ("Conduct made unlawful under this section includes [, *inter alia*,] . . . [r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the [FHA]."). To state a claim for retaliation under 42 U.S.C. § 3617 of the FHA, courts draw from Title VII jurisprudence; thus, to prove a retaliation claim under § 3617, a plaintiff must establish that (1) he

or she was engaged in protected activity; (2) the defendant was aware of that activity; (3) the

defendant took adverse action against the plaintiff; and (4) a causal connection existed between

the protected activity and the asserted adverse action. *Hall*, 637 F. App'x at 98.

loanDepot asserts that Plaintiffs have failed to allege facts sufficient to support the third

and fourth elements of a § 3617 retaliation violation—adverse action by loanDepot against

Plaintiffs caused by Plaintiffs' exercise of their right to a nondiscriminatory appraisal. ECF 32-1

at 33. Here, however, Plaintiffs do not solely rely on allegations of retaliation to support their

§ 3617 claim. Plaintiffs more broadly allege that loanDepot interfered with their right to have their

home appraised in a nondiscriminatory manner.  *See* ECF 25 ¶ 140(iv); ECF 42 at 37. The parties'

focus on the test articulated in *Hall* overlooks this distinction. As this Court has previously

explained:

> *Hall v. Greystar Mgmt. Servs., L.P.* merely recognized that
> retaliation claims can be brought under § 3617. 637 F. App'x 93, 98
> (4th Cir. 2016). It does not stand for the reverse proposition, as the
> defendants would have it that, that only retaliation claims are
> cognizable under § 3617. Indeed, allegations of interference with
> rights protected by the FHA have been permitted to proceed under
> § 3617. *See, e.g.*, *McCauley v. City of Jacksonville, N.C.*, 829 F.2d
> 36, 1987 WL 44775, at *2 (4th Cir. Sept. 8, 1987) (holding that "the
> complaint sufficiently alleges [that the plaintiff] has offered to
> provide racially integrated housing, the city has denied him sewer
> services because of race in violation of § 3604(b) and interfered in
> violation of § 3617 with his aiding and encouraging prospective
> minority tenants to rent the housing that he proposes.").

*Nat'l Fair Hous. All.*, 401 F. Supp. 3d at 642; *see also Bartlett v. Hames*, No. 5:18-CV-1096-CLS,

2023 WL 4038657, at *19 (N.D. Ala. June 15, 2023) (noting that "cases addressing claims for

relief under § 3617 are scarce" and suggesting that "two theories of liability have emerged: one

for 'interference claims,' and another for so-called 'retaliation claims.'").

Thus, the issue is whether Plaintiffs have plausibly alleged that loanDepot intentionally interfered with their protected right to a nondiscriminatory appraisal. In their Amended Complaint, Plaintiffs allege that they worked with Jorgensen, an employee of loanDepot, who initially anticipated that Plaintiffs' refinance application would be approved because he believed $550,000 was a conservative estimate of their home's value. ECF 25 ¶ 41. After Defendant Lanham appraised Plaintiffs' home at only $472,000, loanDepot denied the application and Jorgensen called Plaintiffs to inform them of the rejection. *Id.* ¶ 50. During this call, Plaintiffs informed Jorgensen that the appraisal was racially discriminatory and explained that there is a "long and well-documented history of devaluing Black homes." *Id.* ¶ 51. Plaintiffs further allege that "after a long silence," Jorgensen suggested Plaintiffs could write a letter explaining their beliefs within the next ten days, but that he failed to inform them about the formal appeal process until it was too late to appeal. *Id.* ¶ 52. After that call, Jorgensen "became unhelpful," "began to avoid Plaintiffs' telephone calls" in contravention to the company's policy, and "immediately and completely stopped speaking to them" until answering their request for copies of documents months later. *Id.* ¶¶ 88–89, 91, 92, 102. Based on these factual allegations, and given courts broadly construe the statute's "interfere" language, Plaintiffs have plausibly plead that Jorgensen interfered with their right to a nondiscriminatory appraisal by failing to provide correct information about their ability to appeal the appraisal and thereafter avoiding their calls. *Cf. Valentin v. Town of Natick*, No. CV 21-10830-PBS, 2022 WL 4481412, at *5 (D. Mass. Sept. 27, 2022) (findings a plausible § 3617 claim where plaintiffs allege defendants "delayed the project, asked for expert opinions and then ignored them, and misrepresented the consequences of the repeal"). Further, the timing of Jorgensen's alleged change of behavior plausibly alleges a connection between Plaintiffs' assertion of a right to a nondiscriminatory appraisal and Jorgensen's conduct. While Plaintiffs' allegations

will be subject to more exacting factual scrutiny on summary judgment, their § 3617 claim meets the plausibility pleading standard.

Finally, loanDepot argues that Plaintiffs must state a claim for another FHA violation in order to bring a claim under § 3617, in other words, Plaintiffs must prove a "predicate" violation. ECF 32-1 at 32–33. Although the Fourth Circuit has yet to rule on this precise issue, loanDepot's restrictive view of § 3617 is not supported by the statutory text or its implementing regulations. First, the plain text of § 3617 does not require an underlying violation of another section of the FHA; rather, § 3617 prohibits the coercion, intimidation, threatening, or interference of person exercising their rights granted by other sections of the FHA, including § 3605. Additionally, the implementing regulations list a variety of examples of prohibited acts, without mention or requirement of any predicate violation. *See* 24 C.F.R. § 100.400. Indeed, requiring a predicate violation would render § 3617 superfluous. *See United States v. Pospisil*, 127 F. Supp. 2d 1059, 1063 (W.D. Mo. 2000). Thus, this Court agrees with the other circuit courts that have held no such predicate violation is necessary to bring a § 3617 claim. *See, e.g.*, *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 112 (3d Cir. 2017) ("A Section 3617 claim does not require a substantive violation of Sections 3603–06."); *Hidden Vill., LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 528 (6th Cir. 2013) ("Section 3617 nowhere says that it comes into play only when a violation of one of these other sections has also occurred."); *United States v. City of Hayward*, 36 F.3d 832, 836 (9th Cir. 1994) ("§ 3617 may involve a situation where no discriminatory housing practice may have occurred at all) (internal quotation marks and citation omitted).

Even if a predicate violation were required, as described above, Plaintiffs have sufficiently pled a violation of § 3605. Defendant loanDepot attempts to take advantage of the fact that Plaintiffs only mentioned § 3604 in conjunction with their § 3617 allegations in their Amended

Complaint. Therefore, loanDepot argues that without a valid § 3604 claim, Plaintiffs cannot bring their § 3617 claim. This Court refuses to dismiss Plaintiffs' claims on any perceived technicality. Indeed, such dismissal would be without prejudice, and a simple two-word amendment to Plaintiffs' Complaint would moot loanDepot's concern. But no such amendment is necessary. Through their factual allegations, Plaintiffs have sufficiently pled a § 3605 violation, thus, sufficiently pleading a predicate violation for § 3617—assuming any such predicate violation is required.

### C. CRA Claims

#### i. General Applicability

Plaintiffs next bring claims against all Defendants under 42 U.S.C. §§ 1981 and 1982 of the CRA. ECF 1 at 2 ¶ 1. Defendant Lanham argues that this Court should dismiss Plaintiffs' claims under §§ 1981 and 1982 because § 1982 only applies to discrimination in connection with inheriting, purchasing, leasing, selling, holding, and conveying property, not to refinance transactions. *See* ECF 31-1 at 24. Plaintiffs counter that they sought the "full and equal benefit" of the FHA within the meaning of § 1981 and that "refinancing is a right that flows from holding real property" under § 1982. ECF 43 at 26.

In relevant part, § 1981 provides:

> (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Similarly, § 1982 provides:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof

to inherit, purchase, lease, sell, hold, and convey real and personal property.

There is little caselaw addressing whether § 1982's reach includes refinance transactions. *See Ghosh v. Uniti Bank*, No. CV107412DSFAGRX, 2011 WL 13127590, at *2 (C.D. Cal. Jan. 27, 2011) ("There is little law considering whether § 1982 covers refinancing of real property when the plaintiff is already in possession of the property."). However, the few courts to have addressed the issue have held that § 1982 extends to the refinancing of real property. *See e.g.*, *id.* ("[T]he Court concludes that § 1982 does cover the refinancing of real property, at least where it involves a collateral stake in the property."); *Tate-Austin v. Mille*r, No. 21-CV-09319-MMC, 2022 WL 1105072, at *10 (N.D. Cal. Apr. 13, 2022) (holding that discriminatory appraisal falls under the purview of §§ 1981 and 1982). In both *Ghosh* and *Tate-Austin*, the courts invoked the reasoning in *Evans v. First Fed. Sav. Bank of Ind.*, 669 F. Supp. 915 (N.D. Ind. 1987) to support their holdings. The *Evans* court addressed on first impression "whether the procurement of financing (in particular, a second mortgage) is a protected property interest for purposes of section 1982." *Evans*, 669 F. Supp. at 918. It held that "the equity in one's already-owned home as collateral for a loan . . . is a significant interest associated with home ownership" and is "fused into the right to 'hold' property as is the right of access to, or enjoyment of, recreational facilities associated with the property." *Id.* at 920; *see also City of Memphis v. Greene*, 451 U.S. 100, 120 (1981) (stating that the Supreme Court has "broadly construed" the language of § 1982). Considering § 1982's broad application, this Court agrees with *Evans*'s analysis and concludes that the right to hold real property extends to the present situation, where Plaintiffs sought an appraisal of their home to refinance their mortgage. Accordingly, Plaintiffs properly allege their right to equal benefit of the law and to hold real property under §§ 1981 and 1982, and their claims under these statutes are not subject to dismissal.

ii.   § 1982

Defendant loanDepot challenges Plaintiffs' § 1982 claims, asserting that Plaintiffs fail to allege any facts that loanDepot deprived them of "services available to similarly situated persons outside the protected class," and fail to allege that loanDepot was "hostile" or "objectively unreasonable." loanDepot's arguments, and the specific language, derive from *Painter's Mill Grille, LLC v. Brown*, No. CIV.A. RDB-11-1607, 2012 WL 576640, at \*7 (D. Md. Feb. 21, 2012), which pulled its test from *Dobson v. Cent. Carolina Bank & Tr. Co.*, 240 F. Supp. 2d 516, 520 (M.D.N.C. 2003). *Dobson*, in turn, pulled its test for a prima facie case from a case in this Court in 2000, *Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 706 (D. Md. 2000). In *Callwood*, Black restaurant patrons asserted claims under § 1981 based on allegations of hostile treatment they received from restaurant staff, such as a denial of seating and race-based comments. *Id.* at 698–702. At the motion for summary judgment stage of the case and after reviewing various proposed tests for a prima facie case for a § 1981 claim in the restaurant context, the Court set out the following legal standard:

> I conclude that in order to make out a prima facie case under the circumstances of these cases, plaintiffs must show the following: (1) they are members of a protected class; (2) they made themselves available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and (3) they did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or (b) they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.

*Id.* at 707.

Thus, it is under the *Callwood* test that loanDepot now asserts Plaintiffs must allege either that "they were deprived of services while similarly situated persons outside the protected class

were not deprived of those services" or that "they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable." However, this test is inapposite for a few reasons. First, as described above, Plaintiffs need not make out a prima facie case at this stage of litigation. *Callwood* involved a motion for summary judgment. Although the elements are helpful in guiding a court's analysis of a motion to dismiss a § 1981 or § 1982 claim, the pleading standard remains consistent—Plaintiffs only must plausibly allege a CRA violation. Second, in a subsequent case, the Fourth Circuit specifically rejected *Callwood*'s test. *See Williams v. Staples, Inc.*, 372 F.3d 662, 668 n.5 (4th Cir. 2004) The Fourth Circuit explained that "*Callwood* purports to provide an alternative analytical approach in public accommodation discrimination cases in which there is scant evidence as to how members of the protected class are treated differently from members outside the class." *Id.* Thus, the Fourth Circuit has disapproved of the test and elements advocated by loanDepot.

The test for a § 1982 claim is not as stringent as loanDepot purports. To state a claim under § 1982, a plaintiff must allege "(1) membership in a protected class; (2) discriminatory intent on the part of the defendant and (3) interference with the rights or benefits connected with the ownership of property." *White v. City of Annapolis by & through City Council*, 439 F. Supp. 3d 522, 541-42 (D. Md. 2020); *see also Brummell v. Talbot Cnty. Bd. of Educ.*, No. CV RDB-22-1601, 2023 WL 2537438, at *10 (D. Md. Mar. 16, 2023); *Doe #1 v. Bd. of Educ. of Somerset Cnty.*, No. CV RDB-22-1491, 2023 WL 375189, at *7 (D. Md. Jan. 24, 2023); *Hayat v. Diaz*, No. 20-CV-02994-LKG, 2022 WL 252963, at *7 (D. Md. Jan. 27, 2022). As already addressed above, Plaintiffs have plausibly alleged each of the above elements, specifically that they are a Black couple, that loanDepot intentionally discriminated against them on the basis of their race, and that the denial of access to a nondiscriminatory appraisal is sufficient interference with the rights

connected to the ownership of property under the CRA. For these reasons, Plaintiffs' § 1982 claim is not subject to dismissal.

### D.  MFH Claims

Defendant Lanham argues that Plaintiffs' claims under the MFH should be dismissed because they failed to exhaust their administrative remedies. *See* ECF 31-1 at 25. Plaintiffs' MFH claims fall under SG §§ 20-705, 20-707, and 20-708. In enacting these provisions, the Maryland legislature pulled language from the federal Fair Housing Act, often word-for-word, for the purpose of prohibiting discriminatory housing practices in a manner "substantially equivalent or similar to" the federal laws.  *See* Ch. 571 of the 1991 Acts. Thus, like 42 U.S.C. § 3605, Section 20-707 of Maryland law prohibits persons engaged "in residential real estate-related transactions" from discriminating on the basis of, *inter alia*, race. And like 42 U.S.C. § 3617, under Section 20-708, "[a] person may not coerce, intimidate, threaten, interfere with, or retaliate against any person . . . in the exercise or enjoyment of any right granted or protected by this subtitle."

The Maryland State Government Article, at Title 20, Subtitle 10, addresses the enforcement of Maryland's discrimination laws in two parts. Part I applies to employment discrimination claims and discrimination in government or places of public accommodation, and Part II applies to housing discrimination claims. Both Parts provide procedures for filing complaints with the Maryland Commission on Human Relations ("the Commission")—an independent agency charged with investigating complaints of discrimination in employment, housing and public accommodations under the Maryland Code. *See State Comm'n on Hum. Rels. v. Talbot Cnty. Det. Ctr.*, 370 Md. 115, 122 (2002).

Pursuant to Part I of the Enforcement Subtitle, which addresses employment discrimination claims, plaintiffs must file a timely administrative complaint *prior* to filing a civil action alleging an unlawful employment practice. Specifically, Part I states:

**In general**

(a) (1) In addition to the right to make an election under § 20-1007 of this subtitle, a complainant may bring a civil action against the respondent alleging an unlawful employment practice, if:

(i) the complainant initially filed a timely administrative charge or a complaint under federal, State, or local law alleging an unlawful employment practice by the respondent;

(ii) at least 180 days have elapsed since the filing of the administrative charge or complaint; . . .

SG § 20-1013. In contrast, Part II provides the following instruction for discriminatory housing claims:

**Authorized**

(a) In accordance with this section, an aggrieved person may commence a civil action in an appropriate State court to obtain appropriate relief for an alleged discriminatory housing practice or the breach of a conciliation agreement entered into under this part.

**Time for filing**

. . .

(3) Except as provided in subsection (c) of this section, an aggrieved person may commence a civil action under this section:

(i) not sooner than 130 days after a complaint has been filed under § 20-1021 of this subtitle; and

(ii) regardless of the status of any complaint.

SG § 20-1035.

Defendants emphasize the language of § 20-1035 under "time for filing" that states "an aggrieved person may commence a civil action under this section . . . not sooner than 130 days

after a complaint has been filed under § 20-1021 of this subtitle." They assert that this language implies that a plaintiff *must* file a complaint with the state agency prior to commencing any civil action to enforce state law. *See* ECF 31-1 at 25. Conversely, Plaintiffs note the difference in language used by the two sections. Plaintiffs note that Section 20-1013 plainly permits a civil action "if . . . the complainant initially filed a timely administrative charge or a complaint," but in contrast, Section 20-1035(a) merely authorizes an aggrieved person to file a civil complaint without any conditional language. ECF 43 at 31. Plaintiffs argue that, taken together, these two provisions mean that *if* a person files an administrative complaint, there is a 130-day waiting period before proceeding to court is permitted, but otherwise, there is no waiting period. *Id.* at 32.

The parties cite only one case that has addressed the particular issue of whether a plaintiff must exhaust his or her administrative remedies prior to filing claims under Maryland's fair housing laws. In *Mobley v. Rossell*, No. 02-CV-1702-PJM, a plaintiff brought similar claims and the defendants argued for dismissal because she had not sought redress with the Commission prior to filing her lawsuit. In an unreported memorandum opinion using the prior citation for § 20-1035 (Section 33(a)(1)), Judge Messitte rejected the defendants' argument, reasoning:

> Section 33(a)(1) of the MHRA provides that "an aggrieved person may commence a civil action in an appropriate State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . to obtain appropriate relief for the discriminatory housing practice . . . ." MD. ANN. CODE art. 49B, § 33(a)(1)(i) (1998). Except for two circumstances inapplicable here, this private right of action contains no requirement that a plaintiff must first exhaust her administrative remedies with the Commission before seeking individual judicial relief.

*See* Memorandum Opinion, *Mobley v. Rossell*, No. 02-CV-1702-PJ (D. Md. Oct. 25, 2002). This was the extent of the opinion's reasoning, and no other cases to this Court's knowledge have addressed this issue. Without much guidance from case law, this Court considers the overall governing principles.

Under Maryland law, the general rule "is that where a statute provides a special form of remedy, the plaintiff must use that form rather than any other, . . . and if he is unsuccessful, he must seek the judicial review provided by the Legislature rather than invoke the ordinary jurisdiction of the courts . . . ." *Soley v. State Comm'n on Hum. Rels.*, 277 Md. 521, 526 (1976) (internal citations omitted). Part II of Subtitle 10 provides detailed procedural instruction on how an aggrieved person can file a complaint with the Maryland Commission to remedy a discriminatory housing practice. *See generally* SG §§ 20-1020–37. Thus, on the one hand, the general rule of administrative exhaustion suggests that Plaintiffs should have first filed a complaint with the appropriate administrative agency.

On the other hand, basic principles of statutory interpretation direct this Court to the plain meaning of the words, and SG § 20-1035 contains no express requirement that a plaintiff first exhaust administrative remedies. As explained by the Maryland Supreme Court, statutory interpretation analysis first begins "by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Brown v. State*, 454 Md. 546, 550–51 (2017). However, "[t]he plain language 'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute.'" *Johnson v. State*, 467 Md. 362, 372 (2020) (quoting *State v. Johnson*, 415 Md. 413, 421 (2010)). "To this end, it may be beneficial to 'analyze the statute's relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.'" *Berry v. Queen*, 469 Md. 674, 687 (2020) (quoting *Blackstone v. Sharma*, 461 Md. 87, 114 (2018)).

In 1991, the Maryland legislature enacted Section 20-1035 and related provisions with the "purpose of altering the laws prohibiting discriminatory housing practices to include the provisions of the federal Fair Housing Amendments Act of 1988" and "to prohibit[ ] discriminatory housing practices in a manner substantially equivalent or similar to the federal Fair Housing Amendments Act of 1988." *See* Ch. 571 of the 1991 Acts. Indeed, much of the added language mirrored the federal Fair Housing Act verbatim. *See Gardner v. State*, 77 Md. App. 237, 247 (1988). In the federal counterpart to SG § 20-1035, as amended in 1988, the provision for enforcement of fair housing by private persons unambiguously permitted civil actions regardless of whether a complaint has been filed:

> (2) An aggrieved person may commence a civil action under this subsection whether or not a complaint has been filed under section 810(a) and without regard to the status of any such complaint, . . . .

PL 100-430 (HR 1158), September 13, 1988, 102 Stat 1619. However, the Maryland legislature originally proposed, but ultimately struck, this language. As enacted, the relevant portion of the bill read:

> . . . [A]n aggrieved person may commence a civil action under this subsection ~~whether or not~~ sooner than ~~100~~ 130 days after a complaint has been filed under § 27 of this subtitle and regardless of the status of any complaint.

*See* Laws of Maryland 1991, Ch. 571 (emphasis in original). These legislative changes affirmatively removed the federal language clarifying that no prior administrative complaint was required, indicating an intent to require prospective plaintiffs to first file a complaint with the Commission. Further, this legislative history reveals that the distinction in language between § 20-1013 and § 20-1035 derive from the fact that the latter was pulled from federal law. In combination with the administrative exhaustion doctrine, the state legislature's editorial changes indicate a requirement to first exhaust administrative remedies.

Having failed to plead any facts showing that any such complaint was filed, Plaintiffs' remaining claims under Maryland's fair housing laws are dismissed.

## IV.  PLAINTIFFS' MOTION TO DISMISS

Lanham's Counterclaim alleges defamation and false light invasion of privacy stemming from interviews Plaintiffs conducted with the New York Times and ABC News following the initiation of this lawsuit. *See* ECF 36. "An allegation of false light must meet the same legal standards as an allegation of defamation." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1146–47 (Md. 2012). Accordingly, this Court will address these two counts in tandem.

Under Maryland law, defamation consists of four elements: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Offen v. Brenner*, 935 A.2d 719, 723-24 (2007) (Md. 2016) (citing *Smith v. Danielczyk*, 928 A.2d 795, 805 (Md. 2007)). "A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Id.* at 724 (internal quotation marks omitted). Plaintiffs make several arguments in support in support of dismissal, including: (1) that their media statements accusing Lanham of racial bias constitute protected opinion; (2) that Lanham has failed to plead legal fault; (3) that their statements in question were privileged; and (4) that the Counterclaim is a strategic lawsuit against public participation ("SLAPP") barred by Maryland law.

### A.  Protected Opinion

Generally speaking, "[a]n individual cannot be held liable in defamation for a statement of opinion—a defamation claim must be premised on a false statement of fact." *McReady v.*

*O'Malley*, 804 F. Supp. 2d 427, 441 (D. Md. 2011), *aff'd*, 468 F. App'x 391 (4th Cir. 2012) (citing

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974)). When making the distinction between

fact and opinion, Maryland courts have asked: "Would an ordinary person, reading the matter

complained of, be likely to understand it as an expression of the writer's opinion or as a declaration

of an existing fact?" *Peroutka v. Streng*, 695 A.2d 1287, 1294 (Md. Ct. Spec. App. 1997) (quoting

*A.S. Abell Co. v. Kirby*, 176 A.2d 340, 343 (Md. 1961)). The answer to this question generally

turns on the availability to the reader of the supporting facts that are the basis of the expression.

*See* RESTATEMENT (SECOND) OF TORTS § 566 cmt. *b* (1977); *see also Agora, Inc. v. Axxess, Inc.*,

90 F. Supp. 2d 697, 702 (D. Md. 2000), *aff'd*, 11 F. App'x 99 (4th Cir. 2001) ("In divining the line

between statements of fact and opinion, [the United States Supreme Court] places primary

emphasis on the verifiability of the statement and examines the statement's language to determine

if it may be interpreted as asserting a fact."). Thus, "[w]hen 'the bases for the . . . conclusion are

fully disclosed, no reasonable reader would consider the term anything but the opinion of the

author drawn from the circumstances related.'" *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180,

185 (4th Cir. 1998) (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993));

*see also* RESTATEMENT (SECOND) OF TORTS § 566 cmt. *b* (explaining that a "pure" opinion "occurs

when the maker of the comment states the facts on which he bases his opinion of the plaintiff and

then expresses a comment as to the plaintiff's conduct, qualifications or character"). Nonetheless,

even statements in the form of an opinion may be actionable "if the opinion can be reasonably

interpreted to declare or imply untrue facts." *Biospherics*, 151 F.3d. at 184 (citing *Milkovich v.

Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

     Lanham claims that Plaintiffs' statements are false statements of fact and not protected

opinions. ECF 51 at 12. Although Lanham's Counterclaim does not identify any specific

statements as being the subject of his defamation claim, his Opposition to the Motion to Dismiss identifies the following supposedly actionable statements made by Plaintiffs to the New York Times, *see* ECF 51 at 10:

- Plaintiff Connolly said he "knew" Defendants only valued the home at $472,000 because "[h]e, his wife and three children . . . are Black."
- Plaintiff Connolly further stated: "[T]o be told in so many words that our presence and the life we've built in our home brings the property value down? It's an absolute gut punch."

ECF 44-2 at 2. Lanham's Opposition also identifies the following allegedly defamatory statements from the ABC News article and accompanying video, ECF 51 at 10–11:

- Plaintiff Mott stated that, upon receiving Lanham's appraisal: "My jaw dropped. I was like, this is racism. Because we had done the research, right?"
- Plaintiffs said that Defendants' appraised value was "impossible" in light of the value of other homes in the area.
- Plaintiff Connolly stated that they "experienced discrimination" with the appraisal and are now "very much part of that historical process of Black folk being devalued, of not being able to get, um, a fair shake."

ECF 44-3. Lanham argues that the "clear import" of these statements is that Lanham racially discriminated against Plaintiffs by appraising the house below its actual value. ECF 51 at 11.

Plaintiffs argue that the complained-of statements are not actionable because they are constitutionally protected "pure" opinions based on facts that were disclosed or readily available to the reader. Specifically, Plaintiffs note that the articles and video interview all disclose ample facts which provide the basis for their statements that they were discriminated against. These facts include:

- that Plaintiffs had invested at least $30,000 in renovations and improvements after buying the Churchwardens Home;
- that home prices had risen significantly since the COVID-19 pandemic;
- that Plaintiffs had done "research" prior to the appraisal indicating that the Churchwardens Home's value was higher than what Lanham concluded;
- that Lanham selected undervalued and inappropriate comparable homes for his appraisal;

- that, after whitewashing the Churchwardens home, it reappraised for almost $300,000 more; and
- context regarding recent nationwide accusations of bias in the appraisal industry, including quotes from regulators and academic researchers.

*See* ECF 44-1 at 18–19; ECF 44-2; ECF 44-3. Accordingly, Plaintiffs contend a reasonable reader would interpret the complained-of statements as Plaintiffs' opinion that, based on the facts disclosed in the articles, their initial low appraisal was the product of racial discrimination. *See Peroutka*, 695 A.2d at 1295 ("If the actual facts are accurately stated, an opinion, based thereon will be understood as such and taken for what it is worth." (quoting *Kapiloff v. Dunn*, 343 A.2d 251, 262 n.19 (Md. Ct. Spec. App. 1975)).

However, even assuming arguendo that the statements in question are properly considered opinions, they can still be actionable if they are based upon or imply the existence of untrue facts. Here, the gravamen of Lanham's Counterclaim is that Plaintiffs were aware of and withheld from the press certain information which contradicted their public statements that they were racially discriminated against. For example, the Counterclaim alleges not only that Lanham appropriately selected comparable properties during his appraisal process, but also that Plaintiffs were *aware* of these comparable properties at the time they were seeking to refinance. *See* ECF 36 at ¶ 45. The Complaint also alleges that Plaintiffs were aware of and failed to disclose that the house next to theirs sold one month after Lanham's appraisal for $7,000 less than his appraisal amount, and further that another nearby comparable home sold for closer to Lanham's appraisal price in August, 2022. *Id.* at ¶¶ 9, 57–59, 65–67. Accepting these allegations as true—as the Court must at this stage—they might render false certain facts that Plaintiffs cite as the basis of their statements alleging racial discrimination. For example, the premise that Plaintiffs had conducted research indicating that the $472,000 valuation was unreasonably low would arguably be proven false if Lanham shows that Plaintiffs were aware of the lower-priced comparable homes in their

34

neighborhood. More fundamentally, Plaintiffs' statements that they "knew" the $472,000 valuation was because of race, and that such a valuation was "impossible," *see* ECF 44-2, 44-3, imply that Plaintiffs were not aware of any other market factors that could explain Lanham's appraisal. But the entire basis of Lanham's Counterclaim is that Plaintiffs did know about other home sales in the neighborhood that justified his appraisal.

Of course, it remains to be seen whether Lanham can actually prove that Plaintiffs were aware of these lower-priced sales, or that they knew that these properties were more comparable to their home than the other, higher-priced neighborhood sales which Plaintiffs claim should have been used. For the time being, taking the assertions in the Counterclaim as true as this Court must, Lanham has plausibly alleged, at a minimum, that Plaintiffs' allegedly defamatory statements relied upon or implied false facts.

### B. Legal Fault

Plaintiffs next argue that Lanham has not plausibly alleged that Plaintiffs were legally at fault in making the complained-of statements. *See Hawks v. Ruby*, 2019 WL 4860760, at *9 (Md. Ct. Spec. App. Oct. 1, 2019) ("There can 'be no recovery without fault in any defamation action.'" (quoting *Telnikoff v. Matusevitch*, 702 A.2d 230, 246 (Md. 1997))). Because Lanham is not a public figure, he must plead, at minimum, that Plaintiffs were negligent when they made the statements in question. *See id.*; *Brown v. Bd. of Educ. of Prince George's Cnty.*, 2022 WL 888424, at *8 (D. Md. March 25, 2022); RESTATEMENT (SECOND) OF TORTS § 580B. Negligence, in the context of a defamation claim, is described as follows:

> Negligence is conduct that creates an unreasonable risk of harm. The standard of conduct is that of a reasonable person under like circumstances. Insofar as the truth or falsity of the defamatory statement is concerned, the question of negligence has sometimes been expressed in terms of the defendant's state of mind by asking whether he had reasonable grounds for believing that the communication was true. Putting the question in terms of conduct is to ask whether the defendant acted

reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it.

RESTATEMENT (SECOND) OF TORTS § 580B cmt. *g.*; *Brown*, 2022 WL 888424, at *8.

Although a close call, this Court concludes that, drawing all reasonable inferences in Lanham's favor, he has plead sufficient facts to plausibly allege, if true, that Plaintiffs failed to act reasonably in making the complained-of statements alleging racial discrimination. Specifically, Lanham has alleged that Plaintiffs knew Lanham's appraisal was not racially motived because: (1) Plaintiffs knew their home was valued toward the lower end of similar homes in the area, ECF 36 ¶¶ 31–32; (2) that shortly after receiving Lanham's appraisal, the house next to Plaintiffs' home sold for $7,000 below what Lanham appraised Plaintiffs' home at, *id.* ¶¶ 57–59; (3) that, while Plaintiffs did obtain a much higher re-appraisal after whitewashing their home, this second appraisal occurred seven months after Lanham's appraisal and was therefore affected by intervening sales and changing market conditions, *id.* ¶¶ 10–11; (4) that after the second appraisal, another neighboring property was listed at $605,000 but ultimately sold for $510,000, which was much closer to Lanham's appraisal amount and cast further doubt on the accuracy of the $750,000 valuation, *id.* ¶¶ 65–67; and (5) that Plaintiffs were aware of the above-mentioned, lower-priced sales, as well as the lower-priced properties Lanham appropriately relied on in making his appraisal, *id.* ¶¶ 42–46. Assuming the truth of all of these allegations, they are sufficient to plausibly allege that Plaintiffs failed to "act[] reasonably in checking on the truth or falsity" of their statements to the New York Times and ABC News accusing Lanham of racial bias. RESTATEMENT (SECOND) OF TORTS § 580B cmt. *g.*

In support of their motion to dismiss, Plaintiffs point to the nearly $300,000 discrepancy between the appraisals and the tens of thousands of dollars they spent on home improvements[2] as providing reasonable grounds for believing that Lanham's appraisal was the result of discrimination. *See* ECF 56 at 4–8. That may certainly bear out at trial. Relatedly, Plaintiffs may ultimately prove that they were not aware of the lower comparable sales identified by Lanham, or that they reasonably relied on other, higher sales prices in the Homeland neighborhood to reach their conclusion that Lanham's appraisal was "impossibly" low. At the motion to dismiss stage, however, this Court is required to accept Lanham's allegations as true and to draw all reasonable inferences in his favor. Taken together, the allegations in the Counterclaim assert that Plaintiffs knew, at the time they gave the relevant media interviews, that Lanham's appraisal was not racially motivated, but rather was in line with the value of other similar homes in the area, including at least one allegedly comparable home that sold well below listing price (and closer to Lanham's valuation) after Plaintiffs conducted their whitewashing experiment. While the second, $750,000 appraisal would appear to be powerful evidence supporting Plaintiffs' reasonable belief in the truth of their statements, Lanham has identified certain methodological factors caused by the seven-month delay between appraisals that could potentially account for some (if not all) of the dramatic gap between Lanham's assessment and the subsequent appraisal. At this point, neither Lanham nor the Court has had the benefit of reviewing the second appraisal. And while Plaintiffs are under no obligation to provide that appraisal report at this stage, the lack of any details regarding how

---

[2] Although the Counterclaim does not mention the home improvements, they are discussed in both the New York Times and ABC News articles, which are referenced by, and therefore integral to, the Counterclaim. *See State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 554 (D. Md. 2019) ("Because the [materials] were referenced in the Amended Counterclaim as a basis for the defamation . . . claims, they are integral to the suit." (citing *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015)).

the second appraiser reached his $750,000 valuation (and, by extension, how justified Plaintiffs were in relying on that appraisal as compared to Lanham's) only underscores why dismissal is not warranted at this early stage before discovery. *See Linnemann v. City of Aberdeen*, Civ. No. MJG-12-2021, 2013 WL 3233526, at *8 (D. Md. June 25, 2013) (noting that, under Rule 12(b)(6) "the Court must view the pertinent facts and circumstances . . . as much in favor of [the non-movant] as reasonably possible"). For the above reasons, then, Lanham has plead facts plausibly alleging legal fault sufficient to meet the low bar required to survive a motion to dismiss.

### C. Privilege

Additionally, Plaintiffs raise affirmative defenses—the fair comment privilege and the fair reporting privilege—which they argue shield them from liability. "For reasons of public policy, the law of defamation recognizes certain communications as privileged, and thereby affords those who publish such communications immunity from liability." *Miner v. Novotny*, 498 A.2d 269, 270 (Md. 1985). "The common law conditional privileges rest upon the notion that a defendant may escape liability for an otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest." *Marchesi v. Franchino*, 387 A.2d 1129, 1131 (Md. 1978). Because the fair comment and fair reporting privileges are affirmative defenses, "[a] court may consider [them] on a 12(b)(6) motion only when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 185 (4th Cir. 2000) (internal quotations omitted); *see also id.* (noting that a Rule 12(b)(6) motion "does not generally invite an analysis of potential defenses to the claims asserted in the complaint"). Here, the Court concludes that the facts alleged in the Counterclaim do not clearly reveal that either qualified privilege applies.

### i.   Fair Comment Privilege

The fair comment privilege substantially overlaps with the protections for pure opinions discussed above. *See Piscatelli v. Van Smith*, 35 A.3d 1140, 1151–53 (Md. 2012). Thus, the fair comment privilege does not protect misstatements of fact, or opinions that are based on false or undisclosed facts. *Id*. at 1153. For the same reasons explained above, then, Lanham's Counterclaim includes facts which, if proven true, would contradict certain facts stated or implied by Plaintiffs in their allegedly defamatory statements. Accordingly, this Court cannot rule at this stage that the fair comment privilege applies, and Plaintiffs are not entitled to dismissal on this ground.

### ii.   Fair Reporting Privilege

The fair reporting privilege protects "[r]eports of in-court proceedings containing defamatory material," so long so such reports "are fair and substantially correct or substantially accurate accounts of what took place." *Rosenberg v. Helinski*, 616 A.2d 866, 872 (Md. 1992); *see also Piscatelli*, 35 A.3d at 1150 ("[I]nformation in a court case file is covered by the fair reporting privilege . . . ."). While the fair reporting privilege is "not absolute," it is "somewhat broader in its scope than other conditional privileges." *Piscatelli*, 35 A.3d at 1149 n.3 (quoting *Rosenberg*, 616 A.2d at 872-73). This is because the privilege "arises from the public's interest in having access to information about official proceedings and public meetings." *Id.* at 1149. A party abuses the fair reporting privilege "not upon a showing of actual malice (as with other common law conditional privileges), but when [their] account 'fails the test of fairness and accuracy.'" *Id*. (quoting *Chesapeake Pub. Corp. v. Williams*, 661 A.2d 1169, 1175 (Md. 1995)); *see also* RESTATEMENT (SECOND) OF TORTS § 611 cmt. *a*. "Fairness and accuracy is satisfied when the reports are substantially correct, impartial, coherent, and bona fide." *Piscatelli*, 35 A.3d at 1149.

Plaintiffs claim that the fair reporting privilege protects their statements to the New York Times and ABC News, because those statements merely recite the bases for their lawsuit as contained in the Complaint: that is, that Lanham conducted a racially discriminatory appraisal of their home. Lanham presents two arguments in response. First, he contends that the fair reporting privilege does not apply where, as here, the target of the defamation action is the same party who made the original defamatory statements in Court. Second, Lanham argues that Plaintiffs failed to provide a fair and substantially accurate account of the lawsuit in the articles in question.

As to the first point, Lanham contends that Plaintiffs cannot confer the fair reporting privilege on themselves by filing an allegedly defamatory lawsuit and then describing the contents of that lawsuit to the press. Rather, he claims the privilege is meant to "protect the media primarily in reporting fairly and accurately allegations in litigation without fear of being sued." ECF 51 at 30. In support of this argument, Lanham relies on a comment in the Second Restatement, which provides that "[a] person cannot confer [the fair reporting] privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated." RESTATEMENT (SECOND) OF TORTS § 611 cmt. *c*. Lanham points out that certain states that have applied this "self-conferred" or "self-reporting" exception to hold that individuals who made the original defamatory statements in court may not later invoke the fair reporting privilege to protect their descriptions of those comments in a non-privileged setting. *See id.* at 28–29 (collecting cases). As Plaintiffs point out, however, Maryland's highest court has already addressed the scope of the self-reporting exception. In *Rosenberg*, the then-Court of Appeals held that an expert witness who fairly and accurately recounted his in-court testimony to the news media was protected by the fair reporting privilege. 616 A.2d at 869–71, 876. In reaching that conclusion, the Court of Appeals directly addressed the Restatement's comment regarding the self-reporting exception, noting that

"[a]t first blush, this comment would appear to apply to Rosenberg's situation, and defeat his claim to privilege." *Id*. at 876. However, the Court of Appeals rejected this broad reading, concluding that the fair reporting privilege "confer[s] protection upon any persons who do not act maliciously by commencing judicial proceedings in bad faith and then later repeating their own defamatory statements under the aegis of privilege." *Id*. In other words, "the privilege will be forfeited only if the defamer illegitimately fabricated or orchestrated events so as to appear in a privileged forum in the first place." *Id*.; *see also Myers v. D.C. Hous. Auth.*, 1:20-CV-00700-APM, 2021 WL 1167032, at *5 (D.D.C. Mar. 26, 2021) (interpreting Maryland law to provide that the self-reporting exception "attaches only where the claimant files a defamatory complaint, then republishes it in order to avoid liability" (citing *Rosenberg*, 616 A.2d at 877)). In Rosenberg's case, "[t]here [was] not the remotest indication in the record that [he] sought in bad faith to testify at the domestic hearing with some perverse wish to harm Mr. Helinski afterwards by trumpeting defamatory matter to a television audience." *Id*. at 877.

Thus, to invoke the self-reporting exception to the fair reporting privilege, Lanham must ultimately show that Plaintiffs initiated this lawsuit in bad faith to make defamatory statements while insulating themselves from liability. *See Myers*, 2021 WL 1167032, at *6. While this presents a formidable hurdle, this Court remains cognizant of the fact that affirmative defenses, including qualified privileges, are disfavored at the motion to dismiss stage and should be granted "only when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *E. Shore Markets, Inc.*, 213 F.3d at 185. As discussed above, Lanham has alleged, in relevant part, that Plaintiffs were aware of the lower-priced homes in their neighborhood, that Plaintiffs knew these homes were comparable to theirs, and therefore that they knew that Lanham's appraisal was not the result of racial bias when they filed this lawsuit and gave the related

interviews to the press. Lanham has further alleged that Plaintiffs publicized their lawsuit with "an intent to harm" him because "they were angry that [Lanham's] appraisal was lower than they had hoped and that the lower appraisal made it more difficult for them to get the loan that they were seeking." ECF 36 ¶ 86. In light of these statements and the reasonable inferences that can be drawn from them if they are true, this Court declines to hold that the face of the Counterclaim clearly reveals that Plaintiffs are entitled to dismissal based on the affirmative defense of the fair reporting privilege. Rather, the privilege issue is more appropriately resolved at a later stage of this litigation, once a fuller record has been developed.[3]

### D. Anti-SLAPP Statute

Finally, Plaintiffs assert that they are immune from the defamation claim because it is a Strategic Lawsuit Against Public Participation ("SLAPP") suit under Maryland law and should be dismissed on that basis. Section 5-807(b) of the Courts and Judicial Proceedings Article of the Maryland Code states, in pertinent part, that a lawsuit is a SLAPP suit if it is:

1. Brought in bad faith against a party who has communicated with . . . the public at large to report on, comment on, rule on, challenge, oppose, or in any other way exercise rights under the First Amendment of the U.S. Constitution or Article 10, Article 13, or Article 40 of the Maryland Declaration of Rights regarding any matter within the authority of a government body or any issue of public concern;
2. Materially related to the defendant's communication; and
3. Intended to inhibit or inhibits the exercise of rights under the First Amendment of the U.S. Constitution or Article 10, Article 13, or Article 40 of the Maryland Declaration of Rights.

Section § 5-807(c) provides:

(c) A defendant in a SLAPP suit is not civilly liable for communicating with a federal, State, or local government body or the public at large, if the defendant,

---

[3] Because this Court finds that the Counterclaim does not clearly reveal that Plaintiffs may invoke the fair reporting privilege, it need not address Lanham's second argument that Plaintiffs' defamatory statements to the press were not a fair and accurate description of the lawsuit.

without constitutional malice, reports on, comments on, rules on, challenges, opposes, or in any other way exercises rights under the First Amendment of the U.S. Constitution or Article 10, Article 13, or Article 40 of the Maryland Declaration of Rights regarding any matter within the authority of a government body or any issue of public concern.

"In sum, the Anti-SLAPP statute aims to remedy the fall-out from the unwarranted maintenance of litigation launched to deter, punish or intimidate efforts at critical public comment and participation in governmental proceedings involving the suit-bringer's interests." *MCB Woodberry Dev., LLC v. Council of Owners of Millrace Condo., Inc.*, 265 A.3d 1140, 1144 (Md. Ct. Spec. App. 2021); *see also Fairfax v. CBS Corp.*, 2 F.4th 286, 296 (4th Cir. 2021) ("Generally speaking, anti-SLAPP statutes aim to weed out and deter lawsuits brought for the improper purpose of harassing individuals who are exercising their protected right to freedom of speech.").

The parties dispute the first and third elements of the Anti-SLAPP statute set forth in § 5-807(b). Regarding the first element, Plaintiffs argue that Lanham pursued the litigation in bad faith because he "failed to adduce facts to remotely suggest that Plaintiffs committed acts of such gravity or have the means to support an award of punitive damages in the amount requested, supporting a finding of bad faith." ECF 44-1 at 35. Plaintiffs also assert that the lack of factual allegations to support Lanham's Counterclaim indicates his intention to inhibit Plaintiffs' further media contact, thereby also satisfying the third element. *Id.* Lanham responds that he brought the suit to seek redress for economic and non-economic damages as a result of Plaintiffs' statements to the press, including loss of income, loss of appraisal work, harassment, harmed reputation, and symptoms of depression and anxiety. ECF 51 at 33¬34.

In support of Plaintiffs' argument that the litigation was commenced in bad faith, Plaintiffs rely on *MCB Woodberry*. There, a developer sued a homeowners' associations and their board members as a result of their opposition to the developer's proposed changes in their community.

*MCB Woodberry*, 265 A.3d at 1145. The developer filed suit and requested $25 million in punitive damages for tortious interference with the developer's business and economic relations. *Id.* The Maryland Court of Special Appeals affirmed the lower court's ruling that the developer's case was a SLAPP suit. *Id.* at 1160.

The present case is factually distinct from *MCB Woodberry*. There, the board members individually and through the homeowners' associations merely opposed the developer's project, including "submitting letters, testifying, and making a presentation" to the city planning commission. *Id.* at 1147. Here, Plaintiffs communicated allegations of racial discrimination, which Lanham alleges were false and negligently made, to national news outlets. Consequently, Lanham claims his livelihood, as well as his mental and physical health, were impacted. Indeed, Lanham has alleged that, due to Plaintiffs' statements, he has "suffered a loss of income and [has] not received as much business," and further that he "has been told that he has not received appraisal work because of the false and defamatory statements by [Plaintiffs]." ECF 36 at ¶ 89. And while certainly substantial, the $500,000 in compensatory and punitive damages sought by Lanham, *id*. at ¶ 96, are far less than the $25 million total sought by the developer in *MCB Woodberry*.

Ultimately, this Court cannot conclude at this stage that Lanham's Counterclaim was brought in bad faith. *See Ugwuonye v. Rotimi*, 2010 WL 3038099, at *4 (D. Md. July 30, 2010) ("At this stage of the litigation, where discovery has yet to be completed, the Court is not prepared to dismiss the suit based solely on [defendant's] mere allegation that the suit is brought in bad faith."). While Plaintiffs contend that Lanham's Counterclaim depends on "conclusory allegations and illegitimate inferences" and "is not viable on its face," ECF 56 at 25, this Court has already held that the Counterclaim pleads sufficient facts to otherwise survive the motion to dismiss.

Accordingly, Plaintiffs' motion to dismiss the Counterclaim under Maryland's Anti-SLAPP statute will be denied.

## V.    CONCLUSION

For the reasons stated above, Defendant Lanham's motion to dismiss, ECF 31, will be **GRANTED IN PART** and **DENIED IN PART**, and Defendant loanDepot's motion to dismiss, ECF 32, will be **GRANTED IN PART** and **DENIED IN PART**. Specifically, this Court dismisses Count V of Plaintiffs' Amended Complaint, ECF 25, and dismisses Count I of Plaintiffs' Amended Complaint to the extent it relies on 42 U.S.C. § 3604. All other claims survive.

Plaintiffs' motion to dismiss counterclaims, ECF 44, will be **DENIED**.  A separate Order follows.


Dated: August 2, 2023                                          _____/s/_____
                                                              Stephanie A. Gallagher
                                                              United States District Judge