# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **NATHAN CONNOLLY &** | * | |
| **SHANI MOTT** | * | |
| | * | |
| | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **Civil Case No.: SAG-22-2048** |
| **v.** | * | |
| | * | |
| **SHANE LANHAM,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## MEMORANDUM OPINION

Plaintiffs Nathan Connolly and the estate of Shani Mott[1] allege that Defendants Shane Lanham and his company, 20/20 Valuations, LLC, racially discriminated against Plaintiffs while performing an appraisal of their home in 2021. Defendants counter-sued for defamation. ECF 36.[2] The parties have now filed cross-motions for summary judgment, and each party has opposed the other's motion. ECF 110, 127, 130, 134. This Court held a motions hearing on July 7, 2025. For the reasons explained below, both motions for summary judgment are GRANTED.

---

[1] At the time of filing, Dr. Connolly's spouse, Dr. Shani Mott, was also a Plaintiff. Dr. Mott has since passed away, and this Court granted Dr. Connolly's motion to substitute himself for Dr. Mott as the personal representative of her estate. ECF 84. This Court will continue to refer to Plaintiffs in the plural, recognizing Dr. Connolly's separate potential rights to recover individually and as Dr. Mott's representative.

[2] For clarity, this Court will refer to Dr. Mott and Dr. Connolly as "Plaintiffs," and Mr. Lanham and 20/20 Valuations as "Defendants," even when referring to the counterclaim.

I.    **BACKGROUND**

The Court construes the facts, which are largely undisputed, in the light most favorable to the non-moving party where relevant.[3]

A.    The Appraisal

Plaintiffs, who are Black, purchased their home in Baltimore City in 2017 for $450,000. ECF 25 at ¶¶ 35, 45. Plaintiffs received a sales concession of $13,500 at closing. ECF 110-3 at 12. Their home is in the Homeland neighborhood, which is majority non-Hispanic White. *Id.* ¶¶ 27–35, 58. The Homeland neighborhood is a highly desirable neighborhood with "strict architectural and maintenance requirements." ECF 127-20 at 2–4. Plaintiffs' house is located off of Northern Parkway, a major road, and is set back from the road by about 100 feet. ECF 110-4 at 81–82, 101.

Four years later, and after investing in home improvements, Plaintiffs sought to refinance their mortgage through loanDepot.com, LLC. ECF 25 ¶ 37; PSUMF ¶ 1. In connection with that refinancing, Solidifi, an appraisal management company, hired Defendants to appraise Plaintiffs' home. ECF 25 ¶ 43; PSUMF ¶ 2. On June 14, 2021, Defendant Lanham visited Plaintiffs' home and conducted an appraisal. *Id.* ¶ 4. Plaintiff Mott found Lanham to be "standoffish." ECF 110-4 at 113. At the conclusion of the appraisal, Defendant Lanham and Plaintiffs discussed features of the home, including its location in a desirable school district. *Id.* at 103; ECF 110-5 at 174–75,

---

[3] Defendants included a Statement of Undisputed Material Facts ("DSUMF"). ECF 110-1 at 4–14. Plaintiffs also submitted a Statement of Undisputed Material Facts ("PSUMF"). ECF 127-1 at 2–6. They responded to the DSUMF, although they do not appear to dispute the facts as described by Defendants, but rather the conclusions that should be drawn from them. *Id.* at 22–37. Indeed, the vast majority of Plaintiffs' response to the DSUMF consists of summaries of an expert report that this Court has already, for the most part, excluded. Plaintiffs are of course entitled to make arguments about how the facts should be interpreted, and this Court will draw inferences from the facts in the light most favorable to them, but those arguments are not, in this Court's view, relevant to a neutral statement of facts.

177. Shortly after Lanham left Plaintiffs' home, he called Plaintiff Mott to ask for more information about the Homeland (neighborhood) Association and its membership dues. ECF 110-4 at 100–01. Plaintiff Mott confirmed that she and Plaintiff Connolly were members of the homeowners' association. *Id.*

Defendant Lanham then prepared an appraisal report based on his home visit and market data. ECF 110-6 at 129. Lanham testified that he ordinarily begins by setting neighborhood boundaries, and then looks at sale prices from the preceding year. *Id.* at 129–31. The goal of this step is to identify the most similar houses to use as comparators. *Id.* at 143–47. Because location is a significant factor, for this appraisal Lanham began by looking for sales of homes on Northern Parkway, and then looked for homes with comparable kitchens and bathrooms. *Id.* at 137–141. He ultimately pulled 38 recent sales, including one from Northern Parkway, that he deemed sufficiently similar to Plaintiffs' home in terms of location. *Id.* at 187. He found that the vast majority of those homes had more recently updated kitchens and bathrooms than Plaintiffs' home. *Id.* at 188–89.

Lanham selected comparable properties to use in the appraisal, and then made adjustments, which was his ordinary practice. *Id.* at 152–66. Lanham's initial report (which he submitted to Solidifi) valued Plaintiffs' home at $515,000. ECF 110-7. The report included 4 comparators (although one was not included in calculations because it had not yet sold). *Id.* at 13. The report gave Comparator 2 the most consideration, then Comparator 3, then Comparator 1. Comparator 4, the active listing, was not considered at all. Only Comparator 1 was also located on Northern Parkway. *Id.* Lanham noted that:

> Comp 1 is located on Northern Pkwy in a similar way that the subject is. It is noted that this is the lowest sale in the report, and based off the paired sales analysis of the gridded comps a location adjustment may be necessary. However, this house was on the

> market for only 3 days and sold for 100% of its list price, which
> suggests there was no impact on its value or marketability as a result
> of its location. The appraiser called the agent to determine if the
> house was priced low due to its location but could not reach said
> agent. This appears to be a reliable comp that does not need a
> location adjustment, and supports the lack of location adjustment for
> the subject.

*Id.* at 13. He also remarked that trees on the Plaintiffs' property would block "some noise" and the property had "ample back yard space to where children can play safely." ECF 127-1 at 53. The next day, Lanham revised the report based on a conversation with the realtor who sold Comparator 1. ECF 110-8 at 13. According to the agent, "the house was listed low to account for the external obsolescence of the busy road, and for that reason sold for 100% of its list price and was only on the market for 3 days. Being located on Northern Pkwy had a negative impact on this listing and supports the adjustment in the grid." *Id.* Lanham determined that a "busy road adjustment" was also necessary for Plaintiffs' home based on this new information—in other words, he found that the homes *not* located on Northern Parkway had a greater value attributable to location than a home on Northern Parkway or another busy street. *Id.* at 5; ECF 110-6 at 200–02. This time, his report stated that the tree buffer "has only a minimal affect in mitigating the noise, and no real impact on safety." ECF 127-1 at 53. The busy road adjustment was the only change to the report that impacted the valuation. In the end, Defendants appraised Plaintiffs' home for $472,000. PSUMF ¶ 5.

Upon hearing about the final valuation, but before reading the report, Plaintiffs immediately reacted "that this is racism." ECF 110-4 at 107; ECF 110-5 at 188. Plaintiffs submitted an appeal to their loan officer, ECF 110-30, and Lanham addressed their objections in a response rejecting the appeal, ECF 110-9 at 13–14. Plaintiffs' application for refinancing was denied. PSUMF ¶ 6.

In January 2022, seven months after the first appraisal, another appraiser, Daniel Dodd, valued Plaintiffs' home at $750,000 dollars. PSUMF ¶ 9. For that appraisal, Plaintiffs performed an "experiment" in which they "whitewashed" their home by removing all evidence that a Black family lived there. *Id.* ¶ 8. Plaintiffs' refinance loan was approved. *Id.* ¶ 9. Mr. Dodd now admits that his appraisal "included five errors: (1) a negative adjustment of $14,800 on Comp 3 should not have been included; (2) a negative adjustment of $9,450 on Comp 5 should not have been included; (3) a negative adjustment of $20,000 on Comp 5 should have been a positive adjustment of some unknown amount; (4) a negative adjustment of $4,000 on Comp 5 should not have been included; and (5) the report incorrectly states that Mr. Dodd appraised the subject property on May 9, 2019." ECF 110-1 at 14 (citing ECF 110-18 at 131, 135–40).

### B. Procedural History & Plaintiffs' Public Statements

Plaintiffs filed this lawsuit on August 15, 2022. ECF 1.[4] Three days after filing, the New York Times published an article titled "Home Appraised with a Black Owner: $472,000. With a White Owner: $750,000." ECF 127-13. The article includes several statements by Plaintiffs concluding that Lanham's lower appraisal was because the Plaintiffs are Black. *Id.* ("But 20/20 Valuations, a Maryland appraisal company, put the home's value at $472,000…Dr. Connolly said he knew why: He, his wife, and three children, aged 15, 12, and 9, are Black."); *id.* ("'We were clearly aware of appraisal discrimination,' said Dr. Connolly, 44. 'But to be told in so many words that our presence and the life we've built in our home brings the property value down? It's an absolute gut punch.'").

---

[4] At the time of filing, loanDepot, the loan company, was also a Defendant. loanDepot is no longer a party to this lawsuit. ECF 78, 79.

On August 24, 2022, ABC News both aired an interview with Plaintiffs and published an article about them entitled "Couple's home rose nearly $300,000 in value after it was shown by a white colleague." ECF 127-14, 127-15; *id.* (Dr. Mott said, "My jaw dropped. I was like, this is racism. Because we had done the research, right?"); *id.* ("Based [on] their research, the couple found the $472,000 valuation 'impossible.'"); *id.* (Dr. Connolly said "Well, we experienced discrimination. …It was just one of those moments where, you know, you're kind of like okay, this is real. You know about the history, but to feel that we're very much part of that historical process, of [B]lack folk being devalued, of not being able to get a fair shake, …").

The next day, WUSA9, a Baltimore news station, aired another interview with Plaintiffs and published an article titled "Black Maryland couple says house appraised higher after it was 'Whitewashed.' Now they want justice." ECF 127-16, 127-17; *id.* ("The idea that the life we built in this house would somehow devalue our property was just too hard for us to accept.").

Finally, on September 12, 2022, WYPR, a Baltimore radio station, published an interview with Plaintiffs titled "Countering Racial Bias in Real Estate: Black Perspectives." ECF 127-18. Dr. Mott said:

> When I go back and I look at his report, it felt like a hit job, you know. Like you look at it, and he basically had four comparables, and of the four, one was outside of Homeland, I think two were north of Northern Parkway, and then one was south of Northern Parkway on the border, but I think what's so fascinating about his comp is that he chose comparables that he said, when he actually graded them, said that they were similar in kind of construction or quality as our home, but then he proceeded to take money off of their value so that it met his valuation of our house. So on the one hand, it's like you're saying you chose – I can't remember the exact number that he had to choose from – but he basically restricted his comp to 16% of what was available, and then within that 16%, he chose the homes that he claimed were comparable, but then deducted money in saying that they were not comparable.

*Id.*

Plaintiffs filed an Amended Complaint on October 28, 2022. ECF 25. Defendants answered and filed a counterclaim for defamation and false light invasion of privacy. ECF 36. Defendants filed a motion to dismiss the Amended Complaint, ECF 31, and Plaintiffs filed a motion to dismiss the counterclaim, ECF 44. This Court granted the Defendants' motion in part, and denied the Plaintiffs' motion in full. ECF 58. This Court dismissed Plaintiffs' state law claims (Count V), and the portion of their Fair Housing Act claim (Count I) that relied on 42 U.S.C. § 3604. Four claims remain: a Fair Housing Act claim alleging violations of 42 U.S.C. §§ 3605, 3617 (Count I); an Equal Credit Opportunity Act claim alleging violations of 15 U.S.C. § 1691(a)(1) (Count II); a claim alleging violations of 42 U.S.C. § 1981 (Count III); and a claim alleging violations of 42 U.S.C. § 1982 (Count IV). The counterclaims also remain.

At the conclusion of discovery, the parties filed cross-motions for summary judgment and motions to strike expert reports. This Court denied Plaintiffs' motion to strike a defense report, and granted in part Defendants' motion to strike the opinions of Plaintiffs' expert Junia Howell. ECF 136.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide

enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment is warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.  DISCUSSION

### A.  Discrimination Claims

Each of Plaintiffs' remaining claims is predicated on a finding that the Defendants discriminated against them on the basis of their race. *See* 42 U.S.C. § 3605 (prohibiting individuals or entities engaged in residential real estate-related transactions from discriminating "because of

race"); 15 U.S.C. § 1691 (prohibiting a creditor from discriminating against an applicant on the basis of race regarding a credit transaction); 42 U.S.C. § 1981 (granting all persons "the same right … to make and enforce contracts … as is enjoyed by white citizens"); *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 156 (4th Cir. 2018) ("Although Section 1981 does not explicitly use the word 'race,' the Supreme Court has construed the statute to ban all racial discrimination in the making of public and private contracts."); 42 U.S.C. § 1982 ("All citizens…shall have the same right… as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.").

To survive summary judgment, then, Plaintiffs must adduce evidence that Defendants acted with a discriminatory purpose through either (1) direct evidence of discrimination or (2) satisfying the burden-shifting framework from *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451 (4th Cir. 1990); *Corey v. Secretary, U.S. Dept. of Housing & Urban Development ex rel. Walker*, 719 F.3d 322, 325 (4th Cir. 2013) (holding that discriminatory intent or motive for an FHA claim can be established "either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test."); *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1136 (4th Cir. 1988) (same for Section 1981); *Glenn v. Wells Fargo Bank, N.A.*, 710 F. App'x 574, 576–77 (4th Cir. 2017) (same for Equal Credit Opportunity Act); *Pinchback*, 907 F.2d at 1452 (same for Section 1982). Because Plaintiffs do not argue they have direct evidence of discrimination, this Court will proceed to the burden-shifting framework.

The *McDonnell Douglas* framework requires the person alleging discrimination "to first make out a prima facie case of discrimination." *Anderson v. Diamondback Investment Group, LLC*, 117 F.4th 165, 174 (4th Cir. 2024) (cleaned up). The burden then shifts to the defendant, "who

must establish that there was a legitimate nondiscriminatory reason for the…action." *Id.* If the defendant has such a reason, the burden then shifts back to the plaintiff, who must "prove by a preponderance of the evidence that the legitimate reasons offered by the [defendant] were not its true reasons, but were a pretext for discrimination." *Id.* at 174–75 (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000). The burden to show that the defendant "intentionally discriminated against the plaintiff remains at all times with the Plaintiff." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

*1. Prima Facie Case & Legitimate Nondiscriminatory Reason*

There is no dispute here as to the first two factors. Defendants are willing to assume Plaintiffs have made a prima facie case of discrimination for purposes of summary judgment. ECF 130 at 1. And everyone agrees that Defendants have proffered a legitimate nondiscriminatory reason for the appraisal. The question is whether Plaintiffs have created a genuine issue of material fact as to whether that proffered reason was mere pretext for discrimination.

Although it is not disputed, a brief discussion of Defendants' legitimate nondiscriminatory reason is helpful background for this Court's analysis of pretext. Defendants offer that the appraisal was conducted in a fair and reasonable fashion, addressed the specific circumstances of the Plaintiffs' property, and aligned with professional norms and standards. ECF 110-1 at 21. Because "home valuation is to some degree an art, not a science[,] some degree of variability is to be expected." *Alig v. Quicken Loans Inc.*, 990 F.3d 782, 803 (4th Cir. 2021). Defendants used the "sales comparison approach" to appraise Plaintiffs' home, which everyone agrees is "the primary method appraisers should use for owner-occupied residential property." ECF 110-1 at 19; ECF 110-26 at 25. That approach "assumes that a property's value is primarily dictated by the marketability of its location. The approach operationalizes the marketability of location by using

recent transaction amounts as a proxy for what a hypothetical buyer would offer for the property in question." *Id.* That involves three steps: (1) selecting comparable properties; (2) adjusting the prices of those comparable properties; and (3) calculating the subject property's value. *Id.*[5]

Everyone agrees that having followed this process is a legitimate nondiscriminatory reason the appraisal turned out the way it did. Defendants have two expert witnesses with, collectively, over 50 years of appraisal experience, who have opined "that the most important aspect of this appraisal and in all real estate valuations is location, and Plaintiffs' home is located in the northern part of Homeland, north of Northern Parkway, and suffers from severe external obsolescence because it fronted on Northern Parkway, which is a four-lane thoroughfare and one of the busiest roads in Baltimore City." ECF 110-1 (citing ECF 110-2). They further attested that the appraisal in this case included comparables with similar "external and locational factors." *Id.* Plaintiffs do not have an appraisal expert to rebut that Defendants' appraisal adhered to professional norms and standards because this Court excluded the portion of their expert's report directly addressing that issue.[6] *See* ECF 135 ("The Court will grant the motion to exclude insofar as it applies to Dr. Howell

---

[5] Plaintiffs summarized this same process as follows: "First, the appraiser selects recently sold (usually defined as within a year with the most recent comparable sales seen as preferable), comparable properties (similar plots with enhancements of the same size, structure, and condition) located within the same or comparable neighborhood (often defined by locally defined boundaries, school zones, and architectural styles). Second, the method recognizes no properties can be perfectly identical. Thus, the appraiser is tasked with adjusting the comparable property's sale price to reflect differences between the identified comparable sale and the subject property in question. Third, the appraiser uses the adjusted sale prices across all their selected comparable sales (typically this includes 3 to 6 sales) to derive their opinion of value. The appraiser can choose to consider all their selected comparable sale prices equitably or give preference to certain comparable sales as long as they provide evidence for their decision." ECF 110-26 at 25.

[6] This Court excluded this portion of Dr. Howell's testimony because she is not an appraiser and has no experience conducting appraisals.

opining on the validity of the appraisal of Plaintiffs' home and whether that appraisal comported with professional standards or norms for appraisers.").

    *2. Pretext*

    To show that Defendants' explanation was pretext, Plaintiffs must adduce evidence "both that the reason was false, and that discrimination was the real reason for the challenged conduct." *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997) (cleaned up); *Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196, 216 (D. Md. 2025). "If the defendants provide evidence of a non-discriminatory reason for their action, [the plaintiffs] bears the ultimate burden of persuasion and must show, by a preponderance of the evidence, that the proffered reason was pretext for discrimination." *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998).

    To survive summary judgment, the Plaintiff must "provide…evidence that the…decision was based on impermissible factors." *Id.* ("[C]onclusory allegations…are…insufficient to support a finding of pretext."). They must prove "that the [defendant's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'"); *Foster v. Univ. of Maryland–E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015). "*Substantive* departures" from the Defendants' ordinary practices "may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (emphasis added). But Plaintiffs' "own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons." *Williams v.*

*Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989); *Lyons v. City of Alexandria*, 35 F.4th 285, 288 (4th Cir. 2011) (conclusory allegations are insufficient to preclude summary judgment) . Ultimately, this Court's job is not to "decide whether the [Defendant's] reason was wise, fair, or even correct, ultimately, so long as it was truly the reason." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted).

Plaintiffs still primarily rely on their expert witness, Dr. Junia Howell, in their efforts to show that Defendants' explanation was mere pretext. Dr. Howell's remaining analysis falls far short of making either necessary showing. That is, her analysis does not—and could not—rebut Defendants' position that their appraisal was fair, reasonable, and well explained, nor does it affirmatively show that the appraisal was the result of intentional racial discrimination. Although this Court credits Plaintiffs' position that an appraisal within the universe of fair, accurate, and reasonable appraisals could nevertheless be primarily motivated by discrimination (that is, the reason for a lower but fair appraisal result could be discrimination, not the location or condition of the home), neither Plaintiffs nor Dr. Howell adduce any evidence that discrimination was, in fact, Defendants' real reason. Dr. Howell's report provided two categories of high-level conclusions, which this Court will address in turn.

### i.    Neighborhood-level Disparities

First, Dr. Howell performed a linear regression analysis and concluded that "Defendant systematically appraised homes in census blocks of color as less valuable than comparable homes in comparable White census blocks." ECF 110-26 at 8–9. Plaintiffs admit, though, that "the appraisal industry as a whole produces racially unequal results." ECF 127-1 at 25. That phenomenon, of course, reflects "historical and contemporary racial inequality in our country." ECF 110-20 at 125. But this Court must agree with Defendants that "[i]f the research…is that there

is a $165,000 difference in market value between appraisals of similar homes [where] one [is]
located in a White neighborhood and the other [is located] in a similar community of color,
Defendant systematically appraising homes in census blocks of color as less valuable than
comparable homes in comparable White census blocks only reflects the market that an appraiser
is required to report and is not an indication of pretext." ECF 110-1 at 22.

Relatedly, Dr. Howell concluded that Lanham "systematically evaluated homes in
communities of color as less valuable than other appraisers and evaluated homes in White
neighborhoods as more valuable than other appraisers." ECF 110-26 at 12. Dr. Howell found that
Defendants appraised homes in communities of color $30,000 below average, and homes in White
neighborhoods $10,000 above average. *Id.* at 10. In general, Defendants' appraisals were $9,000
below average. *Id.* Although that analysis may raise an inference of pretext as to the value of an
appraised home in a community color, as Defendants explain, it tells us very little about whether
Defendants conducted a discriminatory appraisal of Plaintiffs' home. Dr. Howell's "comparison"
used only "100 percent non-Hispanic White" neighborhoods and "0 percent non-Hispanic white"
neighborhoods. ECF 110-26 at 8 n.6. Plaintiffs live in neither—the undisputed evidence is that
they live in a majority, but not all, White neighborhood. Moreover, appraisal is more art than
science, and some level of variation between appraisers is to be expected.[7] *See Alig*, 990 F.3d at
803. Without more context, it is hard to say whether the differences Dr. Howell highlighted are in

_____

[7] Take, for example, the second appraisal of Plaintiffs' home. Although the differential is quite
extreme (and that appraiser has now admitted to making a number of errors in calculating the
home's value, ECF 110-18 at 131, 135–40), it would hardly be unusual for appraisals of the same
home conducted by different people several months apart to differ greatly. *See Latimore v.
Citibank F.S.B.*, 151 F.3d 712, 715 (7th Cir. 1998) ("No reasonable suspicion of racial
discrimination can arise from the mere fact of a discrepancy between an appraisal conducted by
another bank and the appraisal made by [Defendant].").

fact anomalies or rather within the range of most appraisers, even if skewed to one side or the other. Had Dr. Howell shown that Defendants appraised homes owned by persons of color *in any neighborhood* at lower values than homes with White owners *in any neighborhood*, this analysis may have been more persuasive. But the inferential leap Plaintiffs ask this Court to make is too long. This Court thus agrees with Defendants that this differential is not sufficient to raise an inference of pretext.[8]

ii.    Departures from Standard Practice

Finally, Dr. Howell opined that Defendants did not comply with the Uniform Standards of Professional Appraisal Practice ("USPAP") or their own ordinary appraisal practices. This Court excluded Dr. Howell's opinions regarding the USPAP, and about whether the appraisal was conducted properly. ECF 135. Dr. Howell argued, essentially, that Defendants' appraisal was discriminatory because of its selection of comparable homes and the modifications of "comps" on those homes. The parties have vigorously debated whether Defendants acted properly in either of those respects. But the only live dispute on this issue is whether Defendants varied from their own prior practices. Without a qualified appraiser as an expert, Plaintiffs offer no solution for how the appraisal should have been done to comply with the USPAP or other professional norms. ECF

---

[8] Dr. Howell found a similar differential between Defendants' own assessed median sale price in neighborhoods and their average appraisals of homes in those same neighborhoods. ECF 110-26 at 13–15. And likewise, Dr. Howell found that Defendants generally appraised homes in White neighborhoods higher than their contract prices, and homes in communities of color as below their contract prices. *Id.* at 16–17. This Court believes that analysis supports the same conclusion that the Defendants assessed homes in White neighborhoods at higher values than comparable homes in communities of color as a general matter. As to Dr. Howell's analysis regarding the locations of comparables and adjustments made, however, this Court lacks necessary context that could only be provided by a qualified appraiser. Each of the appraisal factors she considers necessarily involves a degree of subjectivity that is not captured by statistics, and she does not provide that context.

110-20 at 146 ("I am not an appraiser. I am not trying to suggest that there are specific alternatives."). And Dr. Howell is similarly unqualified to assess whether Defendants complied with those requirements, norms, and standards. *See* ECF 135.

In line with many of their other arguments regarding the appraisals, the distinctions Plaintiffs' expert identified among Defendants' appraisals are no more than nitpicking. Without the foundation in appraisals necessary to explain the significance of these distinctions, this Court has no way to place them in context. None of the "departures" Dr. Howell highlighted is sufficient to raise an inference of discrimination on its own, nor do they collectively raise such an inference. Dr. Howell runs into problems where she found "departures" because the Defendants did not adhere to their "average." By nature, the values that make up a large data set will fall both above and below the average. Particularly in a subjective industry, averages do not tell the full story. This Court will consider Dr. Howell's more specific arguments in the two broad categories she uses.

### a. Comparables

Dr. Howell first argued that Defendants departed from their ordinary practices in selecting comparables. Dr. Howell asserted that Defendants departed from ordinary practice because they usually "selected comparable sales that were, on average, only 120 square feet or 8 percent different from the subject property," and in this case selected properties that were 27 percent larger, 10 percent larger, and 3 percent larger. ECF 110-26 at 27–29. Although Dr. Howell suggested that there were comparables with more similar square footage to Plaintiffs' home that could have been used instead, as a non-appraiser she is not qualified to assess whether those homes would have been better overall comparables. Indeed, the record in this case suggests that square footage is only

one consideration that goes into selecting comparables.[9] But regardless, it is unclear without expert testimony how the fairly minor square footage differences Dr. Howell focused on would have impacted the final appraisal, particularly because they would be accounted for in value adjustments. *See Vill. of Arlington*, 429 U.S. at 267. And because she only compared the percentages from this case to Defendants' average, it is a stretch to say that they "departed" from their standard practice, which naturally would have included a range of differentials.

Dr. Howell continued to suggest that Defendants departed from their standard practice in selecting the locations of comparables. But Dr. Howell only cited one departure from Defendants' prior practice, devoting the majority of her analysis in this section to critiques of the appraisal she is not qualified to make. Dr. Howell argued that Defendants departed from their standard practice because they chose comparables located on census blocks with larger concentrations of residents of color than the census block where Plaintiffs' home is located (and than the average block in Homeland). ECF 110-26 at 30. This Court agrees with Defendants that this is a red herring. As Dr. Howell admitted in her deposition, looking at the census data to determine the precise racial composition of a census block "is not the typical practice of an appraiser." ECF 110-20 at 148–49. This Court is not persuaded that merely being familiar with a neighborhood would mean a person

---

[9] Dr. Howell also disputed Defendants' assessment of the condition of one of the comparables. Again, she is not qualified to opine on whether the comparable was properly categorized under appraisal standards. ECF 110-26 at 28–29; *See also infra*.

would know the racial makeups of particular blocks.[10] And although Plaintiffs are right that Defendants did not use "bracketing"—selecting some comparables of greater value, and others of lesser value—they neglect to mention that Defendants' experts testified that their failure to use bracketing likely resulted in an "artificially inflated" value. ECF 131-12 at 5.

Finally, Plaintiffs argue that Defendants chose older comparables than usual—homes used in this appraisal sold on average seven months before the appraisal (ranging from two to twelve months), versus their average in 2021 of four months (and average appraisal using a range of one to seven months). *Id.* at 31. By Plaintiffs' own account, however, a "recent" sale is any sale within the twelve months preceding the appraisal. ECF 110-25 at 25. And although Dr. Howell asserted—without foundation—that selecting the most recent sales available is a "best practice," no expert provides any insight into how a slightly older average comparable would influence appraisal value.

---

[10] Dr. Howell and Plaintiffs also take issue with Defendants' exclusive use of comparables north of Northern Parkway. Plaintiffs' home is located north of Northern Parkway. Defendants' experts clarify that "not all locations within the Homeland neighborhood are equal for purposes of market value and different locations have different impacts on the market value of properties in those locations." ECF 131-12 at 11. "All other things consistent, homes in the central geographic area of Homeland to the south of Northern Parkway, and to the west of Springlake Way sell for more than homes in the section north of Northern Parkway (and section closer to Bellona Avenue)." *Id.* Although it is understandable that Plaintiffs would have preferred to use higher value homes in a different part of Homeland, the only appraisal experts in this case have testified that it was proper to prioritize homes north of Homeland Parkway for this appraisal. *Id.* at 10.

Dr. Howell and Plaintiffs also continue to assert that Defendants used a comparable home that was not in Plaintiffs' neighborhood. Defendants testified that they believed the house was in Homeland because it was advertised as being located in Homeland and fell within the neighborhood boundaries on the website he usually uses. ECF 110-1 at 34 (collecting record citations). Defendants' experts testified that the house "is in the Greater Homeland Historic District and it was marketed as being located in Homeland," but it was actually ½ a block outside of Homeland. ECF 110-3 at 8. The experts nevertheless thought it an appropriate comparable because it was "the most proximate to the subject property" and "the locational market appeal of this home is similar to the subject property." *Id.*

For departures from ordinary practice to rebut a legitimate nondiscriminatory reason, they must be *substantive*, and they must be departures from standard choices that would have led to a different outcome. *See Vill. of Arlington*, 429 U.S. at 267. To the extent that Dr. Howell identified differences between Defendants' ordinary practices and how they appraised Plaintiffs' home, they were not substantial ones. And without an expert on appraisals, Plaintiffs have not explained how those (minor) departures, to the extent there were any, would have impacted the appraised value of their house.

### b. Adjustments

Plaintiffs argue that several of the adjustments Defendants made to the comparable properties were inconsistent with their practices in other appraisals. After selecting comparable properties, appraisers are supposed to identify all features of the comparables that are different from the house being appraised, and assign dollar values to those differences so they can be accounted for. Dr. Howell discussed six adjustments, only one of which she believes was out of line with Defendants' standard practice. As to the others, Dr. Howell either found that Defendants acted consistently with ordinary practice, or her conclusions are based on subjective criticisms of the appraisal she cannot make as a non-appraiser.

Dr. Howell admitted that Defendants acted consistently with their typical practice as to four of the adjustments she discusses. One adjustment—for outdoor seating areas—was "similar to the average adjustment" Defendants made. ECF 110-26 at 42. Another—for the finished basement—was "in alignment with [Defendants'] typical practice across…appraisals." *Id.* A third—for number of rooms—again fails "within the norm of the profession and Defendant[s'] own practice." *Id.* at 40. And finally, for square footage adjustments, Dr. Howell admitted that the

$40 per square foot Defendants applies in this case falls well within their typical range of $2–200. *Id.* at 40–41.[11]

As to the quality of construction ratings, Dr. Howell did not identify departures from standard practice, but rather took issue with how Defendants conducted the appraisal. She argued that Defendants should have rated Plaintiffs' home a Q3 instead of a Q4 (Uniform Appraisal Dataset quality ratings, ranging from Q1 to Q6) because the Maryland Department of Assessments and Taxation rated Plaintiffs' home a 5 out of 9, and the rating systems are "similar." *Id.* at 35–40. She also noted that Defendants rated all four comparables in this case Q4, when two of them had ratings with the State of Maryland that Dr. Howell believed equate to a Q3. *Id.* Despite Plaintiffs' assertions, Defendants did not "deviate[] from normal practices" by not providing an adjustment that might have been called for under the Maryland system they undisputedly did not use. ECF 127-1 at 31. As a non-appraiser, Dr. Howell is not qualified to declare Defendants' rating of Plaintiffs' home under appraisal standards incorrect. And she admitted, moreover, that the Maryland rating system is *not* identical to the system appraisers use. ECF 110-20 at 39–40. It is unclear to this Court how reaching only slightly different quality conclusions on entirely different scales would evidence intentional discrimination. A review of both scales makes clear that they are not identical. Defendants did not "deny" Plaintiffs a "routine" upward adjustment—they have no basis for their conclusion that their house was a Q3 and not a Q4, or that Defendants' quality ratings of the comparables were wrong.

---

[11] Dr. Howell noted that the $40 adjustment applied in this case was slightly lower than Defendants' usual adjustments in Homeland. *Id.* at 40–41. Defendants rightly note that the appraisals took place months or years before or after their appraisal of Plaintiffs' home, and regardless, the other adjustments (not considering disparate home values) were $70, 70, 55, 50, and 50—hardly a massive disparity. ECF 110-1 at 38–39.

Dr. Howell's discussion of the "busy road adjustment" is a closer question. *Id.* at 34–35. Defendants' decision regarding whether to apply the adjustment shifted between the initial and revised appraisal report, as did their descriptions of the location of Plaintiffs' home. And in general, Dr. Howell found that Defendants did not consistently apply the "busy road adjustment" to houses on Northern Parkway, and where they did apply it, they did not apply the same adjustment amount consistently.

At first, Defendants did not adjust Plaintiffs' appraised value for the busy road, although their initial report noted that they suspected "a location adjustment may be necessary." ECF 110-8 at 13. They remarked in the initial report that trees on the property would block "some noise" and the property had "ample back yard space to where children can play safely." ECF 127-1 at 53. After speaking with the realtor for Comparable 1, the sole comparable located on Northern Parkway, Defendant Lanham learned that the house—which had sold in 3 days for 100% of its list price—"was listed low to account for the external obsolescence of the busy road." ECF 110-9 at 13. He revised the report to account for the location adjustment—he subtracted $50,000, or around 10%, from the value of the two Comparable homes that were not located on busy roads. ECF 110-7. This time, the report stated that the tree buffer "has only a minimal affect in mitigating the noise, and no real impact on safety." ECF 127-1 at 53.

Defendants' appraisal experts testified that the house "suffered from severe external obsolescence because it fronted on Northern Parkway, which is a four-lane thoroughfare and one of the busiest roads in Baltimore City." ECF 110-3 at 4. In other words, in their view, Defendants were right to conclude that Plaintiffs' home was on a busy road, and a location adjustment was appropriate. There is no evidence in this case that the busy road adjustment ultimately applied was improper; the undisputed evidence is to the contrary. And Dr. Howell's argument that Defendants

applied different amounts of busy road adjustments does not contradict the defense expert's finding that that Defendants consistently made 10% busy road adjustments in every neighborhood regardless of racial makeup. *See* ECF 110-29. Although it is true that Defendants did not always apply the adjustment to every house located on a busy road, they make the fair points that different locations on a road may have different levels of traffic, and where the comparables were all also on busy roads, no adjustment is required.

Ultimately, Plaintiffs do not offer evidence sufficient to create a genuine issue of material fact that Defendants' decision to apply the busy road adjustment was related to race. While Defendants changed their position on whether to apply the adjustment, speaking to a realtor in the interim is a reasonable non-discriminatory reason for that change. And Defendants were fully aware of Plaintiffs' race before their initial appraisal report, meaning that race does not explain the change in position. The only unexplained discrepancy, in this Court's view, is in Defendants' descriptions of the impact of the tree barrier. But that discrepancy is in the narrative description of Plaintiffs' home, not the portion of the appraisal where Defendants actually valued the home. Because a change in description would not have impacted the result of the appraisal, this Court cannot conclude it was "substantive" as required to establish pretext.

\*      \*      \*

In sum: Plaintiffs have shown, primarily through their expert, that Defendants had a pattern of valuing homes in 100% White neighborhoods at higher values than comparable homes in 100% non-White neighborhoods, and Defendants provided contradictory written descriptions of the location of Plaintiffs' home. But Plaintiffs have not shown that any other choice in the appraisal was inadequately explained, or a substantive departure from Defendants' ordinary practice.

Neither of those facts alone is enough to create a genuine issue of material fact as to whether the Defendants' legitimate non-discriminatory reason for the appraisal value was pretextual. Nor do they holistically raise a genuine issue as to whether the real reason for the appraisal result was discrimination. Defendants have explained, with the assistance of an appraisal expert, that they were primarily concerned with location and the condition of the houses. Plaintiffs have the burden to adduce evidence that rationale was not true. They have not done so. Plaintiffs have fallen far short of showing that these isolated, seemingly minor discrepancies would have any meaningful impact on the appraisal, much less one that evinces discriminatory intent. Most of the issues they flag as indicative of pretext are merely disputes they had with the appraisal—and for each one, either an expert has said either Defendants acted properly, or a different decision would not have altered the result.

This Court is not an appraiser, and cannot be tasked with assessing the reasonableness of a whole host of small decisions under the USPAP or standard appraising practices. Nor could jurors. An expert is necessary to explain the proper methodology for an appraisal and to assess whether the Defendants complied with industry standards. Defendants have put forth such an expert, and Plaintiffs have not. *See* ECF 110-3. This could have been a "battle of the experts" case, where jurors assess which of two expert accounts they should rely on. But with only defense experts to aid the assessment of whether highly technical decisions were suspect discrimination or ordinary judgments, a factfinder could only conclude that "the appraisal of the property [at] 209 Churchwardens Road by Mr. Lanham was complete, reasonable, factual, and well explained." ECF 110-3 at 4. This Court "is not in a position to second guess" an appraisal that was "based on legitimate, non-discriminatory rationales" according to qualified appraisers. *Causey*, 162 F.3d at 801.

Because the Plaintiffs have failed to create a genuine issue of material fact as to whether Defendants' legitimate nondiscriminatory reason was pretextual, summary judgment must be granted in Defendants' favor on all counts.

B. Counterclaims

Defendants' counterclaims for defamation and false light invasion of privacy are properly considered together under Maryland law. *Piscatelli v. Van Smith*, 35 A.3d 1140, 1146–47 (Md. 2012). Both claims require the movants to adduce facts that: (1) the speaker made a defamatory statement to another person; (2) the statement was false; (3) the speaker was at fault for making the defamatory statement; and (3) the subject of the statement was harmed. *Offen v. Brenner*, 935 A.2d 719, 723–24 (Md. 2007).

Instead of disputing those elements as this juncture, Plaintiffs instead seek summary judgment based on two privileges and First Amendment protections for statements of opinion. This Court finds the fair reporting privilege to be dispositive.

1. *Fair Reporting Privilege*

The fair reporting privilege protects "[r]eports of in-court proceedings containing defamatory material," so long as such reports "are fair and substantially correct or substantially accurate accounts of what took place." *Rosenberg v. Helinski*, 616 A.2d 886, 872 (Md. 1992); *see also Piscatelli*, 35 A.3d at 1150 ("[I]nformation in a court case file is covered by the fair reporting privilege ...."). While the fair reporting privilege is "not absolute," it is "somewhat broader in its scope than other conditional privileges." *Id.* at 1149 n.3 (quoting *Rosenberg*, 616 A.2d at 872–73). This is because the privilege "arises from the public's interest in having access to information about official proceedings and public meetings." *Id.* at 1149. A party abuses the fair reporting privilege "not upon a showing of actual malice (as with other common law conditional privileges), but when

[their] account 'fails the test of fairness and accuracy.'" *Id.* (quoting *Chesapeake Pub. Corp. v. Williams*, 661 A.2d 1169, 1175 (1995)); *see also* Restatement (Second) of Torts § 611 cmt. a. "Fairness and accuracy is satisfied when the reports are substantially correct, impartial, coherent, and bona fide." *Piscatelli*, 35 A.3d at 1149.

As this Court noted in denying Plaintiffs' motion to dismiss, fair reporting privilege may bar Defendants' counterclaims only if Plaintiffs can show there is no genuine dispute of material fact as to whether (1) Plaintiffs' statements were a fair and accurate account of the allegations in the Complaint; and (2) they did not initiate this lawsuit in bad faith. ECF 57 at 39–42. The question, essentially, is whether "the overall impression created by the summary was no more defamatory than that created by the [Complaint.]" *Rosenberg*, 616 A.2d at 876.

But a preliminary matter bears discussion—does this kind of privilege apply here? The traditional account of a "fair reporting" involves a more literal reporting of what transpired during a court proceeding. In *Rosenberg*, for example, the defendant was a trial witness who recounted his testimony to reporters on the courthouse steps. *Id.* at 670–71. The Plaintiffs in this case, by contrast, filed their lawsuit and immediately commenced a nationwide media blitz. Some of their interviews stayed true to the Complaint, reading direct passages from it and showing excerpts. But others barely mentioned the existence of a lawsuit or the Complaint, and extensively described— in quite decisive terminology—the Plaintiffs' experience with what they believed was a discriminatory appraisal. Maryland courts have not excluded any forms of out-of-court statements describing in-court proceedings from the fair reporting privilege, and this Court will not either. Defendants' contention that the privilege is limited to members of the media lacks basis. But it is a close call, and there is a fine line between reporting on a court proceeding and pursuing a media campaign that happens to cover the same contents as a lawsuit.

Plaintiffs' numerous statements to the media "were consistent with the allegations in the Complaint." ECF 127-1 at 12. The Complaint itself contains fairly inflammatory statements that in the end, Plaintiffs failed to prove. Plaintiffs' interviews repeated similar themes and allegations. Defendants point to only a few statements, and no defamatory statements, from the interviews that did not mirror the Complaint. ECF 130 at 46. Because the defamatory statements Plaintiffs repeated in their interviews were also recited in the Complaint, Plaintiffs' statements were a "fair and accurate account" of the Complaint.

And Defendants have not shown that Plaintiffs filed this lawsuit in bad faith. Although Plaintiffs' initial impressions have not been proven true, there is no evidence that Plaintiffs intentionally made false or misleading statements or pursued this lawsuit with the purpose of defaming Plaintiffs. As this Court noted previously, to show bad faith, Defendants would need to adduce facts that Plaintiffs "illegitimately fabricated or orchestrated events so as to appear in a privileged forum in the first place" and "initiated this lawsuit in bad faith to make defamatory statements while insulating themselves from liability." ECF 57 at 41 (discussing Rosenberg, 616 A.2d at 876–77). Defendants have not adduced any facts to support an inference of fabrication or bad faith.

Because Defendants cannot show that Plaintiffs acted in bad faith in filing this lawsuit, and their statements were a fair account of the Complaint, they are entitled to the fair reporting privilege, and accordingly, to summary judgment on all counterclaims.

## IV.   CONCLUSION

For the reasons stated above, summary judgment will be granted in favor of Defendants on all claims in the Amended Complaint and in favor of Plaintiffs on all counterclaims. A separate Order of Judgment follows.


Dated: July 17, 2025                                    _____/s/_____
                                                       Stephanie A. Gallagher
                                                       United States District Judge